## STATE OF CONNECTICUT *v.* TERRY D. JOHNSON
### (SC 14801)

McDonald, C. J., and Borden, Katz, Palmer, Callahan, Foti and Schaller, Js.

1

Argued October 26, 1999—officially released May 2, 2000*

* May 2, 2000, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Richard Emanuel*, with whom were *Kent Drager*, senior assistant public defender, and, on the brief, *Joseph G. Bruckmann*, public defender, for the appellant (defendant).

*Lori Welch-Rubin*, special public defender, for the appellant (defendant) on the proportionality review.

*Marjorie Allen Dauster*, assistant state's attorney, with whom, on the brief, were *Mark S. Solak*, state's attorney, *Susan C. Marks*, supervisory assistant state's attorney, *Michael E. O'Hare*, assistant state's attorney, *Toni M. Smith-Rosario*, deputy assistant state's attorney, and *Harry Weller*, senior assistant state's attorney, for the appellee (state).

*Timothy J. Sugrue*, senior assistant state's attorney, for the appellee (state) on the proportionality review.

*Opinion*

KATZ, J. The defendant, Terry D. Johnson, was charged with: one count of murder and felony murder in violation of General Statutes §§ 53a-54a and 53a-54c;[1] one count of capital felony murder of a member of the division of state police, while the officer was acting within the scope of his duties, in violation of General

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

Because murder and felony murder are contained in separate statutes; General Statutes §§ 53a-54a and 53a-54c; the two crimes could have been charged in separate counts of the information. The information in the present case, however, charged the defendant with murder and felony murder in a single count.

Statutes (Rev. to 1991) § 53a-54b (1)[2] and §§ 53a-54a (a) and (c) and 53a-54c; one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and (2);[3] one count of larceny in the third degree for the taking of property with a value in excess of one thousand dollars in violation of General Statutes §§ 53a-119 and 53a-124 (a) (2);[4] and twenty counts of stealing a firearm in violation of General Statutes § 53a-212,[5] arising out of the shooting death of Connecticut State Trooper Russell Bagshaw during the commission of a burglary of a sporting goods store in North Windham.

[2] General Statutes (Rev. to 1991) § 53a-54b provides in relevant part: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or any fireman . . . while such victim was acting within the scope of his duties . . . ."

Unless otherwise indicated, references hereinafter to § 53a-54b are to the 1991 revision.

[3] General Statutes § 53a-101 (a) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[4] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

[5] General Statutes § 53a-212 provides: "(a) A person is guilty of stealing a firearm when, with intent to deprive another of his firearm or to appropriate the same to himself or a third party, he wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3.

"(b) Stealing a firearm is a class D felony."

The defendant pleaded guilty to murder/felony murder, capital felony and burglary, before a three judge panel, *Corrigan, Spada* and *Potter, Js.* (trial court), admitting to the following facts. During the early morning hours of June 5, 1991, the defendant and his brother, Duane Johnson, broke into the Land and Sea Sports Center (Land and Sea) in North Windham. The defendant entered the building through a small window and removed several weapons and boxes of ammunition from the Land and Sea by passing them through the window to Duane. The defendant loaded a semiautomatic nine millimeter pistol and passed that weapon through the window to Duane as well. During the course of the break-in, Bagshaw, who was on routine patrol in the vicinity, drove his cruiser into the parking lot of the Land and Sea. Duane saw Bagshaw's cruiser approaching and warned the defendant. The defendant exited the Land and Sea through the window by which he had entered. The defendant, armed with the semiautomatic nine millimeter pistol, then proceeded to wait near the building. As Bagshaw's cruiser approached the Land and Sea, the defendant began shooting at the cruiser. One of the bullets fired by the defendant hit Bagshaw, fatally wounding him. The defendant and Duane then fled the scene.

After the defendant's guilty plea, a separate sentencing hearing was conducted pursuant to General Statutes (Rev. to 1991) § 53a-46a[6] by the trial court. At the conclu-

[6] General Statutes (Rev. to 1991) § 53a-46a provides in relevant part: "Hearing on imposition of death penalty. Aggravating and mitigating factors. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impan-

## sion of the sentencing phase of the trial, the jury found

eled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall he governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered

an aggravating factor and no mitigating factor. In accordance with the jury's findings, the trial court rendered a judgment of guilty of capital felony and imposed the death penalty on the defendant. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) and General Statutes (Rev. to 1991) § 53a-46b.[7] We

concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ."

The legislature repealed § 53a-46a and replaced it with a new death penalty statute, effective October 1, 1995, pursuant to Public Acts 1995, No. 95-19, § 1. Unless otherwise indicated, all references hereinafter to our death penalty statute are to the 1991 revision of § 53a-46a, the revision in effect at the time of the commission of the offenses here.

[7] General Statutes § 51-199 provides: "Jurisdiction. (a) The Supreme Court shall have final and conclusive jurisdiction of all matters brought before it according to law, and may carry into execution all its judgments and decrees and institute rules of practice and procedure as to matters before it.

"(b) The following matters shall be taken directly to the Supreme Court: (1) Any matter brought pursuant to the original jurisdiction of the Supreme Court under section 2 of article sixteen of the amendments to the Constitution; (2) an appeal in any matter where the Superior Court declares invalid a state statute or a provision of the state Constitution; (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years; (4) review of a sentence of death pursuant to section 53a-46b; (5) any election or primary dispute brought to the Supreme Court pursuant to section 9-323 or section 9-325; (6) an appeal of any reprimand or censure of a probate judge, pursuant to section 45a-65; (7) any matter regarding judicial removal or suspension pursuant to section 51-51j; (8) an appeal of any decision of the

affirm the judgment of conviction on all counts. Because we conclude, however, that there was insufficient evidence of the existence of an aggravating factor, we reverse the judgment with respect to the imposition of the death penalty and remand the case with direction to impose a life sentence without the possibility of release.

The defendant raises twenty-eight issues on appeal. Because we reverse the judgment imposing the death penalty, we need decide only five of those issues: three addressed to the defendant's guilty plea, one challenging the sufficiency of the evidence of the aggravating

Judicial Review Council pursuant to section 51-51r; (9) any matter brought to the Supreme Court pursuant to section 52-265a; (10) writs of error, pursuant to section 52-272; and (11) any other matter as provided by law.

"(c) The Supreme Court may transfer to itself a cause in the Appellate Court. Except for any matter brought pursuant to its original jurisdiction under section 2 of article sixteen of the amendments to the Constitution, the Supreme Court may transfer a cause or class of causes from itself, including any cause or class of causes pending on July 1, 1983, to the Appellate Court. The court to which a cause is transferred has jurisdiction."

General Statutes (Rev. to 1991) § 53a-46b provides: "Review of death sentence. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and if taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

Unless otherwise indicated, references hereinafter to § 53a-46b are to the 1991 revision.

factor and one contesting the propriety of the probable cause hearing.[8]

---

[8] The issues that we do not need to decide are essentially as follows: (1) Did the special verdict form on mitigating factors and the trial court's instructions allow the jury to return a verdict finding that the defendant failed to prove the existence of a mitigating factor without unanimously rejecting each mitigating factor claimed by the defense?

(2) Did the trial court properly instruct the jury regarding the § 53a-46a (h) (4) aggravating factor?

(3) Did the trial court properly admit evidence relating to the underlying burglary and the defendant's background and history?

(4) Did the trial court properly deny the defendant's motion to suppress certain statements made by the defendant to a correction officer?

(5) Did the trial court improperly allow the state to include within its allegation of capital felony the alternative allegation that this crime was committed by the felony murder of a police officer, in addition to the predicate felony of intentional murder?

(6) Did the trial court properly instruct the jury that it could find the existence of an aggravating factor based upon a theory that was neither argued by the state nor supported by the evidence?

(7) Did the trial court properly instruct the jury on its role as sentencer?

(8) Did the trial court properly decline to instruct the jury that it could find the existence of a mitigating factor if it determined that death was not the appropriate sentence?

(9) Did the trial court properly instruct the jury that it could consider the defendant's guilty plea as a mitigating factor if it determined that the plea was motivated by "rehabilitation or sorrow"?

(10) Did the trial court's instructions adequately distinguish between statutory and nonstatutory mitigating factors?

(11) Did the trial court's instructions properly require the defendant to prove not only the factual basis of his claimed nonstatutory mitigating factors, but also that they were mitigating in nature?

(12) Did the trial court properly decline to provide the jury with a special verdict form that required the jury to indicate, for each claimed nonstatutory mitigating factor, first, whether any of the jurors found the factual basis of the factor and, second, whether those jurors who found the factor to be proven factually also found the factor to be mitigating in nature?

(13) Did the trial court properly instruct the jury on the meaning of the alternative sentence of life imprisonment without the possibility of release?

(14) Did the trial court's instructions to the jury regarding the nonstatutory mitigating factors adequately explain the meaning and importance of the "any other," or catchall, mitigating factor?

(15) Did the trial court properly decline to instruct the jury to consider the cumulative impact of all the mitigating evidence presented before rendering a verdict on mitigation?

## I

We first address the defendant's claim that the trial court improperly denied his motions for a competency examination, pursuant to General Statutes (Rev. to 1991) § 54-56d,[9] thereby depriving him of his right to due

(16) Did the trial court properly decline to instruct the jury that it could consider mercy itself as a mitigating factor?

(17) Did the trial court properly limit the defendant's cross-examination of the state's rebuttal witnesses?

(18) Was sufficient evidence presented to establish the existence of a mitigating factor?

(19) Did the trial court properly deny the defendant's motion for a change of venue in the absence of an evidentiary hearing?

(20) Did the trial court properly deny the defendant's motion for a new penalty phase hearing without holding an evidentiary hearing or otherwise investigating the defendant's claims, based on posttrial statements of two jurors?

(21) Pursuant to this court's mandatory death sentence review under § 53a-46b, should the defendant's death sentence be affirmed where he claims that the sentence was the product of passion, prejudice and other arbitrary factors?

(22) Is Connecticut's death penalty statute unconstitutional?

[9] General Statutes (Rev. to 1991) § 54-56d provides in relevant part: "Competency to stand trial. (a) Competency required. Definition. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) Presumption of competency. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by clear and convincing evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) Examination of defendant. Report. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the superior court, there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. The court either may appoint one or more physicians specializing in psychiatry to examine the defendant or it may order the commissioner of mental health to conduct the examination either by a clinical team consisting of a

process of law under the United States and Connecticut constitutions.[10] Although we agree that the trial court applied an incorrect evidentiary standard to the defen-

physician specializing in psychiatry, a clinical psychologist and a psychiatric social worker, or by one or more physicians specializing in psychiatry. If the commissioner of mental health is ordered to conduct the examination, he shall select the members of the clinical team or the physician or physicians. If the examiners determine that the defendant is not competent, they shall then determine whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order under this section. The court may authorize a physician specializing in psychiatry, a clinical psychologist or a psychiatric social worker selected by the defendant to observe the examination. Counsel for the defendant may observe the examination. The examination shall be completed within fifteen days from the date it was ordered. The examiner or examiners shall prepare and sign, without notarization, a written report and file it with the court within ten days of the completion of the examination. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant.

"(e) Hearing. The court shall hold a hearing as to the competency of the defendant no later than ten days after it receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners must be present to testify as to the determinations in the report, unless his presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and his counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent.

"(f) Court finding of competency or incompetency. If the court, after the hearing, finds that the defendant is competent, it shall continue with the criminal proceedings. If it finds that the defendant is not competent, it shall also find whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order permitted under this section. . . ."

Unless otherwise indicated references hereinafter to § 54-56d are to the 1991 revision.

[10] Specifically, the defendant claims a violation of his due process rights under the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut.

The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

The sixth amendment to the United States constitution provides in relevant

dant's requests for a competency hearing, we conclude that any impropriety did not deprive the defendant of his due process rights. Accordingly, the failure to order a competency hearing was not harmful.

The record reveals the following relevant facts. The guilt phase of the defendant's trial commenced on December 10, 1992, before the trial court. At the start of the proceedings, defense counsel moved for a competency examination of the defendant, pursuant to § 54-56d (c), citing, as the basis of the motion, a letter received from David M. Mantell, a clinical psychologist hired by the defense, which raised concerns about the defendant's mental competence. The relevant portions of Mantell's December 9, 1992 letter provided: "During my first examination of [the defendant] on [November 25, 1992] but particularly during [further examination] this morning and this afternoon, I have found symptomatic evidence of psychotic thought process which, if validated, may severely impact on [his] present legal competence." Defense counsel argued that these concerns required the trial court to halt the guilt phase of the proceedings until completion of a competency examination and determination.

The trial court denied the defendant's motion for a competency examination, citing the adequacy of a

part: "In all criminal prosecutions, the accused shall enjoy the right to . . . be informed of the nature and cause of the accusation . . . ."

Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

Article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

The defendant has not provided an independent analysis of his state constitutional claims. Accordingly, we do not address those claims. See, e.g., *State* v. *Pinder*, 250 Conn. 385, 429 n.4, 736 A.2d 857 (1999).

canvass conducted by one member of the trial court, *Corrigan, J.*, during the October 22, 1992 hearing, at which Judge Corrigan granted the defendant's motion to change his election from a jury trial to a trial by a three judge panel pursuant to General Statutes § 54-82 (b).[11] The trial court explained that during that hearing, Judge Corrigan had found the defendant competent as a result of that canvass, and the trial court further concluded that Mantell's letter did not change that prior determination of competency. The trial court then explained its understanding of the evidentiary burden required for a hearing pursuant to § 54-56d, stating: "By virtue of subsection (b) of [§ 54-56d], a defendant is presumed to be competent and Doctor Mantell's letter does not indicate he is not competent. The burden provided by subsection (b) is that the burden rests upon the defendant to prove by clear and convincing evidence that he is [incompetent]. So at a time when you have such evidence to produce, the court will hear you." When the defendant then offered to produce Mantell to testify, the trial court explained that even Mantell's opinion as set forth in his letter would be insufficient to establish incompetency.

Immediately after the court's ruling on the defendant's motion for a competency examination, the defendant pleaded guilty.[12] Before accepting the defendant's

[11] General Statutes § 54-82 (b) provides: "If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

[12] The defendant pleaded guilty to counts one through three of the amended information. Count one charged the defendant with murder in violation of § 53a-54a, and felony murder in violation of § 53a-54c. Count two charged him with capital felony in violation of §§ 53a-54b (1), 53a-54a (a) and (c), and 53a-54c. Count three charged him with burglary in the first degree in violation of § 53a-101 (a) (1) and (2).

plea, the trial court conducted a lengthy examination of the defendant pursuant to Practice Book §§ 39-19 and 39-20, formerly §§ 711 and 712.[13] The court questioned the defendant extensively regarding his understanding of the specific charges against him, the penalties he faced and the factual basis of his plea. In response to many of the court's inquiries, the defendant stated that he had "reviewed that with my attorneys and I stand by my plea of guilty as to that point."

At the conclusion of the canvass, the trial court asked both the state and defense counsel whether they wanted the court to include any additional questions in the canvass. The state requested that the court ask the

[13] Practice Book § 39-19, formerly § 711, provides: "—Acceptance of Plea; Advice to Defendant

"The judicial authority shall not accept the plea without first addressing the defendant personally and determining that he or she fully understands:

"(1) The nature of the charge to which the plea is offered;

"(2) The mandatory minimum sentence, if any;

"(3) The fact that the statute for the particular offense does not permit the sentence to be suspended;

"(4) The maximum possible sentence on the charge, including, if there are several charges, the maximum sentence possible from consecutive sentences and including, when applicable, the fact that a different or additional punishment may be authorized by reason of a previous conviction; and

"(5) The fact that he or she has the right to plead not guilty or to persist in that plea if it has already been made, and the fact that he or she has the right to be tried by a jury or a judge and that at that trial the defendant has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him or her, and the right not to be compelled to incriminate himself or herself."

Practice Book § 39-20, formerly § 712, provides: "—Ensuring That the Plea is Voluntary

"The judicial authority shall not accept a plea of guilty or nolo contendere without first determining, by addressing the defendant personally in open court, that the plea is voluntary and is not the result of force or threats or of promises apart from a plea agreement. The judicial authority shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the prosecuting authority and the defendant or his or her counsel."

See footnotes 37, 41 and 47 of this opinion for a recitation of the relevant portions of the plea canvass.

defendant whether he was under the influence of any medication or alcohol. The trial court responded that it had already asked the question at the beginning of the canvass.[14] Neither the state nor defense counsel requested that the trial court ask the defendant any additional questions. The trial court subsequently accepted the defendant's guilty plea, stating: "The court finds that the plea of guilty to the three offenses has been made knowingly, intelligently and voluntarily, with full understanding of the crimes charged, their possible penalties and the consequences of such a plea, and after adequate advice and assistance of counsel."

Defense counsel also moved for a competency examination on two subsequent occasions. On March 3, 1993, during argument on the state's motion to change psychiatrists, defense counsel noted that the defendant had declined to come to court that day and expressed concern regarding the defendant's medications and demeanor. Relying on these observations, defense counsel moved for a competency evaluation for the second time.[15] The trial court denied that motion, citing

---

[14] The defendant notes in his brief that the trial court previously asked only about "drugs and alcohol," but not medications. We do not find this difference to be dispositive. See footnote 27 of this opinion.

[15] Defense counsel stated: "And we intend, either today or tomorrow, to move the court for a competency evaluation. We have had personal communication with the attending psychiatrist . . . concerning medications administered to the defendant . . . . And at this point we are reporting to the court that we do have a concern that we believe is legitimate and well founded as to the competence of [the defendant] to proceed with this trial at the present time. We would report to the court that his refusal to partake of the proceedings today was a heretofore unexpected event and one which had not happened previously . . . . [W]e are aware that another psychiatrist increased [the defendant's] medications over the weekend. . . . [My cocounsel] and I have both noted a change in our client's demeanor in the courtroom over the last I would say five days, Your Honor. And we don't believe we should comment on that any further because of our concern for the attorney/client privilege—but we do report to the court that we have noted a change in demeanor, Your Honor. We feel that given the seriousness and importance of this proceeding . . . that a motion to evaluate [the defendant's] legal competence should be granted, Your Honor, for the grounds presented. That is that we have a good faith belief that something—some

its earlier denial on December 10, 1992, of the same request. The trial court also reiterated its understanding of § 54-56d.[16] Additionally, the trial court noted that, although the defendant's behavior sometimes seemed inappropriate, the defendant appeared to have a good relationship with defense counsel and had behaved appropriately during the previous day's proceedings.

Defense counsel asserted that the trial court had incorrectly stated the evidentiary burden contained in § 54-56d. Defense counsel argued that the clear and convincing standard, cited by the court, did not apply to a *request* for a competency hearing but, rather, applied only at a later stage when *proving* the defendant's incompetence. Other than noting the defendant's exception, the trial court did not respond to these arguments.

When the proceedings resumed the following day, the trial court noted the defendant's absence. Defense counsel explained that the defendant was upset and again had declined to attend the proceedings. Additionally, defense counsel reiterated their concerns regarding the defendant's mental state and again requested a competency evaluation.[17] The trial court denied the

change has occurred in him which at this point could be affecting his legal competence."

[16] The trial court stated: "[T]he court is still guided by the requirements of § 54-56d with particular reference to [subsection (b)], which is that [the defendant's] competency is presumed and the one asking for such examination must show by clear and convincing evidence the need for such examination." Additionally, the court explained that "to respond to [defense counsel's] comments that there has been no observation by the court to warrant the court, on its own motion, to have [the defendant] examined for competency . . . that the court is still going to require clear and convincing evidence before it does."

[17] Defense counsel informed the court that the defendant's physicians in prison had changed his medications, and that at least one physician had recommended a review of those medications. Additionally, defense counsel explained that the defendant was upset because he had not been seen by a physician and had not been served lunch that day as defense counsel had assured him he would. Defense counsel stated: "In our opinion . . . his mood has changed dramatically. Yesterday, although there was some diffi-

defendant's motion but postponed voir dire proceedings in order to give the state's psychiatrist an opportunity to examine the defendant.[18] The trial court, in a mittimus accompanying the defendant back to the department of correction, also noted defense counsel's concerns and indicated that the defendant's physicians should more closely monitor his medications. After a brief recess during which the defendant again declined to attend the day's proceedings, the trial court found that the defendant had waived his presence for the day.

Several days later, on March 9, 1993, defense counsel again raised the issue of the defendant's mental competence. During argument on the state's motions for disclosure and production, defense counsel repeated their concerns about the defendant's medications and his resulting mental state.[19] Defense counsel explained that

culty, today he has refused to come up completely. His refusal to cooperate with his attorneys . . . may be due to his medication. I think that he may . . . be unable to assist because of medication. We have found dramatic change in him over the last four or five days, but most importantly since Monday when [a prison physician] did report that over the weekend that [the defendant's] medication level was almost double . . . . We find . . . that under § 54-56d the defendant must be . . . able to understand the proceedings against him and assist counsel in his defense. He is no longer able to assist counsel in his defense, Your Honor. On that basis, I would request that examination under § 54-56d . . . ."

[18] The trial court stated that "[b]y virtue of what I indicated yesterday, I noted from time to time the presence of the defendant in the courtroom and I have indicated on the record yesterday my reluctance to order a § 54-56d without some knowledge of his being incompetent. I have not observed him being less than competent. Without further evidence I would not order a competency exam. I will, however, [accede] to the fact that the defendant is upset with you and perhaps this can be righted by having the proceedings delayed until Tuesday after the promised examination by [a prison physician]."

[19] Defense counsel stated: "[W]e continue to be concerned about the competency of our own client. We have learned . . . that as a result of the mittimus issued in this court, all medication . . . was halted on Thursday. No medication, again, was given until last night. And it's my understanding that the . . . treating psychiatrist was exceedingly upset that the medication was stopped. He had not seen [the defendant]. He didn't discontinue his medication. It was stopped by the jail somehow, in the dispensary, based

the defendant had not received medication for a period of four days, and that the court's order of March 4, 1993, for an evaluation of the defendant's medication, had not been carried out. Defense counsel, however, did not move for a competency examination under § 54-56d.

The defendant argues that the trial court's denial of his motions for a competency hearing deprived him of his due process rights under the state and federal constitutions and his rights pursuant to § 54-56d. The defendant contends that, procedurally, the trial court improperly applied a clear and convincing evidentiary standard to the defendant's requests for a competency hearing pursuant to § 54-56d. Additionally, the defendant claims that the trial court deprived him of his substantive due process rights because defense counsel had presented substantial evidence that the defendant was incompetent to stand trial.[20]

The state agrees, in both its brief and at oral argument, that the trial court incorrectly required clear and convincing proof of incompetency as a prerequisite to granting a competency hearing. The state asserts, however, that despite this impropriety, the defendant presented insufficient evidence of incompetency, and that the trial court's subsequent canvass of the defendant

upon the mittimus. Obviously, Your Honor, in giving that order—that's not what the mittimus said. It said that the psychiatrist should look at—should evaluate. There was no evaluation. Totally different medication of much stronger prescription should be given—had been given I should say. And there has been some discussion by the treating psychiatrist . . . that even the medication given is not sufficient and it would require medication that is not possible to prescribe at that facility."

[20] The defendant claims that if we conclude that the trial court improperly denied his first motion for a competency evaluation, we should invalidate his subsequent guilty plea and capital felony conviction. Alternatively, the defendant contends that, if we find that the trial court properly denied his first request for a competency evaluation but should have granted a subsequent request, we should invalidate his sentence of death because, although he had already pleaded guilty, the penalty was imposed while the defendant was not competent.

regarding his guilty plea cured any harm resulting from the trial court's misapplication of § 54-56d. We agree with the state that the trial court's misapplication of § 54-56d did not harm the defendant.

We begin with the undisputed principle that the guilty plea and subsequent conviction of "an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)."[21] (Internal quotation marks omitted.) *State* v. *Garcia*, 233 Conn. 44, 67, 658 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996); accord *Cooper* v. *Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996); *State* v. *Wolff*, 237 Conn. 633, 662, 678 A.2d 1369 (1996); *Gold* v. *Warden*, 222 Conn. 312, 313 n.3, 610 A.2d 1153 (1992). Connecticut jealously guards this right.[22] Therefore, "[t]his constitutional mandate is codified in . . . § 54-56d (a), which provides that [a] defendant shall not be tried, convicted or sentenced while he is not competent." (Internal quotation marks omitted.) *State* v. *Garcia*, supra, 67.

"[A] defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense." General Statutes (Rev. to 1991) § 54-56d (a). This statutory definition mirrors the federal

---

[21] The constitutional principle prohibiting the criminal trial of incompetent defendants has deep roots in the common law. See *Cooper* v. *Oklahoma*, 517 U.S. 348, 356–58, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) (discussing common-law prohibition); see also note, "Competence to Plead Guilty: A New Standard," 1974 Duke L.J. 149, 151–52.

[22] The United States Supreme Court has concluded that other states' statutes, containing protections similar to those found in § 54-56d, jealously guard the right of an incompetent defendant not to stand trial. See *Drope* v. *Missouri*, 420 U.S. 162, 173, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (Missouri "jealously guards" this right); *Pate* v. *Robinson*, supra, 383 U.S. 385 ("Illinois jealously guards this right").

competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency "must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) Id.; see also *Drope* v. *Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 205 Conn. 673, 686–87, 535 A.2d 345 (1987).

Although § 54-56d (b) presumes the competency of defendants, "when a reasonable doubt concerning the defendant's competency is raised, the trial court must order a competency examination." *State* v. *Wolff*, supra, 237 Conn. 666. Thus, "[a]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. *Sanders* v. *United States*, 373 U.S. 1, 21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963). Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . *Moore* v. *United States*, 464 F.2d 663, 666 (9th Cir. 1972). *State* v. *Watson*, [198 Conn. 598, 605, 504 A.2d 497 (1986)]; see *Pate* v. *Robinson*, [supra, 383 U.S.

385]; *de Kaplany* v. *Enomoto*, 540 F.2d 975, 982–83 (9th Cir. 1976), cert. denied, 429 U.S. 1075, 97 S. Ct. 815, 50 L. Ed. 2d 793 (1977); *People* v. *Pennington*, 66 Cal. 2d 508, 518, 426 P.2d 942, 58 Cal. Rptr. 374 (1967). The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion. *United States* v. *Hall*, 523 F.2d 665, 667 (2d Cir. 1975); *Riccardi* v. *United States*, 428 F. Sup. 1059, 1064–65 (E.D.N.Y.), aff'd, 573 F.2d 1294 (2d Cir. 1977)." (Internal quotation marks omitted.) *State* v. *DesLaurier*, 230 Conn. 572, 585–86, 646 A.2d 108 (1994).

A

We first examine the defendant's claim that the trial court improperly required clear and convincing evidence of incompetency before granting an examination under § 54-56d. We agree with the defendant and the state that the trial court evaluated the defendant's requests for a competency hearing under an incorrect standard and, under the appropriate standard, should have granted the defendant's motions for a competency evaluation.[23]

Section 54-56d establishes the procedural requirements for competency determinations. A court may undertake a competency examination upon a motion by the defendant or the state and in some circumstances must evaluate the defendant's competency sua sponte. General Statutes (Rev. to 1991) § 54-56d (c); see *Pate* v. *Robinson*, supra, 383 U.S. 385 (court must initiate hearing when aware of facts creating reasonable doubt as to defendant's competence); *State* v. *Gonzalez*, supra, 205 Conn. 686 (" 'independent judicial inquiry' " required in some circumstances). "If the court finds

---

[23] Our review of whether the trial court properly interpreted § 54-56d is plenary. See *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995).

that the request for an examination is *justified* and that . . . there is probable cause to believe that the defendant has committed the crime for which he is charged, the court *shall order* an examination of the defendant as to his competency. . . ." (Emphasis added.) General Statutes (Rev. to 1991) § 54-56d (d). "[A] trial court must order a competency hearing at any time that facts arise to raise a reasonable doubt about the defendant's competency to continue with the trial." *State* v. *DesLaurier*, supra, 230 Conn. 589–90 n.12. Once the court grants a motion for a competency examination, the burden rests on the moving party to prove "that the defendant is not competent by clear and convincing evidence . . . ." General Statutes (Rev. to 1991) § 54-56d (b).[24]

Although we agree that generally the discretion to grant a competency hearing lies with the trial court; *State* v. *Wolff*, supra, 237 Conn. 664 (decision to grant competency hearing requires exercise of sound judicial discretion); we conclude that, in the present case, the trial court improperly required the defendant to provide clear and convincing evidence of incompetency in his motion for a competency evaluation. Additionally,

---

[24] We note that the clear and convincing evidentiary standard cited by the trial court here no longer applies to a moving party's burden of proving incompetency to stand trial. Although the clear and convincing standard existed in the 1991 revision of § 54-56d in effect at the time of the relevant proceedings, the United States Supreme Court has since held that standard unconstitutional. The court, in *Cooper* v. *Oklahoma*, supra, 517 U.S. 369, ruled that requiring a defendant to prove incompetency by clear and convincing evidence impermissibly burdened the defendant's due process rights. Accordingly, in 1996, the Connecticut General Assembly replaced the clear and convincing standard with the preponderance of the evidence standard currently contained in § 54-56d. See Public Acts 1996, No. 96-215. In commenting upon Senate Bill No. 295, which changed the language in § 54-56d, Senator Thomas F. Upson explained that the recent decision in *Cooper* necessitated the change from a standard of clear and convincing evidence to that of a preponderance of the evidence. Senator Upson also noted that, at that time, Connecticut was one of only four states with the clear and convincing standard. 39 S. Proc., Pt. 9, 1996 Sess., pp. 3047–50.

because the evidence proffered by the defendant raised a reasonable doubt as to the defendant's competency, a competency examination was justified in this case.

In denying the defendant's initial motion for a competency evaluation, the trial court stated that "[t]he burden provided by subsection (b) [of § 54-56d] is that the burden rests upon the defendant to prove by clear and convincing evidence that he is not competent." The trial court, however, applied subsection (b) of the statute at the incorrect time in the proceedings and thereby inaccurately stated the evidentiary burden required to satisfy subsection (d).

Section 54-56d (b), which provides the standard that a moving party must meet for proof of incompetency, applies only after a trial court has granted a motion for a competency evaluation or has undertaken an evaluation sua sponte. In deciding whether to grant a motion for a competency examination, the trial court is governed by the provisions contained in subsections (c) and (d) of § 54-56d. Far from requiring a moving party initially to provide clear and convincing evidence of the defendant's incompetency, these provisions state that if it "appears" that the defendant is not competent, and if the trial court finds that a request for a competency evaluation is "justified," the court must order a competency examination. We have interpreted this standard as requiring a competency evaluation any time a reasonable doubt is raised regarding the defendant's competency. See *State* v. *DesLaurier*, supra, 230 Conn. 589–90 n.12.

Essentially, in denying the defendant's request for a competency evaluation, the trial court would have had to conclude that no reasonable doubt existed regarding the defendant's competency. Our review of the record reveals that Mantell's letter and defense counsel's concerns about the defendant's demeanor and medications

provided sufficient justification for the trial court to have granted a competency evaluation. The trial court, therefore, improperly denied the defendant's motions for a competency evaluation based on its determination that there was not clear and convincing evidence of the defendant's incompetency. We conclude that defense counsel's assertions raised a reasonable doubt as to the defendant's competency and, therefore, that the trial court should have ordered a competency evaluation.

B

Having determined that the trial court improperly denied the defendant's motions for a competency examination, we next address whether that denial deprived the defendant of substantive due process because he was incompetent to stand trial. Because we conclude that in accepting the defendant's guilty plea, the trial court implicitly found him competent, and because our own review of the record demonstrates that this finding was not an abuse of discretion, the trial court's failure to provide a competency evaluation did not deprive the defendant of due process under the state or federal constitutions. Accordingly, we conclude that the impropriety of the trial court's failure to order a competency evaluation was harmless.

The following facts are relevant to our discussion of this issue. Immediately following the defendant's first motion for a competency evaluation, the trial court conducted a canvass of the defendant for purposes of his guilty plea. The trial court's canvass consisted of detailed questions contained in approximately thirty pages of the printed transcript. The trial court questioned the defendant extensively regarding his understanding of the charges against him, his comprehension of the potential penalties he faced by pleading guilty, the constitutional rights he waived by pleading guilty, and whether he made the plea voluntarily and free from

coercion. The defendant indicated in response to each question that he had discussed the issue with counsel and wished to plead guilty. Additionally, the trial court asked the defendant whether he had taken any drugs or alcohol in the previous forty-eight hours. The defendant responded in the negative.

The United States Supreme Court in *Godinez* v. *Moran*, 509 U.S. 389, 399, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), established that, for federal constitutional purposes, the standard of competency required to stand trial is the same as the degree of competency required to plead guilty or to waive the right to counsel.[25] This court also has recognized that the competency standards for standing trial and other parts of a criminal proceeding are equivalent. *State* v. *Day*, 233 Conn. 813, 825, 661 A.2d 539 (1995) (same competency standard applies to ability to stand trial as to waiving right to counsel). In *Day*, we interpreted the court's decision in *Godinez* as establishing that "any criminal defendant who has been found competent to stand trial, ipso facto, is competent to waive the right to counsel as a matter of federal constitutional law." Id., 824. Furthermore, we explained that although states may require a higher degree of competency than the standard outlined in *Dusky* v. *United States*, supra, 362 U.S. 403, "[w]hatever standard is employed . . . must be applied equally at the various stages of a trial to pass constitutional muster." *State* v. *Day*, supra, 824.

Additionally, prior to *Godinez*, in *Myers* v. *Manson*, 192 Conn. 383, 389–90, 472 A.2d 759 (1984), this court

---

[25] Prior to the decision in *Godinez*, courts disagreed about whether certain aspects of the criminal proceeding required higher levels of competency. See *State* v. *Day*, 233 Conn. 813, 825 n.8, 661 A.2d 539 (1995); *Myers* v. *Manson*, 192 Conn. 383, 390–91, 472 A.2d 759 (1984). In particular, the Ninth Circuit Court of Appeals had held that a guilty plea required a higher degree of competency than that required for a defendant to stand trial. See *Chavez* v. *United States*, 641 F.2d 1253, 1259–60 (9th Cir. 1981); *Sieling* v. *Eyman*, 478 F.2d 211, 214–15 (9th Cir. 1973).

rejected a defendant's claim that a higher competency standard applied to his guilty plea than to the determination of his ability to stand trial. In *Myers*, the court concluded that the trial court's canvass of the defendant prior to accepting his guilty plea demonstrated the defendant's competency. Id., 389–91. The court explained that "[i]mplicit in the scrutiny of the plea at the trial level and on appeal is an inquiry into whether the defendant was competent to plead. . . . Hence, the trial court's acceptance of the plea after a thorough inquiry . . . implies that the [defendant] was competent to enter that plea." (Citations omitted.) Id., 390; see also *State* v. *Watson*, supra, 198 Conn. 604.

In the present case, the canvass of the defendant amply supports the trial court's finding that the defendant was competent to plead guilty.[26] See *State* v. *Wolff*, supra, 237 Conn. 665–66 (defendant's responses during canvass supported finding of competency to waive right to counsel); *State* v. *Watson*, supra, 198 Conn. 606–607 (trial court's canvass supported finding of competency to plead guilty); *Myers* v. *Manson*, supra, 192 Conn. 390–91 (canvass supported habeas court's conclusion that defendant was competent). Throughout the canvass the defendant demonstrated his clear understanding of the charges against him and the implications of

[26] Unlike the first part of this claim addressed to the trial court's interpretation of § 54-56d; see part I A of this opinion; we review the trial court's determination of competency to plead guilty under an abuse of discretion standard. Essentially, we examine the relevant record to determine whether the trial court reasonably could have concluded that the defendant was competent to plead guilty. In doing so, we give deference to the trial court's findings of fact because the trial court has the benefit of firsthand review of the defendant's demeanor and responses during the canvass. See *State* v. *Wolff*, supra, 237 Conn. 665 (trial court did not abuse discretion in denying competency hearing); *State* v. *DesLaurier*, supra, 230 Conn. 586 (reviewing denial of competency hearing under abuse of discretion standard).

his guilty plea.[27] The defendant provided appropriate and coherent responses to the court's questions and indicated that he had consulted with defense counsel regarding the various aspects of his guilty plea.[28] See *State* v. *Janice*, 20 Conn. App. 212, 214, 565 A.2d 553, cert. denied, 213 Conn. 811, 568 A.2d 795 (1989) ("intelligent and articulate dialogue" with judge demonstrated defendant's competency). Furthermore, the defendant paused repeatedly during the lengthy canvass to consult with counsel before answering specific questions. Thus, the record of the canvass establishes that the defendant comprehended the proceedings and was able to consult with and assist counsel in the presentation of his case. Accordingly, the defendant was competent to plead guilty.

Applying the *Godinez* principles to the present case, the same measure of competency applied at the time

---

[27] The defendant claims on appeal that his uncertainty regarding the penalty for intentional murder versus the penalty for felony murder and his lack of knowledge that a guilty plea constituted a waiver of all nonjurisdictional defects, demonstrated his incompetence. We recognize that these are difficult and complex legal concepts. The defendant, however, simply expressed the confusion that any layperson experiences in attempting to understand fully these issues. The trial court's careful review of these topics with the defendant, combined with the fact that the defendant was represented by counsel, effectively eliminated any legitimate concern.

The defendant also points to the fact that he was taking medication as evidence of his incompetency. The fact that he was receiving medication did not automatically render him incompetent. See *State* v. *Gonzalez*, supra, 205 Conn. 688 (antipsychotic drugs did not render defendant incompetent); *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986) (medication does not render defendant incompetent). Indeed, we have found that even mental illness or the use of illegal drugs does not invariably render a defendant incompetent. See *State* v. *DeAngelis*, supra, 230 (defendant may be mentally ill yet competent to stand trial); *State* v. *Lloyd*, 199 Conn. 359, 363, 507 A.2d 992 (1986) (allegations of cocaine use did not entitle defendant to competency hearing). Additionally, we note that in the present case the state, not defense counsel, asked the court to inquire about the defendant's medications.

[28] See footnotes 37, 41 and 47 of this opinion for examples of the defendant's dialogue with the trial court during his guilty plea canvass.

that the trial court denied the defendant's first motion for a competency evaluation as to his guilty plea entered immediately thereafter. Thus, the trial court's extensive canvass of the defendant, prior to accepting his guilty plea, necessarily included a determination that the defendant was competent. See *State* v. *Vane*, 322 A.2d 58, 61 (Me. 1974) (explaining that finding that plea is voluntary and intelligent after extensive canvass "subsumes and definitively determines that the plea was made by a competent defendant"). Because the same competency standard applied to both determinations and because the canvass occurred immediately after defense counsel raised the issue of competency, implicit in the trial court's conclusion that the defendant was competent to plead guilty is its finding that the defendant was also competent to stand trial.

## C

The defendant also argues that the trial court's denial of his two subsequent motions for a competency examination and its failure to order a competency examination sua sponte when defense counsel raised the issue on a fourth occasion deprived him of due process because he was incompetent to stand trial. We conclude that the defendant was competent to stand trial on those later occasions.

As explained previously, the defendant was competent when he pleaded guilty. Less than three months passed between the defendant's guilty plea and his second motion for a competency evaluation. Defense counsel based the later motions for a competency examination on changes in the defendant's demeanor, an increase in medication and his refusal to attend court proceedings. Although defense counsel's concerns are an important indicator of a defendant's incompetency, we do not find that the factors cited by defense counsel here established the defendant's incompetency. Again,

the fact that the defendant received medication was not sufficient, in and of itself, to establish incompetency. Additionally, defense counsel never specifically indicated that the medication interfered with the defendant's ability to comprehend the proceedings. Furthermore, the trial court expressly noted that from its observations the defendant appeared competent. Nothing transpired between December 10, 1992, and March 3, 1993, that required the trial court to order a competency examination.

Similarly, the trial court did not abuse its discretion on March 4, 1993, when it denied defense counsel's third motion for a competency evaluation. On that occasion, defense counsel reiterated their concerns regarding the defendant's medications and indicated that the defendant again had refused to attend court proceedings. The record shows that the defendant's refusal to come to court stemmed from his anger with defense counsel's alleged failure to keep a promise rather than from the defendant's incompetency. The defendant's dissatisfaction with defense counsel does not indicate his incompetency. See *State* v. *Johnson*, 22 Conn. App. 477, 489, 578 A.2d 1085, cert. denied, 216 Conn. 817, 580 A.2d 63 (1990) (defendant's "obstreperous, uncooperative or belligerent behavior" including refusal to return to court and hostility toward attorney did not necessarily indicate defendant's incompetency); *Commonwealth* v. *Logan*, 519 Pa. 607, 623–24, 549 A.2d 531 (1988) (refusal to cooperate with defense strategy and display of childish behavior at trial does not necessarily constitute incompetence). Although defense counsel stated that the defendant's medications may have caused his refusal to cooperate with counsel, the record demonstrates that the medications did not interfere with his ability to consult with defense counsel or to assist in his defense. See *United States* v. *Caldwell*, 543 F.2d 1333, 1349 n.70 (D.C. Cir. 1974), cert. denied, 423 U.S.

1087, 96 S. Ct. 877, 47 L. Ed. 2d 97 (1976) (mere uncooperativeness with defense counsel does not prove inability to communicate and, therefore, does not prove incompetency). "[The defendant] had the ability to cooperate but did not want to do so." *State* v. *Johnson,* supra, 489; see also *Commonwealth* v. *Logan,* supra, 624 (" 'issue is the defendant's ability to cooperate and not whether he is actually cooperating' ").

Finally, the record reveals that the defendant was competent when defense counsel raised the competency issue for the fourth and final time on March 9, 1993. On that occasion, defense counsel simply mentioned the issue of competency in the context of a discussion regarding a change of psychiatrists and the release of medical records. Defense counsel did not make a motion, pursuant to § 54-56d, for a competency evaluation. The trial court did not respond to defense counsel's comments and defense counsel did not raise the issue thereafter. Again, defense counsel made no specific reference as to why he felt that the defendant was incompetent and, therefore, unable to assist counsel.

D

Because we conclude that in accepting the defendant's guilty plea, the trial court implicitly found him competent, and because our own review of the record demonstrates that this finding was not an abuse of discretion, the trial court's failure to provide a competency evaluation did not deprive the defendant of due process under the state or federal constitutions. Accordingly, we conclude that the impropriety of the trial court's failure to order a competency evaluation was harmless.

II

We next address the defendant's claim that the trial court improperly accepted his plea of guilty in violation

of the federal and state due process clauses[29] and his rights to ensure an informed and voluntary plea pursuant to Practice Book §§ 39-19 and 39-20.[30] The defendant argues on appeal that his guilty plea violated due process because it was not knowing, intelligent or voluntary.[31] Additionally, the defendant claims that the trial court failed to comply substantially with the procedures for acceptance of a guilty plea contained in §§ 39-19 and 39-20.[32]

---

[29] Specifically, the defendant claims a violation of his due process rights under the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut. The defendant has not provided an independent analysis of his state constitutional claims. Accordingly, we do not address those claims. See, e.g., *State v. Pinder*, 250 Conn. 385, 429 n.4, 736 A.2d 857 (1999).

[30] See footnote 13 of this opinion for the text of §§ 39-19 and 39-20.

[31] The defendant failed to raise these constitutional claims before the trial court. He nevertheless argues that he should prevail under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), in which we concluded that a defendant may prevail on an unpreserved constitutional claim if all of the following four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Even if we were to assume that the first two conditions have been satisfied, as we conclude herein, the defendant has failed to demonstrate that his constitutional rights were violated.

[32] Because the defendant's claims do not merely challenge the court's failure to comply "literally" with the rules of practice, but, rather, assert a lack of substantive compliance with the constitutionally based norms set forth in those sections, he seeks review under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the doctrine of plain error as set forth in Practice Book § 60-5, formerly § 4061. Section 60-5 provides: "Review by the Court; Plain Error; Preservation of Claims

"The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court.

The following additional facts are relevant to our resolution of these claims. On December 10, 1992, the defendant appeared before the trial court and pleaded guilty to the first three counts of the amended information.[33] After the defendant entered his guilty plea and the state recited the factual basis for the charges, the trial court canvassed the defendant regarding his plea. The trial court questioned the defendant extensively regarding each charge, the potential penalties for each charge, the factual basis for the plea and whether the defendant understood the constitutional rights he waived by pleading guilty. Thereafter, the trial court accepted the defendant's guilty plea finding that it was made knowingly, intelligently, voluntarily and with a full understanding of the crimes, penalties and consequences of the guilty plea. The trial court also found that the plea was made with adequate assistance of counsel and that a factual basis for the plea existed.

## A

First, we review the defendant's assertion that he did not understand the law in relation to the facts and,

"In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same.

"If the court deems it necessary to the proper disposition of the cause, it may remand the case for a further articulation of the basis of the trial court's factual findings or decision.

"It is the responsibility of the appellant to provide an adequate record for review as provided in Section 61-10." Once again, as we conclude herein, the defendant failed to demonstrate that the alleged constitutional violations existed or that the trial court's "decision [was] otherwise erroneous in law." Practice Book § 60-5.

[33] See footnote 12 of this opinion.

therefore, his plea of guilty was not knowing, intelligent or voluntary, because: (1) the charging document was complex and confusing; (2) the trial court failed to advise him of an essential element of the capital felony count; (3) he was confused about the sentencing consequences of his guilty plea; and (4) he did not understand that his guilty plea waived all nonjurisdictional defects. We reject these claims.

Before addressing the defendant's claims, we review the well established standards for valid guilty pleas. It is axiomatic that "[u]nless a plea of guilty is made knowingly and voluntarily, it has been obtained in violation of due process and is therefore voidable. *State* v. *Childree*, 189 Conn. 114, 119, 454 A.2d 1274 (1983); see *McCarthy* v. *United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969); *State* v. *Lopez*, 197 Conn. 337, 341, 497 A.2d 390 (1985). When a defendant pleads guilty, he waives important fundamental constitutional rights, including the privilege against self-incrimination, the right to a jury trial, and the right to confront his accusers. . . . These considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. *Boykin* v. *Alabama*, [395 U.S. 238, 243–44, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)]. *State* v. *Childree*, supra, 120.

"We, therefore, require the trial court affirmatively to clarify on the record that the defendant's guilty plea was made intelligently and voluntarily. *State* v. *Childree*, supra, 189 Conn. 120. In order to make a knowing and voluntary choice, the defendant must possess an understanding of the law in relation to the facts, including all relevant information concerning the sentence. *State* v. *Collins*, 176 Conn. 7, 9, 404 A.2d 871 (1978). . . . A determination as to whether a plea has been knowingly and voluntarily entered entails an

examination of all of the relevant circumstances. *State v. Wright*, 207 Conn. 276, 287, 542 A.2d 299 (1988)." (Citations omitted; internal quotation marks omitted.) *State v. Garvin*, 242 Conn. 296, 310, 699 A.2d 921 (1997); see generally *State v. Domian*, 235 Conn. 679, 686–87, 668 A.2d 1333 (1996); *State v. Nelson*, 221 Conn. 635, 639–40, 605 A.2d 1381 (1992); *State v. Badgett*, 220 Conn. 6, 11–13, 595 A.2d 851 (1991).

1

The defendant first claims that due to the complex and confusing nature of the information he did not understand the law in relation to the facts of the case.[34] In particular, the defendant cites the inclusion, in count one, of both intentional murder pursuant to § 53a-54a and felony murder pursuant to § 53a-54c. Although the defendant concedes that the two charges are "legally reconcilable" and that we previously have approved joinder of the two charges; see, e.g., *State v. Couture*, 194 Conn. 530, 560, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State v. Chicano*, 216 Conn. 699, 708, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); he advances no reason for overruling these decisions, nor do we find one. Additionally, the defendant provides no basis for his assertion that the charge contributed to his confusion. Therefore, he has failed to demonstrate that the alleged constitutional violations deprived him of a fair trial. *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The defendant also argues that count two was confusing and, therefore, jeopardized his understanding of the

[34] The defendant asserts, in a footnote in his brief, that his incompetency also contributed to his confusion regarding the charges contained in the information. Because we previously have determined that the defendant was competent to stand trial and enter a plea; see part I B of this opinion; we reject this claim.

law in relation to the facts. Count two of the amended information charged the defendant with capital felony[35] predicated on both burglary and felony murder. The defendant contends that felony murder may not constitute the underlying offense for a capital felony charge because only intentional murders may serve as the predicate offense for such a charge.[36] Therefore, the defendant argues, count two contained capital felony charges based on murder, a death eligible charge, and felony murder, a charge that is not death eligible, and he did not fully comprehend this distinction.

The defendant correctly concludes that felony murder may not serve as a predicate offense for a capital felony charge under § 53a-54b. *State* v. *Harrell*, 238 Conn. 828, 831–39, 681 A.2d 944 (1996). The inclusion, however, of the capital felony charge based on felony murder did not render the defendant's plea unknowing, involuntary or unintelligent. Despite the fact that the capital felony charge predicated on felony murder was invalid, the defendant nonetheless pleaded guilty to an additional capital felony charge predicated on murder pursuant to § 53a-54a. Thus, by pleading guilty to a second capital felony charge the defendant faced either life imprisonment without the possibility of release or the death penalty regardless of the validity of his plea to the felony murder based capital felony. Accordingly, the exclusion of the felony murder based capital felony charge would not have affected the defendant's decision to plead guilty because he faced the same penalty regardless of the inclusion of that charge.

Additionally, the canvass reveals that the defendant clearly understood the potential penalties for a capital felony conviction. When the trial court asked him

---

[35] Count two charged the defendant with capital felony in violation of §§ 53a-54b (1), 53a-54a (a) and (c), and 53a-54c.

[36] The defendant also raised this issue at trial during his probable cause hearing.

whether he knew about the penalties for the capital felony charge, the defendant correctly responded that the penalties were either life imprisonment without the possibility of release or the death penalty.[37] Therefore, the record of the guilty plea canvass supports the conclusion that the defendant's guilty plea passed constitutional muster.

---

[37] The following colloquy between the trial court and the defendant took place during the plea canvass:

"The Court: And as to the second count of capital felony, the statute to which you've pleaded guilty to in the second count, is as follows: 'A person is guilty of capital felony who is convicted of any of the following: Murder of a member of the division of state police within the department of public safety.' Did your attorneys read that statute to you or have you read that statute prior to your guilty plea?

"The Defendant: I have reviewed that with my attorneys and I stand by my plea of guilty as to that point.

"The Court: And do you know what the penalty for a violation of that statute is?

"The Defendant: Life imprisonment. Life imprisonment.

"The Court: And there is an alternative.

"The Defendant: Ah'm—and/or the death penalty.

"The Court: And the death penalty. And do you recall discussing with your attorneys that if you are found guilty of this statute the only possible penalty is life imprisonment without possibility of release, unless the death penalty is imposed?

"The Defendant: I've reviewed that with my attorneys and I stand by my plea of guilty as to that point.

"The Court: Well, I asked you the specific question. Were you read that portion as to the penalty?

"The Defendant: Yes. My attorneys have read me all the statutes.

"The Court: And you understand that those are the only penalties that you can be given concerning a violation of that statute of capital felony? Either life imprisonment without possibility of release or death.

"The Defendant: My attorneys have informed me.

"The Court: And that was prior to your plea of guilty to that statute?

"The Defendant: I believe so. Yes, sir.

"The Court: Aren't you sure?

"The Defendant: Well, it's been a long—it's been—I've seen them on countless occasions and I can't recall which—

"The Court: It was prior to today?

"The Defendant: Prior to today. Yes, sir.

"The Court: It was prior to your plea of guilty to this offense?

"The Defendant: Yes, sir."

2

The defendant also alleges that he did not understand the law of the crimes charged in relation to the facts of his case because the trial court did not read to him that portion of the capital felony statute containing the requirement that the victim was "acting within the scope of his duties . . . ." General Statutes (Rev. to 1991) § 53a-54b (1). The defendant argues that the scope of duty element was critical to his understanding of the capital felony charge and that it is not appropriate, in these circumstances, to presume that defense counsel provided an adequate explanation of the charge. We disagree.

We begin by reiterating that "the [defendant's] plea could not be voluntary in the sense that it constituted an intelligent admission that he committed the offense unless the defendant received real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." (Internal quotation marks omitted.) *Henderson* v. *Morgan*, 426 U.S. 637, 645, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976); see also *Paulsen* v. *Manson*, 203 Conn. 484, 490, 525 A.2d 1315 (1987); *State* v. *Eason*, 192 Conn. 37, 43–44, 470 A.2d 688 (1984), overruled in part on other grounds, *Paulsen* v. *Manson*, supra, 491. However, "[w]e recognize that *Henderson* . . . falls short of announcing a per se rule that notice of the true nature of a charge always requires a description of every element of the offense. . . . The trial court's failure to explicate an element renders the plea invalid only where the omitted element is a critical one . . . and only where it is not appropriate to presume that defense counsel has explained the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." (Citations omitted.) *State* v. *Childree*, supra, 189 Conn. 123; see also *Oppel* v. *Lopes*, 200 Conn. 553, 558, 512 A.2d 888 (1986).

We acknowledge that the trial court did not recite the specific portion of § 53a-54b (1) pertaining to the scope of duty requirement.[38] Nonetheless, on the basis of our review of the record and the transcripts, we conclude that the defendant was informed sufficiently of the pertinent element of the capital felony offense. Additionally, under the circumstances of the present case, it was appropriate for the trial court to presume that defense counsel explained each element of the capital offense charge to the defendant.

Our careful review of the record reveals that the defendant acquired knowledge of the scope of duty element from sources other than the trial court's explanation of the charge. First, the information expressly contained the scope of duty element.[39] See *Oppel* v. *Lopes*, supra, 200 Conn. 558 (finding it significant that

---

[38] The trial court stated: "And as to the second count of capital felony, the statute to which you've pleaded guilty to in the second count, is as follows: 'A person is guilty of capital felony who is convicted of any of the following: Murder of a member of the division of state police within the department of public safety.'" See footnote 37 of this opinion.

[39] Count two of the amended information dated December 9, 1992, provides: "And the above State's Attorney further accuses and charges that the said Terry Johnson did commit the crime of CAPITAL FELONY in violation of [§§] 53a-54b (1), 53a-54a (a) and (c), and 53a-54c of the Connecticut General Statutes in that on or about the fifth day of June, 1991, in the early morning hours, in the town of Windham, Connecticut, the said TERRY JOHNSON, with the intent to cause the death of another person, to wit, Connecticut State Trooper Russell Bagshaw, caused the death of Trooper Russell Bagshaw, who was a member of the Division of State Police within the Department of Public Safety, *while Trooper Russell Bagshaw was acting within the scope of his duties*, and that said TERRY JOHNSON, on or about the fifth day of June, 1991, in the early morning hours, in the town of Windham, Connecticut, acting either alone or with one or more other persons, committed or attempted to commit Burglary, and in the course of and in furtherance of such Burglary or of the flight therefrom, he, or another participant, if any, caused the death of another person, to wit: Connecticut State Trooper Russell Bagshaw, who was other than one of the participants in said Burglary, and who was a member of the Division of State Police within the Department of Public Safety, *while Trooper Russell Bagshaw was acting within the scope of his duties*." (Emphasis added.)

indictment specifically contained element omitted from trial court's recitation of pertinent statute). Second, after the defendant entered his guilty plea, the clerk of the court read each count of the information aloud and asked the defendant how he pleaded. With reference to the capital felony charge in count two, the clerk specifically stated on two occasions that the defendant caused the death of the victim while the victim "was acting within the scope of his duties." Third, throughout its summation of the facts at the plea proceeding, the state referred to the fact that the victim was in his police cruiser, on patrol and on duty at the time of murder. See *State* v. *Eason*, supra, 192 Conn. 44 (defendant on notice of elements of offense where state's factual basis included all elements of offense).

Furthermore, during the canvass the defendant repeatedly stated that defense counsel had explained § 53a-54b (1) to him. The trial court specifically asked the defendant whether defense counsel had "read [the capital felony] statute to you or have you read the statute prior to your guilty plea?" The defendant responded, "I have reviewed that with my attorneys and I stand by my plea of guilty as to that point." Thereafter, when the trial court asked the defendant whether defense counsel had read him the penalty portion of § 53a-54b, he responded that "[m]y attorneys have read me *all* the statutes." (Emphasis added.) See *Bowers* v. *Warden*, 19 Conn. App. 440, 443, 562 A.2d 588, cert. denied, 212 Conn. 817, 565 A.2d 534 (1989) (trial court may rely on defendant's responses during plea canvass in deciding he was informed adequately of elements of charged offenses). Moreover, later in the canvass, the defendant indicated that he had reviewed his plea with defense counsel for at least one entire day.

On the basis of the foregoing, we conclude that the defendant had been adequately apprised of the scope of duty element in § 53a-54b (1).

### 3

The defendant also briefly argues that he was confused about the potential sentencing consequences of his guilty plea. The defendant cites his erroneous responses to several of the trial court's questions regarding the penalties for particular charges.[40]

We conclude that the defendant was informed adequately of the potential sentencing possibilities and, therefore, that his plea was knowingly made. At several points during the canvass, the defendant corrected himself after initially providing an inaccurate answer regarding the sentencing possibilities. Additionally, the trial court corrected the errors in the defendant's responses, thus informing him of the correct penalties. Furthermore, the defendant expressly stated that defense counsel had read to him the portions of the statutes pertaining to penalties and had informed him of the potential penalties, including the death penalty, that he faced as a result of his guilty plea. See id., 444 (finding that defendant was aware of potential penalties through defense counsel's and trial court's explanations). Thus, the defendant knew the potential penalties and his guilty plea was knowingly and intelligently made.

### 4

Finally, the defendant claims that his guilty plea was not knowing or voluntary because he did not clearly understand that a guilty plea waives all nonjurisdictional defects. Specifically, the defendant asserts that although the trial court provided defense counsel with an opportunity to explain the waiver rule to the defendant during the canvass, the record does not establish exactly what defense counsel instructed on this issue.

---

[40] Specifically, the defendant refers to his erroneous responses regarding the penalties for murder versus the penalties for felony murder. See footnote 27 of this opinion.

Therefore, the defendant claims, it is unclear whether he understood the waiver rule. We reject this claim.

It is well established that a voluntary and intelligent guilty plea operates as a waiver of all nonjurisdictional defects. See *State* v. *Reddick*, 224 Conn. 445, 451, 619 A.2d 453 (1993); *State* v. *Suggs*, 194 Conn. 223, 227, 478 A.2d 1008 (1984); *Cajigas* v. *Warden*, 179 Conn. 78, 81, 425 A.2d 571 (1979). "It is [however] not necessary for the trial court to canvass the defendant to determine that [he] understands that [his] plea of guilty or nolo contendere operates as a waiver of any challenge to pretrial proceedings." *State* v. *Gilnite*, 202 Conn. 369, 383–84, 521 A.2d 547 (1987).

Accordingly, the defendant's claim that his guilty plea was not made knowingly or intelligently is without merit. Although it was not required to do so, the trial court specifically asked the defendant whether he understood that his guilty plea waived his right to appeal all nonjurisdictional defects of the conviction. Moreover, when the defendant responded in the negative, the trial court halted the proceedings and permitted defense counsel to meet with the defendant and explain to him the waiver doctrine.[41] Thereafter, the defendant responded that defense counsel had assured him that the waiver of nonjurisdictional defects would not be a

---

[41] The following colloquy took place regarding the waiver rule:

"The Court: You recognize that your plea waives—or forgoes any nonjurisdictional defects in your prosecution?

"The Defendant: No, sir. I do not understand that.

"The Court: Do you want to consult your attorney about it.

"The Defendant: I reviewed that with my . . .

"[Raymond Canning, Defense Counsel]: We simply haven't discussed that issue at all with our client . . . .

"The Court: Could you then explain to [the defendant] now what nonjurisdictional defects might be?

"Mr. Canning: If I can have a few minutes I will certainly do so, Your Honor. . . .

"The Court: You may. Right now. I'll wait for you."

problem.[42] In light of these circumstances, we reject the defendant's claim that his plea was not knowing or intelligent.

B

We next address the defendant's claim that the trial court's canvass failed to comply substantially with the requirements of Practice Book §§ 39-19 and 39-20.[43] Specifically, the defendant contends that the canvass did not conform to the rules of practice because: (1) he did not understand the nature of the charges as required by § 39-19 (1); (2) the trial court failed to inform him of the mandatory minimum and nonsuspendable sentence for the burglary charge as required by § 39-19 (1) and (2); and (3) the trial court inadequately questioned the defendant regarding the voluntariness of his plea in accordance with § 39-20. Because we conclude that the plea canvass complied with the relevant rules of practice, we reject the defendant's claims.

1

The defendant first contends that the trial court failed to ensure that he understood "[t]he nature of the charge to which the plea is offered" as required by § 39-19 (1). In support of his claim, the defendant repeats the arguments set forth in his constitutional challenge to his guilty plea, specifically, that: (1) the charging document

[42] After the pause in the proceedings, the following colloquy occurred:

"The Court: You recognize your plea waives or forgoes all nonjurisdictional defects in the prosecution?

"The Defendant: My lawyers have explained things to me and I really don't have a clue but they assure me that those things are not . . . a problem. . . .

"The Court: They're not your problem? In other words, they felt that it was their problem? . . .

"The Defendant: They explained it. I really—I don't understand it but they assure me that—

"The Court: That it wouldn't be a problem?

"The Defendant: —it isn't going to be a problem. A problem at all."

[43] See footnote 13 of this opinion for the text of §§ 39-19 and 39-20.

was complex and confusing; (2) the trial court failed to advise him of an essential element of the crime of capital felony; (3) he was confused about the sentencing consequences of his guilty plea; and (4) he did not understand that a guilty plea waives all nonjurisdictional defects.

As we have concluded previously, the defendant's guilty plea was made with knowledge of the charges to which the plea was offered and in accordance with the standards for due process. See part II A of this opinion. Any failure by the trial court to comply strictly with the relevant Practice Book requirements did not affect the defendant's ability to make a fully informed and voluntary plea decision.

2

The defendant also maintains that the trial court violated § 39-19 (2) and (3) by failing to advise him of the nonsuspendable, mandatory minimum sentence applicable to the burglary charges in count three.[44] We conclude that this omission did not impact the defendant's decision to plead guilty and, therefore, did not render his plea invalid.

"[B]ecause the determination as to whether a plea has been knowingly and voluntarily entered entails an examination of all of the relevant circumstances . . . the plea may satisfy constitutional requirements even in the absence of literal compliance with the prophylactic safeguards of [§§ 39-19 and 39-20]. . . . Thus, although the trial court never expressly informed the defendant of the mandatory minimum sentence . . . as required

[44] The defendant pleaded guilty to first degree burglary in violation of § 53a-101 (a) (1) and (2). General Statutes § 53a-101 (c) provides: "Burglary in the first degree is a class B felony provided any person found guilty under subdivision (1) of subsection (a) shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

by [§ 39-19 (2)], that fact alone is not dispositive of the defendant's constitutional claim. We must determine, instead, whether, in light of all of the circumstances evident from the record before us, the trial court's failure to inform the defendant of the statutorily required minimum sentence rendered his guilty plea unknowing or involuntary." (Citations omitted; internal quotation marks omitted.) *State* v. *Domian*, supra, 235 Conn. 687–88.

Our resolution of the defendant's claim is guided by our opinion in *Domian*, wherein we concluded that "[o]ur inquiry . . . must focus upon the effect, if any, that the trial court's noncompliance with [§ 39-19 (2)] had on the defendant's ability to make a fully informed and voluntary plea decision. Thus, the ultimate issue to be resolved is whether the defendant was aware of actual sentencing possibilities, and, if not, whether accurate information would have made any difference in his decision to enter a [guilty] plea." (Internal quotation marks omitted.) Id., 688; see also *State* v. *Wright*, supra, 207 Conn. 288 (failure to advise defendant of mandatory minimum sentence did not jeopardize constitutional rights where plea intelligently and voluntarily made).

"[T]here is nothing in the record of the trial court proceedings to suggest that the defendant was unaware of the actual sentencing possibilities and, further, that even if his understanding of the possible sentencing alternatives was less than perfect, the record does not support a claim that any additional information would have made a difference in his decision to plead guilty." *State* v. *Domian*, supra, 235 Conn. 689. The defendant, by virtue of his guilty plea to the other charges, faced a minimum penalty of life imprisonment without the possibility of release. Thus, the trial court's failure to inform him of a mandatory, nonsuspendable five year sentence for the burglary charge did not mislead the

defendant about the possible sentencing outcomes.[45] Additionally, we find it incomprehensible that the five year minimum sentence for burglary would have altered the defendant's decision to plead guilty.[46] Accordingly, the trial court's failure to follow strictly the requirements of § 39-19 (2) and (3) did not undermine the voluntariness of the defendant's plea.

### 3

Finally, the defendant argues that the trial court did not fully inquire into whether prior discussions with the prosecutor had affected his decision to plead guilty as required by Practice Book § 39-20.[47] Our review of

[45] We note that the present situation differs dramatically from cases wherein the trial court failed to inform the defendant of the *maximum* potential sentence. See *State* v. *James*, 197 Conn. 358, 497 A.2d 402 (1985); *State* v. *Bowden*, 53 Conn. App. 243, 729 A.2d 795 (1999). The record of the plea canvass here unmistakably demonstrates that the defendant was aware of the maximum penalty to which his plea exposed him.

[46] The defendant acknowledges in his brief that "it is not certain" that knowledge of the five year mandatory minimum sentence for burglary would have made any difference in his decision to plead guilty.

[47] *The defendant refers specifically to the following discussion:*

"The Court: Was any force used upon you to make you plead guilty to these counts?

"The Defendant: No, sir.

"The Court: Was any threat used? Threat of force?

"The Defendant: No, sir.

"The Court: And were any promises made as to—well, this morning you heard [Mark S. Solak, state's attorney] indicate, when you pleaded guilty to the first three counts, that he wasn't going to proceed on the rest of the counts, which amounted to larceny counts. Other than that were any other promises made—as to the sentence to be imposed, or dropping any other charges?

"The Defendant: He promised that.

"The Court: Pardon?

"The Defendant: Mr. Solak promised that.

"The Court: Well he promised, apparently—

"The Defendant: To drop the—

"The Court: —to drop the larceny charges. Were there any other charges that he indicated he would drop or any sentence he would recommend?

"The Defendant: Not that I know of.

"The Court: So you can't think of any promises as to anybody recommending sentence or dropping any other charges?

the transcripts of the plea canvass reveals that the trial court specifically asked the defendant whether the prosecutor had promised to drop any charges in exchange for the defendant's guilty plea. The defendant responded that the prosecutor simply had offered to drop the charges of larceny and stealing a firearm, contained in counts four through twenty-four of the amended information. Thus, the trial court fully complied with § 39-20.

## III

The defendant also claims that, with respect to his motion to withdraw his guilty plea, the trial court improperly (1) rejected his motion to withdraw his guilty plea without holding an evidentiary hearing, and (2) declined to appoint new counsel to assist him with the motion.[48] We conclude that the trial court did not

"The Defendant: My attorneys haven't told me of any.

"The Court: You have no reason to believe then there are such promises.

"The Defendant: Not to my knowledge."

[48] The defendant claims a violation of his rights under the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. The defendant also claims that the trial court violated Practice Book §§ 39-19 et seq. and 44-3.

Practice Book § 44-3, formerly § 961, provides: "—Waiver of Right to Counsel

"A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

See footnote 13 of this opinion for the text of §§ 39-19 and 39-20; see also footnotes 51 and 52 of this opinion.

abuse its discretion and, accordingly, we reject the defendant's claims.

The following additional facts are relevant to our resolution of these claims. Subsequent to the jury's verdict in the penalty phase, the trial court convened on June 10, 1993, to sentence the defendant. The trial court imposed a sentence for the burglary charge,[49] and then recessed briefly before sentencing the defendant on the capital felony count.

Prior to the trial court's sentencing on the capital felony conviction, defense counsel indicated that the defendant wanted to address the court personally. Defense counsel also indicated that they had not advised the defendant to address the court and that, based upon their knowledge of the defendant's intended comments, they believed that the trial court should consider appointing additional counsel to represent the defendant. In response, the trial court informed the defendant that, although it was common at that particular time in the proceedings for a defendant to address the court and request a mitigation of his sentence, in the present situation the court was required to impose the death penalty and, therefore, the defendant's comments could only jeopardize future appeals. After a sidebar conference with defense counsel, the trial court agreed that it was not appropriate to deny the defendant's request and permitted him to address the court.

The defendant then stated: "Your Honor, I would just like to say that my plea of guilty was not voluntary and . . . was not made with my full understanding and I ask that the court . . . permit me to withdraw my plea

---

[49] The trial court imposed a twenty year sentence for the burglary count to run concurrently with the sentence to be imposed for the capital felony count.

of guilty."[50] Judge Corrigan denied the defendant's request to withdraw his plea, stating that "[h]aving been one of the panel of three judges who accepted your plea and the one who questioned you and canvassed you on your plea, the court is not moved by your statement, so the court denies your oral motion to have the prior plea vacated."

The standard governing the withdrawal of a guilty plea is well settled. "Before a guilty plea is accepted a defendant may withdraw it as a matter of right. . . . After a guilty plea is accepted but before the imposition of sentence the court is obligated to permit withdrawal upon proof of one of the grounds in [Practice Book § 39-27, formerly § 721]."[51] (Citation omitted.) *State* v. *Torres*, 182 Conn. 176, 185, 438 A.2d 46 (1980); see

[50] By the time the defendant moved to withdraw his guilty plea, the trial court already had sentenced him on the burglary count. He nevertheless maintains that the claims addressed in his motion to withdraw his guilty plea apply to the burglary sentence as well as the capital felony sentence. Although "[a] defendant may not withdraw his or her plea after the conclusion of the proceeding at which the sentence was imposed"; Practice Book § 39-26, formerly § 720; see footnote 52 of this opinion; and although he already had been sentenced on the burglary count, the sentencing proceeding itself had not yet concluded.

[51] Practice Book § 39-27, formerly § 721, provides: "—Grounds for Allowing Plea Withdrawal

"The grounds for allowing the defendant to withdraw his or her plea of guilty after acceptance are as follows:

"(1) The plea was accepted without substantial compliance with Section 39-19;

"(2) The plea was involuntary, or it was entered without knowledge of the nature of the charge or without knowledge that the sentence actually imposed could be imposed;

"(3) The sentence exceeds that specified in a plea agreement which had been previously accepted, or in a plea agreement on which the judicial authority had deferred its decision to accept or reject the agreement at the time the plea of guilty was entered;

"(4) The plea resulted from the denial of effective assistance of counsel;

"(5) There was no factual basis for the plea; or

"(6) The plea either was not entered by a person authorized to act for a corporate defendant or was not subsequently ratified by a corporate defendant."

Practice Book § 39-26, formerly § 720;[52] see also *State* v. *Lloyd*, supra, 199 Conn. 362; *State* v. *Watson*, supra, 198 Conn. 607; *State* v. *Martin*, 197 Conn. 17, 20, 495 A.2d 1028 (1985); *State* v. *Lasher*, 190 Conn. 259, 265, 460 A.2d 970 (1983). In the present case, the defendant, in his oral motion to withdraw his guilty plea, claimed that the acceptance of his guilty plea was in violation of § 39-27 (1) and (2) because it was not knowing or voluntary.

## A

First, the defendant contends that the trial court improperly denied his motion to withdraw his guilty plea without affording him an evidentiary hearing.[53] We conclude that the defendant's motion to withdraw his guilty plea was vague and conclusory, and, therefore, an evidentiary hearing was not required.

"An evidentiary hearing is not required if the record of the plea proceeding and other information in the court file conclusively establishes that the motion is without merit. See *Fontaine* v. *United States*, 411 U.S. 213, 215, 93 S. Ct. 1461, 36 L. Ed. 2d 169 (1973). . . .

---

[52] Practice Book § 39-26, formerly § 720, provides: "Withdrawal of Plea; When Allowed

"A defendant may withdraw his or her plea of guilty or nolo contendere as a matter of right until the plea has been accepted. After acceptance, the judicial authority shall allow the defendant to withdraw his or her plea upon proof of one of the grounds in Section 39-27. A defendant may not withdraw his or her plea after the conclusion of the proceeding at which the sentence was imposed."

[53] We note that the defendant did not specifically request an evidentiary hearing when he made his motion to withdraw his guilty plea. Despite his failure to request an evidentiary hearing, we review the defendant's claim. See *State* v. *Safford*, 22 Conn. App. 531, 534, 578 A.2d 152, cert. denied, 216 Conn. 823, 581 A.2d 1057 (1990) (motion to withdraw guilty plea and briefing of issue preserved claim despite failure to request hearing); see also *State* v. *Watson*, supra, 198 Conn. 612–13 (defendant's claim reviewed despite failure to request evidentiary hearing at any time); *State* v. *Peterson*, 51 Conn. App. 645, 648–49, 725 A.2d 333 (1999) (defendant's claim reviewed despite failure to request hearing at time of motion).

*State* v. *Torres*, [supra, 182 Conn. 185]. The burden is always on the defendant to show a plausible reason for the withdrawal of a plea of guilty. [*State* v. *Crenshaw*, 210 Conn. 304, 308, 554 A.2d 1074 (1989)] *Blue* v. *Robinson*, 173 Conn. 360, 374, 377 A.2d 1108 (1977); *State* v. *Slater*, 169 Conn. 38, 46, 362 A.2d 499 (1975). In considering whether to hold an evidentiary hearing on a motion to withdraw a guilty plea the court may disregard any allegations of fact, whether contained in the motion or made in an offer of proof, which are either conclusory, vague or oblique. *State* v. *Torres*, supra, 185. Such allegations are discountenanced. *State* v. *Deboben*, 187 Conn. 469, 474, 446 A.2d 828 (1982). To warrant consideration, the defendant must allege and provide facts which justify permitting him to withdraw his plea under [§ 39-27]." (Internal quotation marks omitted.) *State* v. *Lasher*, supra, 190 Conn. 265–66; see also *State* v. *Blue*, 230 Conn. 109, 125, 644 A.2d 859 (1994); *State* v. *Collins*, 207 Conn. 590, 597, 542 A.2d 1131 (1988).

In the present case, the defendant failed to satisfy his burden of setting forth sufficient facts to require an evidentiary hearing on his motion to withdraw his guilty plea. The defendant simply made the vague and conclusory statement that his plea was not "voluntary . . . and was not made with [his] full understanding . . . ." The defendant failed to set forth any additional facts supporting this statement and failed to advance any specific reason why his plea was involuntary and made without his full understanding. See *State* v. *Cooper*, 55 Conn. App. 95, 105, 738 A.2d 1125 (1999) (motion to withdraw contained no facts to support defendant's claim); *State* v. *Peterson*, 51 Conn. App. 645, 652, 725 A.2d 333 (1999) (defendant's "bare assertion" that he was using drugs at time of plea did not warrant evidentiary hearing); *State* v. *Casado*, 42 Conn. App. 371, 375, 680 A.2d 981, cert. denied, 239 Conn. 920, 682 A.2d 1006

(1996) ("mere assertion by the defendant that the plea was involuntary . . . does not entitle [him] to withdraw the plea, nor does it require . . . an evidentiary hearing on the motion to withdraw").

Additionally, the defendant's assertion that his plea was not voluntarily and intelligently made contradicts the detailed plea canvass conducted by the trial court, in which the defendant expressly stated that he understood the implications of his plea, had received advice and assistance of counsel in preparing to plea, and had entered the guilty plea voluntarily. See *People* v. *Williams*, 178 App. Div. 2d 570, 577 N.Y.S.2d 656 (1991) (defendant's claims in motion for withdrawal of guilty plea did not require hearing where refuted by record of plea canvass). In light of the comprehensive canvass conducted by the trial court; see, e.g., footnotes 37, 41 and 47 of this opinion; and our previous conclusion that the defendant's plea was entered voluntarily with full knowledge of the consequences of his plea, the defendant's bare and unsupported assertion in support of his motion did not warrant an evidentiary hearing. In this situation the trial court was entitled to rely on its knowledge of the canvass, which it had conducted itself. See *Fluitt* v. *Superintendent*, 480 F. Sup. 81, 85 (1979) (noting that only in rare situations will defendant be entitled to evidentiary hearing). Accordingly, the trial court acted within the legitimate bounds of its discretion in not undertaking an evidentiary hearing regarding the defendant's motion to withdraw his plea.

## B

The defendant also argues that the trial court improperly denied his request for appointment of new counsel to assist him with his motion to withdraw his guilty plea. We conclude that the trial court did not abuse its discretion in declining to appoint new counsel.

The following facts are relevant to our discussion. Before the defendant addressed the trial court, defense counsel informed the court that, based upon their knowledge of the content of the defendant's proposed statement, they believed that "it would be appropriate and proper for the court to consider appointing him additional counsel to press before the court in a proper manner the claims which he intends to make to the court." The trial court acknowledged defense counsel's request but never specifically denied it. Instead, the trial court addressed the defendant directly, urging him to reconsider his statement and to consult with defense counsel.

First, we reiterate the standard under which we consider the defendant's claim. "Whether the circumstances warrant the appointment of new counsel is within the discretion of the trial court. . . . [A]bsent a factual record revealing an abuse of [the court's] discretion, the court's failure to allow new counsel is not reversible error." (Citation omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 210 Conn. 314; see also *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987).

In *State* v. *Cooper*, supra, 55 Conn. App. 95, and *State* v. *Casado*, supra, 42 Conn. App. 371, the Appellate Court rejected claims similar to the defendant's arguments. In *Cooper*, the defendant had moved to withdraw her plea of guilty to manslaughter in the first degree and risk of injury to a child, claiming that she had received ineffective assistance of counsel and that her plea was unknowing and involuntary. *State* v. *Cooper*, supra, 101. The trial court refused defense counsel's request for appointment of new counsel to represent the defendant on the motion to withdraw her plea. Id., 102–103. On appeal, the Appellate Court affirmed the trial court's refusal to appoint new counsel, concluding that the trial court had acted within its discretion despite the

defendant's assertions that a conflict existed between herself and defense counsel. Id., 106–107.

In *Casado*, the Appellate Court affirmed the trial court's refusal to appoint new counsel to assist with the defendant's motion to withdraw her plea of nolo contendere to assault in the first degree and risk of injury to a child. *State* v. *Casado*, supra, 42 Conn. App. 380–81. In that case, the defendant had moved to withdraw her plea at her sentencing hearing on the ground that defense counsel had pressured her to enter the plea. Defense counsel informed the court that the defendant no longer wanted him to represent her and suggested that the trial court appoint new counsel and provide an evidentiary hearing. The trial court denied both requests. Id., 373–74.

The Appellate Court affirmed the denial of an evidentiary hearing and the refusal to appoint new counsel, concluding that the trial court had not abused its discretion in refusing to appoint new counsel to press the defendant's motion to withdraw her plea. Id., 379. The Appellate Court noted that "[t]he constitutional right to counsel does not necessarily include the unbridled right to discharge counsel and have new counsel appointed." Id., 378. The Appellate Court concluded that, by denying the defendant's request for an evidentiary hearing, the trial court had rejected explicitly the defendant's assertions of pressure and, therefore, appointment of new counsel was not required. Id., 379.

As in *Casado* and *Cooper*, the trial court in the present case acted within its discretion when it declined to appoint new counsel. It is clear from the record that the defendant had consulted with defense counsel prior to addressing the court. Defense counsel assisted as much as they thought was appropriate, and even requested a sidebar conference to inform the court of the content of the defendant's proposed statement and

to encourage the court to permit the defendant to address the court. See *Fluitt* v. *Superintendent*, supra, 480 F. Sup. 86 (defense counsel "scrupulously avoided doing or saying anything which might impede the petitioner's pro se motion"). Furthermore, defense counsel indicated that they had provided advice regarding the statement. In these circumstances, we conclude that while defense counsel did not join specifically in the defendant's motion, the defendant had sufficient opportunity to advance his cause. See id., 85 (despite defense counsel's failure to join in motion to withdraw, defendant's grounds in support of motion adequately presented). Accordingly, the trial court did not abuse its discretion in declining to appoint new counsel to assist the defendant with his motion to withdraw his plea of guilty.

The defendant also claims a violation of Practice Book § 44-3, which requires that the trial court question the defendant before accepting a waiver of the right to counsel. See footnote 48 of this opinion. As explained previously, defense counsel made statements to the court regarding the possible need for additional counsel. The defendant now claims that he was not represented when he made his motion to withdraw his guilty plea. The transcript reveals that the defendant had not waived counsel in connection with his motion, and had not declined the assistance of defense counsel who had represented him at trial. Moreover, that same defense counsel continued to assist the defendant subsequent to the denial of the motion to withdraw. Accordingly, we conclude that the defendant was represented at the time that the trial court imposed a sentence and, therefore, the trial court was not required to undertake an inquiry pursuant to § 44-3. See *State* v. *Casado*, supra, 42 Conn. App. 379–82.

## IV

Under our capital offense sentencing scheme, a capital defendant may not be sentenced to death unless the state establishes the existence of an aggravating factor beyond a reasonable doubt, and the defendant fails to establish a mitigating factor by a preponderance of the evidence. General Statutes § 53a-46a (f). In the present case, the jury rejected the aggravating factor of "especially depraved," but did find as an aggravating factor that the defendant had committed the offense of capital felony in an "especially cruel and heinous manner." See General Statutes (Rev. to 1991) § 53a-46a (h) (4). The jury's verdict also indicated that it had found no mitigating factor. The defendant claims that the evidence adduced at trial did not support the jury's finding of an aggravating factor. We are constrained to agree. Consequently, principles of double jeopardy require us to reverse the judgment imposing the death penalty and to remand the case to the trial court with direction to impose on the defendant a sentence of life imprisonment without the possibility of release. *State* v. *Daniels*, 207 Conn. 374, 397–99, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989).

### A

In deciding whether the evidence adduced at trial failed to support the jury's finding of an aggravating factor, we begin with a recitation of the evidence supporting the jury's verdict. In June, 1991, Bagshaw was a state trooper assigned to Troop K in Colchester. His duties included conducting security checks of commercial establishments located on his patrol route. On June 5, 1991, Bagshaw was assigned to patrol Windham and nearby towns. Part of his patrol ran along Route 6. One of the businesses located on that road in North

Windham was the sporting goods store, Land and Sea, which sold guns and ammunition, hunting and fishing supplies and boats and boating equipment. Bagshaw commenced his patrol and reported to the barracks by radio several times on routine matters. Shortly before 3 a.m., he drove past the Land and Sea, heading east on Route 6, and his last transmission, which pertained to an abandoned vehicle, was at 3:02 a.m.

At approximately 3:15 a.m., Richard Serwanski spotted Bagshaw's cruiser outside the Land and Sea. Serwanski, who occasionally worked at the Land and Sea, summoned its owner Steven Winick, who lived nearby. Joined ten minutes later by Winick, together the two men approached Bagshaw's cruiser. They found both the right rear passenger window and the driver's side window shattered, the strobe lights flashing, the headlights and spotlight still on, the gearshift still in drive, and the vehicle stationary, resting against a boat. Bagshaw's body was in the front seat slumped over toward the passenger side, his weapon still in his gunbelt. Serwanski saw that Bagshaw had been shot and attempted to render medical assistance, but despite his efforts and those of additional police, fire and medical personnel, Bagshaw was pronounced dead at the scene.

Before closing and alarming the store for the evening on June 4, 1991, Winick had locked up two large pistols, a Wilkinson "Linda" and a Thompson "Contender," along with several rifles and shotguns. None of the weapons was loaded. Subsequently, it was discovered that the alarm and telephone wires, located on the outside of the west wall of the shop, had been ripped out or cut, the cash register lay empty on the floor, drawers and cabinets were open, and several knives were missing from the display case. A cable that Winick had run through the trigger guards of the rifles for security purposes had been cut, and twenty-two firearms were missing. Some long guns remained in the rack and oth-

ers were piled nearby. On the floor, there was an empty twenty-round box of Federal Hydra-Shok hollow point ammunition. A boat had been moved from a location in the yard nearby to under the octagonal window on the shop's west wall. Numerous items that had been removed from the store were found stockpiled near the boat.

Ballistic evidence revealed that the weapon used to kill Bagshaw was a Wilkinson Linda, a semiautomatic nine millimeter pistol that has a magazine capacity of thirty-one rounds, and a trigger pull of six and one-half to six and three-quarters pounds. To operate the weapon, cartridges are manually inserted into the magazine, and the magazine is then inserted into the handgrip area of the pistol. In order to "chamber" the first cartridge, the shooter must pull back the bolt; thereafter, each squeeze of the trigger discharges a shot and automatically chambers another cartridge. The gun can be fired as quickly as one can pull the trigger, and with each shot, a cartridge case is ejected from the gun.

The fatal bullet recovered from Bagshaw's body was identified as a copper jacketed, Federal Hydra-Shok hollow point nine millimeter bullet, which had been fired from the Wilkinson Linda. According to Wayne Carver, chief state medical examiner, the bullet entered through the left arm hole of Bagshaw's bulletproof vest. The fatal bullet did not pass through Bagshaw's left arm. Because the bullet had passed through either the metal door or the glass window of the cruiser before striking the trooper, the bullet was deformed and the entry wound was "atypical" and "asymmetrical" in that "the bullet was not round when it hit the skin." Consequently, the fatal bullet did not exhibit any mushrooming effect.[54] The bullet passed through Bagshaw's

---

[54] Federal Hydra-Shok hollow point bullets are designed to mushroom and expand on impact, thereby breaking the copper jacket into pieces. Testimony indicated that "that is the bullet that you would use if you wanted to kill something."

left lung and heart, lodging in his right shoulder. The cause of death was this single gunshot wound to the chest. Additionally, a bullet fragment was recovered from Bagshaw's arm, and a few minor abrasions on the back of the trooper's arm and two wounds on his finger, caused probably by flying shrapnel or glass, were also discovered.

Carver explained that Bagshaw essentially had bled to death. Most of the bleeding was internal, and the loss of blood was fairly rapid. Carver testified that the wound was mortal "the instant [the bullet] went through him" because the sequence that caused Bagshaw's death was "irrevocably started," and there was no "medical procedure that could have repaired this wound to his heart." According to Carver, Bagshaw remained conscious for anywhere from five seconds to one and one-half minutes after suffering the wound. Because people's responses vary, Carver could not determine precisely how long Bagshaw had remained conscious. He testified that Bagshaw survived "anywhere from large hunks of minutes to several minutes—and then the more minutes you tack on [while bleeding] the less likely, as you get up to ten, fifteen, or so forth." Because Bagshaw's brain showed no sign of swelling from lack of oxygen, which takes twenty to twenty-five minutes to occur, Carver could state with certainty that the trooper did not survive that long.

There was extensive testimony regarding the crime scene. As described previously, the driver's side window of Bagshaw's cruiser was smashed, along with the right rear passenger window. There were a large number of bullet holes in the driver's door and front quarter panel, and a bullet hole through the front windshield. There were bullet fragments, inside the cruiser, and some fragments were embedded in the driver's side door post and in the rear passenger door. Three bullet fragments were found outside the cruiser: one on Route

6; another across Route 6; and a third at the base of a boat located between Route 6 and the building. All of the fragments were of Federal Hydra-Shok ammunition, or consistent therewith, and all had been fired from, or were consistent with having been fired from, the Wilkinson Linda pistol. In the grass under the octagonal window on the west wall of the shop, in addition to numerous weapons and other merchandise that had been removed during the course of the burglary, investigators recovered seventeen nine millimeter shell casings and two live rounds. Bagshaw's weapon, which was still in its holster, contained one round in the chamber and fifteen rounds in the clip.

Based in part on bullet trajectories that had been provided to him by the state police forensic laboratory, Robert Mantho, a state trooper who specialized in traffic accident reconstruction, testified as to the position and path of Bagshaw's cruiser during the time that the trooper was under attack. Based upon Mantho's testimony, the evidence supported the inference that Bagshaw's cruiser had traveled in a straight path for approximately thirty to thirty-five feet before coming to rest against the boat. According to Mantho's measurements, the shooter was probably twenty-five to thirty feet away from the cruiser when the shots were fired. The cruiser was moving very slowly or was almost stopped when the first bullet struck. It was also possible that the cruiser was stationary when the firing began and then began to accelerate, to one to three miles per hour, until it collided with the boat. The cruiser traveled approximately ten feet between the first bullet strike and the last. Mantho testified that, if the cruiser had traveled at the rate of one mile per hour, the time between the first strike and the last was about 6.6 seconds.

Henry Lee, chief criminalist and director of the state forensic laboratory, reconstructed the crime scene. On

the basis of Lee's testimony, the jury reasonably could have concluded that seventeen bullets struck, passed through, or passed by Bagshaw's cruiser. There were two bullet holes in the front windshield and twelve bullet holes in the driver's side of the cruiser, either in the driver's door, the front quarter panel or the column between the front and rear doors. Additionally, two bullets went through the driver's window, one passing through the cruiser and exiting the rear passenger side window. Although the exterior metal portion of the driver's door contained seven bullet holes, there were only two exit bullet holes on the interior side of the driver's door, indicating that five bullets were imbedded inside the door. Bullets entering the cruiser hit the organizer next to Bagshaw, the rear passenger door and the steering wheel.

The evidence also supported the inference that the cruiser was in motion when the bullets hit it. The seventeen bullets were fired in two separate sequences. The first group was discharged at an angle of approximately thirty to forty degrees in relation to the cruiser, and the final group of nine shots was "a direct hit at ninety degrees" near the center of the driver's side door. The first shot missed the cruiser completely, hitting a boat instead. The second and third shots hit the windshield. The fatal shot was fired as part of the second group and went through the driver's window before hitting Bagshaw. Relying on bloodstains, fingerprints and shoe prints on the boat as well as other evidence, Lee testified that the burglary had been committed by two persons, one who wore Nike sneakers and a second who wore Reebok sneakers.

There was ample evidence linking the defendant to the crime. On June 7, 1991, the police searched the basement area of a house where the defendant resided. The house was located a few hundred yards from the Land and Sea. The police seized, among other items,

ammunition clips, knives, two duffle bags, a rifle, a shotgun, and a pair of Reebok sneakers. One of the duffle bags contained a box of twenty rounds of Federal Hydra-Shok nine millimeter ammunition and the Wilkinson Linda that had been stolen from the Land and Sea and was used to shoot Bagshaw.

On June 5, 1991, at 3:45 a.m., Scott Ilewicz, a friend of the defendant, received a telephone call from the defendant asking to meet him because he needed to dispose of some weapons. Ilewicz drove to the designated rendezvous spot where the defendant gave him numerous guns that, based upon their tags, Ilewicz assumed had been stolen. He turned the weapons over to the police after he learned of Bagshaw's death.

Also on June 5, 1991, the defendant told a close friend that he had killed a policeman during the course of a burglary of a gun shop. He admitted that, after cutting the alarm wires at the shop, and after removing the weapons, he looked around a corner of the shop and saw a trooper with his lights on. The defendant said he had an Uzi with a forty round clip, which he thought was an automatic. He pulled the trigger but only one shot discharged. He heard the officer say "Oh, my God," and he continued to fire upon the car. The defendant confessed to others as well. He told Marjorie Shanaberger, the mother of his daughter, that he shot Bagshaw because, had he not, the officer would have shot him. He cried throughout most of this conversation and told her that he shot Bagshaw twenty-eight times because he was scared.

While he was at the Hartford correctional center, the defendant boasted to Brian Parisella, another inmate, that he had shot Bagshaw and that the trooper had gotten what he deserved. The defendant further stated that he had shot Bagshaw during the course of the burglary because he did not want to get caught and

that if he was going to get in trouble, it was going to be for something big. The defendant told another inmate that, while he was stealing from the gun store, he emptied a clip from an Uzi into an officer's cruiser. He also told a correctional officer, Robert Wolstencroft,[55] that he had chosen the Land and Sea because he had broken into it before and knew it had easy access. The defendant also said he knew how to get around the alarm system and was able to render it inoperative. During the course of the burglary of the Land and Sea, Bagshaw drove up the driveway and raised his left arm as the defendant began shooting. Using the nine millimeter semiautomatic pistol, the defendant continued to fire it until he ran out of ammunition. According to Wolstencroft, the defendant acted proud and very sure of himself when relating this information. Specifically, the defendant told him that he did not regret shooting Bagshaw and that he would do it again.

The jury also heard evidence from which it reasonably could have concluded that the defendant had burglarized the Land and Sea in October, 1990, that he had completed basic training with the National Guard in 1989, that he had qualified as a sharpshooter on the M-16 rifle in March, 1991, and that at the end of his National Guard service he had qualified as an expert shooter.[56] Finally, there was extensive evidence that the defendant was hostile to police, as evidenced by a verbal encounter he had had with Steven Fields, a state trooper, on

[55] Although on appeal the defendant has raised the propriety of the admissibility of this evidence, for purposes of deciding the issue of whether there was sufficient evidence to support the finding of an aggravating factor; see part IV of this opinion; we presume it was properly admitted. We nevertheless conclude that the evidence was insufficient to establish the presence of an aggravating factor.

[56] Qualifying as a sharpshooter meant that out of forty shots at a range of 300 meters, the defendant hit a target thirty-two to thirty-six times. Qualifying as an expert meant that he hit a target thirty-six out of forty times at ranges from fifty to 300 meters.

June 5, 1991, and a conversation he had had with Melanie Bratavich, a woman with whom he had had a brief romance, during which he had related that he hated police officers and that he would kill one if given the chance. Additional facts will be discussed where relevant.

## B

In reviewing a claim that "the evidence fail[ed] to support the finding of an aggravating factor specified in subsection (h) of section § 53a-46a"; General Statutes (Rev. to 1991) § 53a-46b (b) (2); we subject that finding "to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina,* 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); or the seizure of a defendant. *State* v. *Greenfield,* 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Northrop,* 213 Conn. 405, 414, 568 A.2d 439 (1990)." *State* v. *Ross,* 230 Conn. 183, 259, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). However, "[e]ven with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury." Id., 264. Furthermore, "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks

omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993); see also *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

Moreover, in reviewing a claim under § 53a-46b (b) (2) that the evidence failed to support the finding of an aggravating factor specified in subsection (h) (4) of § 53a-46a, we recognize that a person of ordinary sensibility fairly could characterize almost every murder as vile and horrible. Our role, however, is to "differentiate among murders on the basis of their respective brutality, winnowing case by case those which are merely heinous, atrocious or cruel, from those which the jury could find are especially so. It is a grisly duty." *State* v. *Stanley*, 310 N.C. 332, 337, 312 S.E.2d 393 (1984).

C

Before we review the evidence adduced by the state, we again define the standard by which it is to be measured. As we acknowledged in *State* v. *Breton*, 212 Conn. 258, 265, 562 A.2d 1060 (1989), the phrase "in an especially heinous, cruel or depraved manner" from § 53a-46a (h) (4) contains an arguably subjective standard that runs the risk of being unconstitutionally vague. Therefore, to avoid constitutional jeopardy for this aggravating factor, we adopted a limiting construction of that statutory language. Focusing on the meaning of "especially cruel," we concluded that an acceptable core construction of this term "must include the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." *State* v. *Breton*, supra, 270.

The *Breton* decision did not address, however, two additional issues concerning the proper construction of § 53a-46a (h) (4): (1) whether the "extreme pain or torture" that is at the core of "especially cruel" includes the infliction of psychological anguish as well as physical pain; and (2) whether § 53a-46a (h) (4) envisages

three separate aggravating factors, so that an independent core meaning must be assigned to "depraved" and "heinous," or whether these terms are to be read conjointly with "cruel" to describe a single aggravating factor.

Thereafter, in *State* v. *Ross*, supra, 230 Conn. 260, we answered the first question affirmatively, concluding that "[a] defendant cannot intentionally engage in conduct that inflicts extreme psychological trauma and then claim that his victims' mental distress was unintended or unforeseeable." This court in *Ross* also concluded that § 53a-46a (h) (4) does not set forth three separate aggravating factors, but instead describes a "unitary aggravating factor." Id., 261. We concluded that, in reviewing the sufficiency of the evidence to support the jury's finding of an aggravating factor under § 53a-46a (h) (4), the focus must be on whether the state has proved, beyond a reasonable doubt, that the defendant engaged in intentional conduct that inflicted extreme physical or psychological pain or torture on the victim above and beyond that necessarily accompanying the underlying killing,[57] *and* that the defendant specifically intended to inflict such extreme pain and torture.[58] Thereafter, in *State* v. *Cobb*, 251 Conn. 285,

---

[57] Notwithstanding the cases from Alabama cited by the state and Chief Justice McDonald's dissent; see, e.g., *Bush* v. *State*, 695 So. 2d 70 (Ala. Crim. App. 1995); execution-style killings evincing a calculated design to kill, even when perpetrated to avoid later identification, do not, without more, satisfy the § 53a-46a (h) (4) requirements. Noticeably absent from Alabama's "heinous, atrocious or cruel" calculus is a concern about whether the victim suffered extreme physical or psychological pain or torture or whether such suffering was the defendant's conscious objective.

[58] Although the defendant's trial preceded our decision in *Ross*, the trial court here instructed the jury as follows: "The commission of the crime must have the nature of being committed without pity or conscience and must include the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing. So the defendant must intend to cause extreme pain or torture to the victim above and beyond that necessary to cause the death in order to have the element of an aggravating factor as noticed in this case."

445, 743 A.2d 1 (1999), we held that reading *Breton* and *Ross* together, "they hold that, with respect to the requisite state of mind and consequences thereof, either of the following will suffice for the aggravating factor in question: (1) the defendant intended to, and in fact did, inflict extreme physical or psychological pain, suffering or torture on the victim; or (2) the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim."[59] "Evidence of the defendant's callousness or indifference to his victims' suffering would substantiate such a finding, but it would not suffice without some showing of the infliction of extreme pain, suffering or torture on the victims." *State* v. *Ross*, supra, 262.[60]

D

Finally, before we determine whether the evidence in this case was sufficient to satisfy this burden, brief comment on the death penalty scheme established by the legislature is warranted. As distinct from those jurisdictions where the murder of a law enforcement officer is, in itself, a statutorily enumerated aggravating circum-

[59] Therefore, unlike the cases from Arizona cited by the state; *State* v. *Bolton*, 182 Ariz. 290, 896 P.2d 830 (1995); *State* v. *Runningeagle*, 176 Ariz. 59, 859 P.2d 169 (1993); *State* v. *Greenway*, 170 Ariz. 155, 823 P.2d 22 (1991); in Connecticut, the state must prove more than that the victim's pain was a foreseeable consequence of the defendant's acts.

[60] It is therefore evident that § 53a-46a (h) (4) has been interpreted narrowly, indeed far more so than similar provisions from either Mississippi or Illinois, two states relied upon by the state and Chief Justice McDonald's dissent. The broad interpretation of the state's "especially heinous, atrocious or cruel" aggravating factor by the Mississippi Supreme Court was noted in *Clemons* v. *Mississippi*, 494 U.S. 738, 760–61, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990) (Blackmun, J., concurring and dissenting). Similarly, the Illinois statute has been interpreted liberally to allow premeditation to be a part of the "wanton cruelty" calculus. See *People* v. *Johnson*, 154 Ill. 2d 356, 368, 609 N.E.2d 294 (1993); *People* v. *Lucas*, 132 Ill. 2d 399, 446, 548 N.E.2d 1003 (1989).

stance,[61] our legislature has enacted "a three-tiered pyramid, in which each tier narrows the class of defendants that may be found eligible for the death penalty." Id., 236–37. The victim's status as an on-duty police officer qualifies his homicide as a capital felony, separate from other homicides, but does not satisfy the requirement that the state prove "the existence of at least one statutorily delineated aggravating factor." Id., 237.[62] The victim's status as an on-duty officer at the time of the killing is, as a matter of law, insufficient to establish the aggravating circumstance. See *Brown* v. *State*, 526 So. 2d 903, 906–907 (Fla.), cert. denied, 488 U.S. 944, 109 S. Ct. 371, 102 L. Ed. 2d 361 (1988). That is not to say that, although all murders are repugnant and shock the conscience, the murder of a police officer in the performance of his duties is not *particularly* offensive. We agree that it is. That agreement, however, cannot

---

[61] See Ariz. Rev. Stat. § 13-703 (F) (10) (1989) ("[t]he murdered individual was an on duty peace officer who was killed in the course of performing his official duties and the defendant knew or should have known, that the victim was a peace officer"); Fla. Stat. c. 921.141 (5) (j) (1999) ("[t]he victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties"); Ga. Code Ann. § 17-10-30 (b) (8) (1997) ("[t]he offense of murder was committed against any peace officer, corrections employee, or fireman while engaged in the performance of his official duties"); La. Rev. Stat. Ann. § 905.4 (A) (2) (West 1997) ("[t]he victim was a fireman or peace officer engaged in his lawful duties"); Mo. Ann. Stat. § 565.032 (2) (8) (West 1999) ("[t]he murder in the first degree was committed against any peace officer, or fireman while engaged in the performance of his official duty").

[62] Because eligibility for the death sentence depends upon the state's ability to prove the existence of an aggravating factor, it is that very factor that plays the constitutional role of distinguishing between those who may be sentenced to death and those who may not be and, as such, it must be objectively understandable. *Stringer* v. *Black*, 503 U.S. 222, 233–36, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992); *Maynard* v. *Cartwright*, 486 U.S. 356, 362–64, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988); *State* v. *Breton*, supra, 212 Conn. 263–64. Therefore, to the extent that the state claims that there is no eighth amendment justification for a restrictive interpretation of the statutory language constitutionally required in a one-tiered state, or that the term "heinous and cruel" demands a stricter interpretation when it is an element of the murder as opposed to the aggravant, we disagree.

displace our duty to determine whether the manner in which the murder was committed meets the aggravating factor defined by the capital felony death penalty statutory scheme.

## E

The defendant fired seventeen hollow point bullets at Trooper Bagshaw in a period of 6.6 seconds. Based on the forensic evidence, it was determined that the fatal shot was fired in the final nine shots. Bagshaw remained conscious for five to ninety seconds after sustaining the fatal bullet wound, during which time he experienced the physical pain associated with the injury and the psychological pain associated with the knowledge that he had been shot. Although, fortunately, he was conscious only briefly, he lived anywhere from one to fifteen minutes.

The state theorized that the homicide was especially cruel in that Bagshaw suffered extreme pain in addition to the pain caused by the fatal shot. According to the state, this extreme pain was evidenced in two forms. First, that Bagshaw uttered "Oh, my God," and lived long enough to turn on the switch to activate the strobe light indicated that he suffered mental pain and anguish during the short period of time in which he remained conscious. Second, the state claims that he suffered pain caused by the shrapnel in his arm that was over and above the pain associated with the fatal shot.[63] In support of its assertion that the killing was especially heinous, the state noted the senselessness of the crime, the helplessness of the victim and the satisfaction, after

---

[63] To the extent that the state claims that the § 53a-46a (h) (4) factor *can* be satisfied in a case in which death has been inflicted by a gunshot wound, it misinterprets the defendant's argument. Indeed, the defendant does not suggest otherwise. Rather, the defendant contends that there must be something more about the killing to distinguish it from "the norm of [intentional] murders." *Lewis* v. *State*, 398 So. 2d 432, 438 (Fla. 1981).

the fact, that the defendant seemed to take in the homicide.[64]

The defendant contends that the state failed to sustain its burden. The requisite physical or psychological pain above and beyond that necessarily accompanying the underlying killing must be *extreme. State* v. *Ross*, supra, 230 Conn. 260–61; *State* v. *Breton*, supra, 212 Conn. 270. " '[T]he term "extreme" refers to the greatest degree of intensity away from the norm for that individual.' " *State* v. *Crespo*, 246 Conn. 665, 681, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "Extreme" has also been defined as "[b]eing in or attaining the greatest or highest degree . . . extending far beyond the norm . . . [o]f the greatest severity . . . ." American Heritage Dictionary (2d College Ed. 1992).

In this case, the absence of "extreme pain or torture above and beyond that necessarily accompanying the killing"; *State* v. *Breton*, supra, 212 Conn. 270; is attributable both to the instrument of death and the rapidity with which unconsciousness and death ensued. Although the § 53a-46a (h) (4) aggravating factor can

---

[64] To prove that the defendant had intended to inflict pain and suffering above and beyond that necessarily accompanying the underlying killing, the state noted the following factors. The defendant was enraged that Bagshaw interrupted his elaborate burglary scheme. Having been alerted by his brother Duane Johnson that the trooper making his rounds might return to the store, the defendant chose to stay to complete the theft rather than escape. The defendant continued to shoot at Bagshaw even after the trooper cried out. The defendant also chose a bullet with great destructive power and the defendant failed to render assistance to Bagshaw, instead leaving him to die. In addition, the defendant hated police and lacked remorse for the killing. The defendant fired seventeen shots, although he could have killed Bagshaw "instantly." Because we determine that the state failed to prove the defendant's conduct did in fact inflict extreme physical or psychological pain or torture on Bagshaw above and beyond that necessarily accompanying the underlying killing, we need not decide whether the state proved beyond a reasonable doubt that the defendant specifically intended to inflict such extreme pain and torture.

be satisfied in a case in which death has been inflicted by a gunshot wound, in order to establish the cruelty there must be something more about the killing than the pain associated with the death resulting from the gunshot. For example, in *James* v. *State*, 695 So. 2d 1229, 1235 (Fla.), cert. denied, 522 U.S. 1000, 118 S. Ct. 569, 139 L. Ed. 2d 409 (1997), the Florida Supreme Court noted that the "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel."[65]

To qualify for the imposition of the death penalty, a murder by shooting must be distinguished somehow from the "norm" of murders. *Lewis* v. *State*, 398 So. 2d 432, 438 (Fla. 1981) (multiple rifle and shotgun wounds

[65] Similarly, in *State* v. *Webb*, 238 Conn. 389, 487, 680 A.2d 147 (1996), we concluded that the jury reasonably found that the victim experienced extreme physical and psychological pain beyond that necessary to accomplish her death. This court related the following evidence: "Prior to her death, [the victim] experienced a prolonged abduction during which she was held at gunpoint while the defendant drove, for approximately twelve minutes, to a park nearly four miles away from the point of abduction. . . . Once they arrived at the park, the defendant either forcibly removed or forced the victim to remove her shoes, pantyhose and panties, and he attempted to assault her sexually. . . . After the victim escaped from the defendant, he shot her twice in the back. These wounds caused the victim to suffer excruciating pain and hemorrhaging, caused her to aspirate blood from her mouth, and rendered her unable to walk. . . . While repeatedly crying for help, the victim then began crawling away from the defendant, and crawled for a distance of approximately thirty-three yards. . . . As the victim crawled away and cried repeatedly for help, the defendant got into the car and drove to where the victim had crawled. The defendant got out of the car, walked over to the victim and, standing directly in front of her, shot her three more times: in the chest, in the ear and, bending over the prostrate victim, point blank in the face. This last shot finally killed the victim. As much as three minutes may have passed between the time the defendant first wounded the victim and when he shot her for the last time. . . . Finally, the bullets used by the defendant were specially designed to generate a high velocity and, as a result, had greater destructive capacity than ordinary bullets. At least two of the bullets were designed with hollow points, which caused them to expand upon impact and cause greater damage than ordinary bullets." Id., 486–87.

through window not "conscienceless or pitiless crime which is unnecessarily torturous to the [murder] victim"). Our "heinous, atrocious or cruel" aggravator should "[refer] to the few capital killings that are in an objectively measurable way more horrible and more noxious to civic sensibilities than the run of such crimes." *Hansen* v. *State*, 592 So. 2d 114, 151–52 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S. Ct. 1970, 118 L. Ed. 2d 570 (1992).

Given the manner in which Bagshaw was murdered and the speed with which he died, as reprehensible as the attack was, there is no principled way to distinguish this case from the "ordinary" gunshot death or to differentiate it from the norm of capital felonies. See *Kearse* v. *State*, 662 So. 2d 677, 686 (Fla. 1995) (where defendant grabbed police officer's weapon and fired nine shots into officer's body and four shots into his bulletproof vest, killing did not satisfy heinous, atrocious or cruel aggravating circumstances); *Reaves* v. *State*, 639 So. 2d 1, 6 (Fla.), cert. denied, 513 U.S. 990, 115 S. Ct. 488, 130 L. Ed. 2d 400 (1994) (where defendant fired seven shots at deputy sheriff, striking him with four, crime was not heinous, atrocious or cruel); *Robertson* v. *State*, 611 So. 2d 1228, 1233 (Fla. 1993) (where woman was shot several times during robbery, murder not heinous, atrocious or cruel); *McKinney* v. *State*, 579 So. 2d 80, 84 (Fla. 1991) (although victim shot seven times, "murder is not heinous, atrocious or cruel without additional facts to raise the shooting to the shocking level"); *Raulerson* v. *State*, 420 So. 2d 567, 571–72 (Fla. 1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3572, 77 L. Ed. 2d 1412 (1983) (killing not heinous, atrocious or cruel where during robbery, defendant shot officer in chest and after officer cried out that he was hurt, defendant fired five more shots, shooting officer in heart, killing him); *Fleming* v. *State*, 374 So. 2d 954, 959 (Fla. 1979) (where police officer killed by single shot, during struggle, crime not

heinous, atrocious or cruel); *State* v. *Biegenwald*, 106 N.J. 13, 51, 524 A.2d 130 (1987) (where victim shot four times in skull, insufficient evidence that murder accompanied by either aggravated battery or torture as required by New Jersey statute). As in many of the aforementioned cases, the pain caused by the one bullet that penetrated Bagshaw's vital organs, killing him within moments, necessarily accompanied the underlying killing.

Indeed, as many courts have determined, "[o]rdinarily, an instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious or cruel." *Robinson* v. *State*, 574 So. 2d 108, 112 (Fla.), cert. denied, 502 U.S. 841, 112 S. Ct. 131, 116 L. Ed. 2d 99 (1991); see *State* v. *Graham*, 135 Ariz. 209, 210, 660 P.2d 460 (1983) (murder not committed in especially cruel, heinous or depraved manner where defendant "fired twice in rapid succession through" closed screen door, hitting victim "once in the head and once in the chest"; victim "rendered unconscious immediately, died within five minutes and did not suffer"); *Kearse* v. *State*, supra, 662 So. 2d 686 (gunshot killing not heinous, atrocious or cruel where police officer victim "could have remained conscious for short time or rapidly gone into shock"); *Burns* v. *State*, 609 So. 2d 600, 606 (Fla. 1992) (murder not especially heinous, atrocious or cruel where, during struggle with highway patrol trooper, motorist got hold of trooper's revolver, stood over trooper and fired one fatal shot; "the wound would have caused rapid unconsciousness followed within a few minutes by death"); *Richardson* v. *State*, 604 So. 2d 1107, 1109 (Fla. 1992) (killing not heinous, atrocious or cruel where victim "was shot suddenly in the heart, lost consciousness, and died within moments"); *Rivera* v. *State*, 545 So. 2d 864, 866 (Fla. 1989) (murder not especially heinous, atrocious or cruel where defendant fired five shots at police officer, hitting

him once in arm and twice in chest; "all three shots were fired within approximately sixteen seconds of each other," and officer "did linger for a few moments after the fatal shots were fired"); *State* v. *Moore*, 432 So. 2d 209, 212 (La.), cert. denied, 464 U.S. 986, 104 S. Ct. 435, 78 L. Ed. 2d 367 (1983) (where victim "died almost instantly from a single gunshot wound [to the chest]," state failed to prove aggravating circumstance of "especially heinous, atrocious or cruel manner"); *State* v. *Stewart*, 197 Neb. 497, 523, 250 N.W.2d 849 (1977) (killing not especially heinous, atrocious or cruel, where "death was instantaneous, by reason of a gun shot wound to [victim's] head"); *State* v. *Stanley*, 310 N.C. 332, 340, 312 S.E.2d 393 (1984) (murder not especially heinous, atrocious or cruel where defendant fired nine shots at victim, all in rapid succession, and lethal wound to victim's aorta "rendered her unconscious within minutes").[66] In the present case, there was "no evidence that [the defendant] had a quicker or less painful method available to him" that would have caused Bagshaw's death any faster or less painfully. See *State* v. *Tuttle*, 780 P.2d 1203, 1218–19 (Utah 1989), cert. denied, 494 U.S 1018, 110 S. Ct. 1323, 108 L. Ed. 2d 498 (1990).

Although there are cases in which a near instantaneous death by gunfire could satisfy the § 53a-46a (h) (4) factor, typically such cases have involved extreme

---

[66] These cases, like the present case, are markedly different from *State* v. *Chaney*, 141 Ariz. 295, 312, 686 P.2d 1265 (1984), the case upon which Chief Justice McDonald's dissent is anchored. In *Chaney*, "[a]t least one shot from behind was from such short range that powder burns were left on his body. After the attack, the victim, who was a doctor, was conscious for approximately 30 minutes. He was slowly bleeding to death, and he knew it. He told the medics, 'I'm dying, I'm dying.' His left arm was almost severed by a bullet, it hung to the body by a muscle; the victim looked at what remained of his arm. Before help arrived, he could hear the radio transmissions and the fact that no one was sure where he was for several minutes. It [was] not necessary to speculate about the victim's mental anguish; he helplessly and uselessly begged and waited for help." Id.

fear, emotional strain and terror during the events leading up to the murder. See, e.g., *Henyard* v. *State*, 689 So. 2d 239, 254 (Fla. 1996), cert. denied, 522 U.S. 846, 118 S. Ct. 130, 139 L. Ed. 2d 80 (1997) (defendant's abduction of mother and her three and seven year old daughters, rape and shooting of mother, followed by execution of girls, sufficiently terrifying to children to constitute cruel, heinous and atrocious aggravating factor). Fortunately, this case was not accompanied by such cruelty. Six seconds of being the target of the defendant's fusillade and up to ninety seconds of consciousness following being struck by one bullet do not suffice to meet the heinous, atrocious or cruel aggravating factor. Short of an instantaneous death, which, according to Carver, is quite rare, occurring only when there is a direct injury to the brain stem or sufficient trauma to the brain cavity, virtually *any gunshot wound* will involve some pain. The issue, in this case, is whether there existed the requisite extreme pain or torture above and beyond that necessarily accompanying the underlying killing. We conclude that it did not exist.

The state also points to the shrapnel arm wound to support the finding of the § 53a-46a (h) (4) factor. As the aforementioned cases further demonstrate, however, the fact that the victim sustained more than one wound does not, by itself, establish an aggravating factor. See *Shere* v. *State*, 579 So. 2d 86, 96 (Fla. 1991) (that defendant fired multiple gunshots insufficient to support finding of cruel, heinous or atrocious); *McKinney* v. *State*, supra, 579 So. 2d 84 (although victim was shot multiple times, murder is not heinous, atrocious or cruel without additional facts to raise shooting to shocking level required by this factor). This is particularly so when each shot was fired *in a manner to kill*; *Cannady* v. *State*, 620 So. 2d 165, 169 (Fla. 1993); and the elapsed time between the shots was temporally insignificant. See *Brown* v. *State*, 526 So. 2d 903, 907

(Fla.), cert. denied, 484 U.S. 944, 109 S. Ct. 371, 102 L. Ed. 2d 361 (1988) (where "fatal [head] shots came almost immediately after the initial shot to the [officer's] arm," crime was not especially heinous, atrocious or cruel); *Commonwealth* v. *Brode*, 523 Pa. 20, 29, 564 A.2d 1254 (1989) (although defendant first shot his wife in abdomen and elbow, then reloaded and fired fatal shots to her chest, there was no evidence supporting state's theory that defendant "might have allowed time to elapse between shots so that victim might suffer").

Moreover, with regard to Bagshaw's shrapnel arm wound, the evidence does not demonstrate whether that wound preceded or followed the fatal chest wound, and thus it is uncertain whether Bagshaw was even conscious when that wound was inflicted. Consequently, this nonfatal wound could not support the aggravating factor in issue. See *State* v. *Cobb*, supra, 251 Conn. 446–50; see also *State* v. *Jiminez*, 165 Ariz. 444, 453, 799 P.2d 785 (1990) ("[t]o support a finding of cruelty, the state must prove beyond a reasonable doubt that the victim was conscious and suffered pain or distress at the time of the offense"); *Perry* v. *Oklahoma*, 893 P.2d 521, 534 (Okla. Crim. App. 1995) (in prosecution under especially heinous, atrocious or cruel aggravating circumstance, "[i]t is . . . critical that the State prove that the victim consciously suffered before death"). Finally, even assuming that Bagshaw was conscious when he sustained the arm wound, there was no evidence that the wound would have caused the *extreme* pain required for the finding of the aggravating factor. In fact, the state implicitly acknowledged the absence of such extreme pain in its closing argument.[67]

To the extent that the state relies on extreme psychological pain, we also disagree that the evidence was

---

[67] The state simply argued that "the actual piece of shrapnel that went up into his arm . . . caused pain in addition to the pain of the bullet . . . ."

sufficient to satisfy the § 53a-46a (h) (4) factor. The state theorizes that Bagshaw's last utterance, namely, "Oh, my God," and his last act of activating his cruiser's lights, prove that he was suffering mental pain and anguish from the first moment of gunfire until he lost consciousness.

Although Bagshaw's last words certainly evoke great sympathy, such words do not demonstrate extreme psychological pain above and beyond that necessarily accompanying any killing that is not absolutely instantaneous. Moreover, the ability to activate the lights merely demonstrates that the trooper was conscious. Even if these combined factors show an awareness of his situation, we cannot conclude that "the mere apprehension of death, immediately before [or after] the fatal wounds are inflicted, amounts to serious psychological abuse prior to death." *Phillips* v. *State*, 250 Ga. 336, 341, 297 S.E.2d 217 (1982).

In *Phillips*, the defendant approached his estranged wife at her place of employment. When she saw that he was carrying a rifle, "she screamed 'Oh, no!' before [the defendant] fired [five] times in rapid succession"; she was hit by four of the shots, and "lived at least [five] minutes from the onset of the injuries." Id., 339–40. The court rejected the state's claim that, because the victim had "suffered pain and anticipated the prospect of death, she suffered serious physical and psychological abuse before death." Id., 340; see also *Clark* v. *State*, 609 So. 2d 513, 514 (Fla. 1992) (where "fatal shot came almost immediately after the initial shot to the chest," and "there [was] no indication that the crime was committed in such a manner as to cause unnecessary and prolonged suffering to the victim," insufficient proof that victim was aware of impending death so as to satisfy aggravating factor); *Shere* v. *State*, supra, 579 So. 2d 96 ("there was no prolonged apprehension of death," and no "prolonged suffering," where, without

warning, victim's hunting companions fired "a rapid succession of gunshots at [the victim] from close range with two weapons").

We conclude that there is no evidence that the defendant in the present case inflicted mental suffering upon Bagshaw "beyond that ordinarily suffered by anyone who is shot to death." *State* v. *Stanley*, supra, 312 S.E.2d 398.

Finally, the state claims that the homicide was especially heinous because it was senseless,[68] the victim was helpless and the defendant later expressed satisfaction in his accomplishment. These factors do no more than prove the defendant's intent to kill, something he had already admitted as part of his guilty plea. We have carefully considered all of the evidence supporting the jury's determination that the aggravating factors defined by § 53a-46a (h) (4) were proven. We are constrained to conclude, however, that the evidence was insufficient to meet the state's burden of proof.

V

The defendant also claims that the trial court deprived him of a fair determination of probable cause in violation of article first, § 8, of the constitution of Connecticut, and General Statutes § 54-46a. He further contends that he was deprived of the right to due process of law, the right of confrontation and the right to the assistance of counsel in violation of the fifth, sixth and fourteenth amendments to the constitution of the United States, and article first, §§ 8 and 9, of the constitution of Connecticut. Specifically, the defendant asserts that the trial court deprived him of a fair determi-

---

[68] In this regard, the state claims that the defendant was familiar with the premises and the surrounding area, that his brother Duane Johnson warned him the first time the trooper drove by and that he could have left before Bagshaw returned. According to the state, the combination of these factors demonstrates that the killing was senseless.

nation of probable cause because: (1) Judge Potter improperly presided over the probable cause hearing after issuing the defendant's arrest warrant; and (2) the trial court refused to sever the defendant's probable cause hearing from that of his brother, Duane Johnson.

The following additional facts are pertinent to this claim. The defendant's probable cause hearing commenced on September 23, 1991, before Judge Potter, the same judge who had issued the defendant's arrest warrant. The defendant did not raise the issue of Judge Potter's disqualification. The probable cause hearing was held jointly with that of the defendant's brother, Duane, who was also charged with capital felony.[69] On or about June 6, 1991, Duane had given the police an eight page statement detailing the events of June 5, 1991, and identifying the defendant as the shooter. Duane's statement was summarized in one paragraph of the affidavit that had been offered in support of the arrest warrant application for the defendant. Before the probable cause hearing had commenced, anticipating that the state would introduce Duane's statement, the defendant moved to sever their two cases. Based on *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), the state argued that severance was not necessary and that it intended to ask the court to consider Duane's statement against him only, and not against the defendant. The trial court denied the defendant's motion.

At the hearing, the state offered Duane's statement, and over the defendant's objection, the court admitted

[69] Duane Johnson was convicted of felony murder in violation of § 53a-54c, capital felony in violation of § 53a-54b, burglary in the first degree in violation of §§ 53a-101 (a) and 53a-8, larceny in the third degree in violation of §§ 53a-119, 53a-124 (a) (2) and 53a-8, and twenty counts of stealing a firearm in violation of §§ 53a-212 and 53a-8. On appeal, we vacated Duane Johnson's conviction on the capital felony count but affirmed his conviction on all of the remaining counts. See *State* v. *Johnson*, 241 Conn. 702, 706, 699 A.2d 57 (1997).

the statement only as to Duane. The court made a similar ruling with regard to another exhibit—a one page document containing additional information obtained from Duane on June 6, 1991. In concluding that the state had established probable cause to hold the defendant for felony murder and capital felony, the court specifically addressed the issue of Duane's statement. "The court reiterates its earlier statement regarding the admission of the statements of . . . Duane Johnson. The court has not considered any portion of these statements as they may apply to the defendant, Terry Johnson, in its decision [of] whether probable cause exists as to the aforesaid three charges against him—murder and felony murder in the first count and capital felony in the second count."

On December 10, 1992, the defendant pleaded guilty to the crimes of murder in violation of §§ 53a-54b (1), 53a-54a (a) and (c), and 53a-54c, and burglary in the first degree in violation of § 53a-101 (a) (1) and (2). The state claims that because the defendant's claims are nonjurisdictional in nature, he waived his right to raise them when he pleaded guilty. We agree.

It is well established that an unconditional plea of guilty, made intelligently and voluntarily, operates as a waiver of all nonjurisdictional defects and bars the later assertion of constitutional challenges to pretrial proceedings. *Tollett* v. *Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973). In general, the only allowable challenges after a plea are those relating either to the voluntary and intelligent nature of the plea or the exercise of the trial court's jurisdiction. Id.; *State* v. *Niblack*, 220 Conn. 270, 276–77, 596 A.2d 407 (1991). In this case, the defendant's challenges to the finding of probable cause were waived, because neither of these claims is relevant to the validity of his pleas, nor do they challenge the trial court's subject matter jurisdiction.

## VI

The vile nature of the crime committed by the defendant in this case cannot be overstated, either from the standpoint of Bagshaw's family, friends and colleagues or from the perspective of the community at large. When a peace officer is murdered in the course of his or her duties, the community rightly demands that the perpetrator of that atrocious deed be dealt with in the most severe terms permitted by law. It therefore is understandable that our statutory scheme defines the murder of a police officer as a capital felony, which carries, at a minimum, a sentence of life imprisonment without the possibility of release.

That same statutory scheme, however, authorizes a sentence of death only when the state has proven beyond a reasonable doubt one of the statutorily defined aggravating circumstances, which, in this case, was alleged to be that the murder was committed in an especially cruel, heinous and depraved manner. As judges, it is our sworn responsibility to apply the law in an objective, reasoned and dispassionate manner. We bear this responsibility equally in all cases, whoever the parties and however unpopular the result. Thus, we are obligated to determine whether there was sufficient evidence that the defendant in fact caused the victim extreme pain and torture *above and beyond that necessary to cause his death.*

In this case, there was not sufficient evidence to support those facts. Therefore, the discharge of our judicial duty in this case compels the conclusion that, under our law, the sentence of death imposed on the defendant cannot stand.

The judgment is reversed with respect to the imposition of the sentence of death and the case is remanded to the trial court with direction, pursuant to § 53a-46a (g), to impose a sentence of life imprisonment without

the possibility of release; the judgment is affirmed in all other respects.

In this opinion BORDEN, PALMER and CALLAHAN, Js., concurred.

MCDONALD, C. J., with whom FOTI and SCHALLER, Js., join, dissenting. I agree with parts I, II, III and V of the majority opinion. I disagree, however, with the reversal of the sentence of death. I would affirm that sentence.

I

I would hold that the cold-blooded and brutal murder of Trooper Russell Bagshaw was especially heinous and cruel.

We have defined the aggravating factor of committing the crime in "an especially heinous, cruel or depraved manner"; General Statutes (Rev. to 1991) § 53a-46a (h); to mean that the defendant intentionally inflicted pain and torture on the victim above and beyond that necessary to accomplish the murder. See *State* v. *Ross*, 230 Conn. 183, 261–62, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Breton*, 212 Conn. 258, 270–71, 562 A.2d 1060 (1989). In this case, the jury properly was instructed that, in order to find that this aggravating factor existed, it must find that the defendant intentionally inflicted such pain and torture on Trooper Bagshaw. The jury found the aggravating factor and we should view the evidence in the light most favorable to sustaining its verdict. As we said in *State* v. *Webb*, 238 Conn. 389, 485, 680 A.2d 147 (1996), citing *State* v. *Ross*, supra, 264: "Even with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defen-

dant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury."

The majority does not, in my reading, honor the jury's findings. Instead, it makes its own findings as a thirteenth juror. Rather than deciding if there is substantial evidence to support the jury's finding, the majority draws its own inferences from the evidence. This is a usurpation of the province of the jury. See, e.g., *Wichers* v. *Hatch*, 252 Conn. 174, 188, 745 A.2d 789 (2000) ("the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court" [internal quotation marks omitted]); *State* v. *Wooten*, 227 Conn. 677, 696, 631 A.2d 271 (1993) (same); see also *State* v. *Pinnock*, 220 Conn. 765, 786, 601 A.2d 521 (1992) ("[q]uestions of fact and of the credibility of witnesses . . . are within the purview of the jury, not the trial court").

The jury reasonably could have found that Trooper Bagshaw was making a routine police patrol check of the gun shop at 3 a.m. Bagshaw did not know that a burglary was taking place when the defendant fired seventeen rounds at Bagshaw's approaching cruiser. When the shooting began, Trooper Bagshaw called out, "Oh, my God" and turned on his strobe lights. All this time, the cruiser was still moving forward, and Trooper Bagshaw knew that he was unable to reach his pistol and that he was defenseless. Trooper Bagshaw lived in anticipation of being mortally wounded after the attack began. Both before and after being wounded, Trooper Bagshaw was aware of his impending fate but was unable to defend himself, escape or call anyone for help. From the outset of the ambush, Trooper Bagshaw's vehicle was pelted with bullet fragments and flying glass. The first eight rounds from the defendant's semiautomatic pistol did not wound the officer. One

bullet hit a nearby boat, two bullets glanced off the windshield of the cruiser and the remainder were stopped by the body of the cruiser. The fatal bullet was among the last nine shots fired. The hollow point bullet, designed to inflict maximum damage to game, entered and crossed the officer's chest, causing great physical pain. Trooper Bagshaw's lungs then slowly filled with blood, suffocating him as he bled to death.

The jury did not need to speculate about the officer's suffering, terror, anguish and despair. That is shown by his cry, "Oh, my God." Helpless in the face of mortal danger, Trooper Bagshaw called out to God in that agony and despair. It was entirely reasonable for the jury to have found that "Oh my God" spoken by a twenty-eight year old state trooper in these terrifying circumstances was a prayer in the face of death. The prayer is basic and instinctive. Throughout human history, the dying do turn to God for deliverance.

The majority states that these last words "evoke great sympathy"; page 77 of the majority opinion; but reverses the jury's conclusion that Bagshaw was making, in suffering, despair and terror, an anguished prayer for deliverance. The majority's sympathy naturally arises from Trooper Bagshaw's suffering, the very basis of the jury's finding of an especially heinous and cruel murder.

Other courts have affirmed a sentence of death in cases where the victims called out to God in the face of their impending death. See *Jimenez* v. *State*, 703 So. 2d 437, 438 (Fla. 1997) (upholding jury's conclusion that murder was especially heinous, atrocious or cruel when victim, suffering in pain and fear, shouted "Oh God! Oh my God!" during brutal stabbing); *People* v. *Steidl*, 142 Ill. 2d 204, 223, 568 N.E.2d 837 (1991) (upholding sentence of death for violent and heinous murders where one victim was held down and stabbed as she screamed

"Oh my God. Oh my God"); *Valdez* v. *State*, 900 P.2d 363, 384 (Okla. Cr. 1995) (evidence was compelling that murder was especially heinous, atrocious or cruel when victim struggled with defendant, repeating "Oh my God," before his death).

Like the killings in *State* v. *Ross*, supra, 230 Conn. 263, the jury could and did find that this murder "produced [in Trooper Bagshaw] extreme anxiety, fear and uncertainty as to [his] ultimate fate." The terror of a victim facing death, considered sufficient for the death penalty in *Ross* was clearly presented in the evidence. The conscious, psychological torture and terror that Trooper Bagshaw endured supports the jury's finding that the murder was committed in an especially heinous and cruel manner.

Because Trooper Bagshaw was conscious for only five to ninety seconds and lived for less than twenty minutes after the attack, the majority concludes that the jury's finding that the murder was committed in an especially heinous and cruel manner was not supported by the evidence. To the contrary, many other courts have held that, in a brutal murder, the length of time during which the victim is conscious is not controlling. In *Edwards* v. *State*, 441 So. 2d 84, 92 (Miss. 1983), the Supreme Court of Mississippi upheld a verdict that the shooting death of a police officer was especially heinous, atrocious or cruel, even though the victim lost consciousness within a matter of seconds and died no more than five minutes after being shot. See also *Bush* v. *State*, 695 So. 2d 70 (Ala. Crim. App. 1995) (upholding jury's finding that crime was heinous, atrocious or cruel when victim died very quickly); *State* v. *Mann*, 188 Ariz. 220, 934 P.2d 784, cert. denied, 522 U.S. 895, 118 S. Ct. 238, 139 L. Ed. 2d 169 (1997) (consciousness between eighteen seconds to several minutes is sufficient for finding of heinous, cruel or depraved murder); *People* v. *Johnson*, 154 Ill. 2d 356, 609 N.E.2d 294 (1993), cert.

denied, 512 U.S. 1227, 114 S. Ct. 2725, 129 L. Ed. 2d 848 (1994) (quick death where victim lost consciousness within five or ten seconds of attack was sufficient to find murder was especially brutal or heinous).

The jury heard evidence that the defendant was experienced with firearms and loaded his weapon with ammunition designed to do the most damage to his victim. The defendant purposefully used destructive hollow point bullets. This evidence substantiates the jury's finding of cruelty and heinousness. See *State* v. *Chaney*, 141 Ariz. 295, 686 P.2d 1265 (1984) (crime was cruel and heinous when defendant repeatedly fired hollow point ammunition at victim); *Commonwealth* v. *Stevens*, 543 Pa. 204, 215, 670 A.2d 623, cert. denied, 519 U.S. 855, 117 S. Ct. 151, 136 L. Ed. 2d 96 (1996) (use of hollow point bullets, which are highly destructive, illustrates intent to kill by means of torture). The jury also heard evidence that the defendant was an expert marksman at ranges from 50 to 300 meters, and that the officer's cruiser was only twenty feet from the defendant when he emptied the entire clip of seventeen rounds into the cruiser. I believe that this evidence supports a finding of cruelty and heinousness.

Shooting the officer from ambush in the dark is also evidence of aggravating circumstances. In *State* v. *Chaney*, supra, 141 Ariz. 312, the Supreme Court of Arizona, in circumstances very similar to those of this case, held that the ambush shooting of a police officer satisfied that state's "heinous, cruel and depraved" murder requirement. The Arizona court stated: "The murder was cruel. We know the victim suffered mental anguish. As the high-powered rifle was fired, bullets began bursting through the windshield, sending flying glass and metal throughout the vehicle, with approximately two hundred such objects striking with enough velocity that they ripped through the victim's clothes and struck his body. The victim knew his weapons were of no use to

him. The shotgun with which his vehicle was equipped had a safety lock on the mechanism that held it in place. . . . We also know he suffered because he said into his microphone, 'goddamn someone please help.' He was shot several times. . . . The murder was especially heinous and depraved. Chaney exhibited a complete disregard for the victim's life. Once the victim was down, he was helpless. . . . [Chaney] could have made his escape but he decided to shoot again. . . . Thus, the crime was also senseless. . . . Also, intentionally and repeatedly firing a high-powered, destructive weapon at the victim tends to show the crime was heinous and depraved." Id.

The evidence in this case is very similar to that in *Chaney*. This was a senseless murder, as the defendant had ample opportunity to flee the scene. The officer's death was not necessary, but instead of escaping, the defendant chose to shoot the officer in order to take away the stolen guns. Trooper Bagshaw knew that he was helpless to defend himself, as his pistol remained holstered during the attack. The testimony also demonstrated the defendant's complete disregard for Trooper Bagshaw's life. He showed no remorse; to the contrary, he took pleasure in murdering Trooper Bagshaw, as evidenced by his callous bragging about the crime.[1] See

---

[1] Brian Parisella, who was an inmate at the Hartford Correctional Center at the same time as the defendant, testified that the defendant had told him in a bragging tone that he had shot the trooper, and that the defendant had acted like it was not a big deal. Parisella further testified that the defendant had told him that if he was going to get into trouble, it was going to be for something big. The defendant added that the trooper had gotten what he deserved.

Kevin Shea, an inmate at the Hartford Correctional Center at the same time as the defendant, testified that the defendant had mentioned emptying a clip from an Uzi into an officer's car. According to Shea, the defendant had "made himself out to be some kind of hero."

Edward Chaput, a correction officer at the Hartford Correctional Center, testified that he had overheard the defendant tell other inmates: "I'm the one who killed the state trooper."

*State* v. *Greenway*, 170 Ariz. 155, 166–67, 823 P.2d 22 (1991) (evidence of bragging about murder relevant to depravity). The defendant looked forward to the notoriety that his actions would evoke,[2] and stated that he would do it again if given the chance.[3]

The defendant's hatred of police officers[4] also supports the jury's conclusion that he enjoyed firing the shots at Trooper Bagshaw and turning his police cruiser into "Swiss cheese."[5] The evidence showed that this was simply the callous and cruel slaughter of a police officer. As we said in *State* v. *Ross*, supra, 230 Conn. 262, "[e]vidence of the defendant's callousness or indifference to his victims' suffering would substantiate" a finding of an especially heinous, cruel or depraved murder.

The brutal murder of a police officer while performing his duties requires the state to impose the most

[2] The defendant and some friends went out to a pub the night after the murder. While the television in the pub played news coverage of Bagshaw's murder, the defendant repeatedly told his friends: "Remember me, just remember." Steven McMechen, one of the defendant's friends, testified that these statements caused him to believe that the defendant had murdered Bagshaw.

[3] The defendant told correction officer Robert Wolstencroft that he did not regret shooting Trooper Bagshaw and that he would do it all over again if given the chance.

[4] Melanie Bratavich, a former girlfriend of the defendant, testified that the defendant had told her on two separate occasions that he hated police officers and would kill one if he ever got the chance. Santo Downing, an acquaintance of the defendant, also testified that he had heard the defendant say that he did not like police officers because they were "in his way."

Sergeant Steven Fields of the Connecticut state police testified that, when he walked into Altone's Restaurant on June 6, 1991, the defendant shouted "smelt like pig in here." The defendant then told Fields that it was too bad that Fields had not been sitting behind the steering wheel of the car when the officer was shot.

[5] Donald Williams testified that the defendant had told him about Trooper Bagshaw's murder: "He said he thought the—the Uzi was an automatic so he pulled the trigger and only one shot came out and he heard the cop say, oh, my God, so then he said he kept firing and then he said the car looked like Swiss cheese."

severe penalty. "There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property." *Roberts* v. *Louisiana*, 431 U.S. 633, 636, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977). "Policemen on the beat are exposed, in the service of society, to all the risks which the constant effort to prevent crime and apprehend criminals entails. Because these people are literally the foot soldiers of society's defense of ordered liberty, the State has an especial interest in their protection. . . . Policemen are both symbols and outriders of our ordered society, and they literally risk their lives in an effort to preserve it. . . .[T]he State therefore has an interest in making unmistakably clear that those who are convicted of deliberately killing police officers acting in the line of duty be forewarned that punishment, in the form of death, will be inexorable." (Citation omitted.) Id., 646–47 (Rehnquist, J., dissenting).

The jury speaks for the community and is supreme in finding facts and drawing inferences from those facts. The majority's drawing its inferences from the facts is simply not true to the sovereignty of the people and their spokespersons on the jury. As Alexis de Tocqueville said in Democracy in America: "Trial by jury, as applied to the repression of crime, appears to me an eminently republican element in the government . . . [because] it places the real direction of society in the hands of the governed . . . ." 1 A. de Tocqueville, Democracy in America (1898 Ed.) p. 361.

Police officers are human beings who can and do suffer terror, despair and anguish in the face of a brutal, cowardly and deadly attack. The majority's decision does not protect them as society, speaking through the jury, rightly demands. See *State* v. *Johnson*, 241 Conn. 702, 721–24, 699 A.2d 57 (1997) (*McDonald, J.*, dissenting).

## II

Because I would affirm the sentence of death imposed on the defendant, I address his remaining arguments on appeal, most of which revisit claims that this court already has rejected many times.

### A

#### Jury Instructions on Aggravating Factor

The defendant argues that the trial court improperly instructed the jury on the "especially heinous, cruel or depraved" aggravating factor of General Statutes (Rev. to 1991) § 53a-46a (h). Specifically, the defendant argues that the trial court (1) improperly instructed the jury that the aggravating factor consisted of three separate and independent factors instead of one unitary factor; and (2) improperly defined "especially heinous," "especially depraved" and "especially cruel." I would reject these claims, following the principles of law set forth in *State* v. *Cobb*, 251 Conn. 285, 433, 743 A.2d 1 (1999), *State* v. *Webb*, supra, 238 Conn. 477–79, and *State* v. *Ross*, supra, 230 Conn. 259–62.

### B

#### Theory of Aggravation

The defendant also contends that the trial court improperly instructed the jury on a theory of aggravation that was not advanced by the state or supported by the evidence.[6] The defendant seeks review of this

---

[6] The trial court instructed the jury as follows:

"Now the theory of the case—or the theory of the state as argued to you is that despite being interrupted during the burglary as evidenced by the items taken from the store but then being left outside on the premises, the defendant had an escape route available to him to leave undetected, but he chose to ambush the officer, that he felt so secure in his position in the dark and the advantage of surprise, *that he purposefully did not aim the first shot at the officer so as to alert him of the attack to increase the pain to the officer in the form of impending harm.* . . .

"The following evidence may be considered, the nature of the following evidence may be considered by you in setting the time that Officer—or

unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine.[7] I would find that the defendant cannot prevail on this claim.

In *State* v. *Golding*, supra, 213 Conn. 239–40, we held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

The record here is adequate for review and the defendant claims that the trial court's instructions violated his constitutional right to due process. The alleged constitutional violation, however, does not clearly exist. There was evidence to support the trial court's instruction on the "purposeful miss" theory. The state presented evidence that the defendant hated police officers, and that he had the gun loaded with hollow point bullets in order to inflict great physical and mental pain upon his potential victim. There was also evidence that the defendant was an expert marksman at ranges from 50 to 300 meters and therefore easily could have aimed to hit or miss Trooper Bagshaw's cruiser, which

Trooper Bagshaw lived with what the state claims to have been the intent to inflict extreme pain or torture.

"As you recall *Dr. [Henry] Lee testified that the first shot did not strike the cruiser but hit the boat and the question then for you to determine is, was this shot to alert the trooper of ambush?*" (Emphasis added.)

[7] The defendant also asks for review of this claim under a "special capital [reviewability] rule." We recently held, however, that no special capital reviewability rule exists in our state. See *State* v. *Cobb*, 251 Conn. 285, 343–44 n.34, 743 A.2d 1 (1999).

was only twenty feet away. Dr. Henry Lee testified that the defendant did not hit the cruiser with the first shot, and missed Trooper Bagshaw with the first eight rounds, delivering the fatal bullet in one of the last nine rounds. From this evidence, the jury reasonably could have inferred that the defendant purposefully missed the officer in order to cause him mental pain and anguish. The jury instruction on this theory was not improper.[8]

C

Special Verdict Form

The defendant claims that the special verdict form submitted to the jury pursuant to General Statutes (Rev. to 1991) § 53a-46a (e)[9] was improper for two reasons. First, the defendant argues that the verdict form permitted the jury to return a death verdict without first unanimously having rejected each mitigating factor that he presented. Second, the defendant argues that the verdict form was inadequate because, with respect to the nonstatutory mitigating factors, it failed to distinguish between the jury's factual findings and the jury's judgments as to whether those facts were mitigating in nature. Thus, the defendant argues, the verdict form provides an inadequate record for appellate review. I would conclude that these claims are meritless.

---

[8] For these same reasons, the defendant's claim does not constitute one of plain error. Practice Book § 60-5 provides in relevant part that "[t]he court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . ." Neither the trial court's instruction on the theory of aggravation nor the jury's findings in that regard were clearly erroneous, and there was no plain error.

[9] General Statutes (Rev. to 1991) § 53a-46a (e) provides in relevant part: "The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor."

1

## Unanimity of Mitigating Factors

The verdict form and the jury instructions did inform the jury properly that a finding of no mitigating factor had to be unanimous. The special verdict form read, "Has the defendant proved by a preponderance of the evidence a mitigating factor?" and provided a space for the jury to check "Yes" and a space for the jury to check "No." The trial court instructed the jurors to answer the question in the affirmative if they found that the defendant had proved a mitigating factor and, alternatively, in the negative if they found that the defendant had not proved a mitigating factor. The trial court also told the jury that any decision must be unanimous. Even in capital murder cases, the jury is "presumed to follow the court's directions in the absence of a clear indication to the contrary." *State* v. *White*, 229 Conn. 125, 160, 640 A.2d 572 (1994).

The defendant argues that the special verdict form was defective under our holding in *State* v. *Breton*, 235 Conn. 206, 237–44, 663 A.2d 1026 (1995).[10] In contrast

---

[10] The special verdict form in *Breton* contained two options with regard to each mitigating factor: (1) "Yes, we the jury unanimously agree that the Defendant has proved this mitigating factor by a preponderance of the evidence"; and (2) "No, we the jury do not unanimously agree that the Defendant proved this mitigating factor by a preponderance of the evidence." *State* v. *Breton*, supra, 235 Conn. 237. We held that this verdict form was defective because of the second option, reasoning that "[t]he literal meaning of the response 'we the jury do not unanimously agree that the defendant proved [the] mitigating factor' is plain: the jury was *unable to reach unanimous agreement* that the defendant had proved the existence of the mitigating factor. Thus, the jury's affirmance of that statement in response to the two questions on mitigating factors definitively established only that *one or more of its members had not found* the existence of those factors; the answers do not necessarily establish that the jury *had unanimously rejected any of the mitigating factors*. . . . It cannot be determined, therefore, solely upon review of the special verdict form, whether the jury's responses on the statutory and nonstatutory mitigating factors were unanimous." (Emphasis in original.) Id., 238–39.

to *Breton*, however, the "No" response in the special verdict form in this case indicates that the jury unanimously agreed that the defendant had not proved a mitigating factor. Moreover, unlike in *Breton*, it is clear from the special verdict form and the record that each juror found that no mitigating factor existed. Each juror signed the special verdict form and, in open court, affirmed that the form accurately reflected his or her verdict. In this case, each juror examined each mitigating factor and concluded that the defendant had not proved any of them. I would conclude that the defendant's claim must fail.

## 2

### Bifurcated Verdict Form

Second, the defendant argues that the special verdict form was inadequate because it failed to bifurcate the jury's factual finding and mitigating judgment, making meaningful appellate review impossible. I would reject this claim because the evidence before the jury provides a sufficient record for appellate review. See *State* v. *Cobb*, supra, 251 Conn. 451–52 (affirming trial court's denial of motion for articulation, stating that "the panel's refusal to make its verdict more specific has not impaired our ability to review it because we can examine the evidence on which the panel reasonably may have relied"). Meaningful appellate review is not hampered because, whatever the jurors' reasoning in rejecting the nonstatutory mitigating factors, this court can examine the record to determine if a mitigating factor exists as a matter of law.

## D

### Sufficiency of Mitigating Evidence

The defendant also claims that the evidence established a mitigating factor as a matter of law. I would disagree.

The defendant claimed the following nineteen mitigating factors: (1) his mental capacity at the time of the offense was significantly impaired; (2) his ability to conform his conduct to the requirements of the law at the time of the offense was significantly impaired; (3) he was born into and raised by a family whose history shows strong evidence of a malignant, genetic loading for antisocial behavior and for mental illness; (4) he was a battered child; (5) his life history shows the typical developmental history, family history and young adult profile common to severely abused and neglected persons who go on to commit violent criminal offenses; (6) he has experienced a significant loss of cognitive capacity over recent years; (7) his psychiatric/psychological profile presents significant evidence that he is currently suffering from the insidious onset of a major mental disorder; (8) he has experienced several clinically significant head traumas which have contributed to his explosive temperament and minimal impulse control; (9) he has suffered from a variety of forms of serious mental illness throughout his life, including attention deficit hyperactivity disorder, conduct disorder, antisocial personality disorder, and alcohol or substance abuse; (10) he never received any psychiatric therapy and treatment at a mental health hospital prior to the offense despite several recommendations that such intervention was merited; (11) he was significantly and traumatically affected by his abandonment by his mother and by her repeated failure to protect him from physical and emotional abuse; (12) he was twenty-one years old at the time of the offense and had an immature adolescent personality consistent with that of a young teenager; (13) his father, brothers and sister and other friends and acquaintances have expressed a desire to maintain personal relationships with him and to offer him their personal support and friendship during his imprisonment; (14) he is the father of two young daugh-

ters with whom he has an ongoing affectionate relationship, and his daughters have the support and encouragement of their mothers to maintain their contact with their father during his imprisonment; (15) he has pleaded guilty to capital felony, felony murder, and burglary in the first degree; (16) he joined the National Guard in 1989 and served his country in a National Guard unit for approximately two years; (17) mercy as well as concern for the defendant's unique life; (18) any other particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime that the jury might find to be a basis for a sentence less than death; (19) in light of all the mitigating evidence presented, life imprisonment without the possibility of release is the appropriate sentence in this case. In support of his mitigating factors, the defendant submitted evidence to show that he was raised by a dysfunctional and abusive family, he has suffered from various psychological disorders, he served his country in the Connecticut Army National Guard for almost two years, and he is the father of two young daughters with whom he has an ongoing relationship.

"Although our review of the evidence in mitigation of the death penalty is a heightened one . . . we will not substitute our judgment or opinions for that of a reasonable jury. . . . Instead, we must determine whether the defendant's proof of a mitigating factor was so clear and so compelling that the jury, in the exercise of reasoned judgment, could not have rejected it." *State* v. *Breton*, supra, 235 Conn. 229. "[T]he credibility of the defendant's expert and lay witnesses, and the weight to be given to their testimony regarding the existence of mitigating factors, is a matter committed to the sound judgment and common sense of the trier of fact." Id., 234.

Upon review of the record, I would conclude that the jury reasonably could have rejected the defendant's proof of any mitigating factor. The jury could have concluded that the defendant had not proved his allegations of fact or that the facts, if proved, were not mitigating in nature. Because the evidence does not establish a mitigating factor as a matter of law, I would hold that the defendant's claim must fail.

## E

### Jury Instructions on the Mitigating Factors

The defendant claims that the trial court improperly instructed the jury on a number of the mitigating factors. Specifically, he argues that the trial court improperly instructed the jury regarding (1) the appropriateness of death as a mitigating factor and mercy as a mitigating factor; (2) the catch-all mitigant; (3) the cumulative impact of the mitigating evidence; and (4) the guilty plea as a mitigating factor. I would reject these claims because the jury instructions properly referred to all the defendant's claimed mitigating factors. The trial court instructed the jury to "consider all the factors which the defendant has listed and all the factors which might arise from the evidence and ask yourself, is there a circumstance or factor which you can draw from the evidence of the defendant's character, background, history or the nature or circumstances of the crime which provides a basis for a penalty less than death."

## F

### Jury Instructions on Responsibility for Death Sentence

The defendant argues that the trial court improperly failed to instruct the jury that it was solely responsible for the decision on whether to impose the death penalty

or a sentence of life in prison without the possibility of release. I would reject this claim.

The defendant argues that the court's charge, which instructed the jury that the court would be "directed," rather than "bound," by the jury's findings, was improper.[11] I would conclude that the trial court's instruction adequately informed the jury that it was solely responsible for determining whether the defendant would receive the death penalty. The instruction given by the trial court could not have misled a reasonable juror into believing that the jury's special verdicts on the mitigating and aggravating factors were merely advisory, rather than mandatory. Accordingly, I would hold that the jury charge given by the trial court was proper.

G

## Jury Instructions on Alternative Sentence of Life Imprisonment

The defendant argues that the trial court improperly failed to instruct the jury on the alternative sentence of life in prison without possibility of release. Relying on *Simmons* v. *South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), the defendant argues that jurors must be given accurate and complete information on the alternative sentence, including the fact that the defendant would spend the rest of his natural life in prison.

---

[11] The trial court instructed the jury as follows: "If the state fails to prove an aggravating factor, the sentence imposed on the defendant is a life sentence without possibility of release. If the state proves an aggravating factor but the defense proves a mitigating factor, the sentence imposed upon the defendant is a life sentence without possibility of release. The only way the death penalty may be imposed is if the state proves an aggravating factor and the defense fails to prove a mitigating factor. Now, the judge is the one who imposes the sentence, but as you can see, he is directed by the jury's findings of the existence or nonexistence of aggravating and mitigating factors."

In *Simmons* v. *South Carolina,* supra, 512 U.S. 157, the prosecutor argued to the jury that it should consider the petitioner's future dangerousness to society when fixing the appropriate punishment. Concerned that the jury might not understand that the future threat to society would be minimal if the defendant were not sentenced to death because the alternative sentence was life in prison without possibility of parole, the defendant requested that the court define "life imprisonment" to the jury. Id., 158. The trial court refused to give the requested instruction. Id., 159–60. Ninety minutes into its deliberations, the jury sent a note to the judge inquiring whether a life sentence carried with it the possibility of parole. The judge then gave the following instruction: " 'You are instructed not to consider parole or parole eligibility in reaching your verdict. Do not consider parole or parole eligibility. That is not a proper issue for your consideration. The terms life imprisonment and death sentence are to be understood in their [plain] and ordinary meaning.' " Id., 160. The plurality of the United States Supreme Court found that the "instruction actually suggested that parole *was* available, but that the jury, for some unstated reason, should be blind to this fact. Undoubtedly, the instruction was confusing and frustrating to the jury . . . ." Id., 170. The plurality concluded that "[b]ecause truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court." Id., 169.

In this case, the trial court instructed the jury regarding the circumstances that require the imposition of a life sentence without possibility of release,[12] but did not

---

[12] The court charged the jury as follows: "The statutory scheme is as follows. If the state fails to prove an aggravating factor, the sentence imposed on the defendant is a life sentence without possibility of release. If the state proves an aggravating factor but the defense proves a mitigating factor, the sentence imposed upon the defendant is a life sentence without possibility

expand on the meaning of that sentence. Unlike the instruction in *Simmons*, the instruction in this case was neither confusing nor misleading, but was an accurate statement of the controlling law. Moreover, the state did not argue that the future dangerousness of the defendant should be considered, as the prosecution did in *Simmons*, and the court did not allude to future dangerousness in its instructions. *Simmons* does not require a trial court to define the meaning of life imprisonment without the possibility of release in all circumstances and I would decline to hold that such an instruction was necessary in this case.[13] Accordingly, the trial court's refusal to give the requested instruction was proper.

## H

### Distinction between Statutory and Nonstatutory Mitigants

The defendant next argues that the trial court improperly failed to explain the legal distinction between statutory and nonstatutory mitigating factors, which had two prejudicial effects. First, the defendant claims that the jury instructions allowed the jury to reject the claimed statutory mitigating factors, even if it found such factors factually proven, by improperly substituting its judgment as to the mitigating nature of those factors for the judgment already made by the legislature. I would hold that this claim is meritless. The trial court's instructions properly directed the jury that, if it found the factual basis for either of the two statutory mitigating

---

of release. The only way the death penalty may be imposed is if the state proves an aggravating factor and the defense fails to prove a mitigating factor."

[13] As argued by the state of South Carolina in *Simmons*, an instruction informing the jury that the defendant would never be released into society might be inherently misleading because future exigencies such as legislative reform, commutation, and clemency might allow the defendant to be released into society. See *Simmons* v. *South Carolina*, supra, 512 U.S. 166.

factors, it would have found the existence of the mitigating factor.[14]

Second, the defendant claims that the jury instructions improperly prevented the jury from considering the nonstatutory parallels to the defendant's claimed statutory mitigants. The defendant claimed two statutory mitigating factors, namely, that his mental capacity was significantly impaired and that his ability to conform his conduct to the requirements of the law was significantly impaired. The defendant argues that the jury was misled in thinking that if it did not find the claimed statutory factors because of the "significant impairment" threshold, then it need not consider any lower level of impairment that it might have found. I would conclude that this claim is without merit. The defendant listed two nonstatutory mitigating factors that related to "less than significant" impairment of the defendant's mental capacity and ability to conform his conduct to the requirements of the law,[15] and the jury properly was instructed to consider those factors. I would conclude that the trial court's instructions were proper.

---

[14] The trial court instructed the jury that "if you find that the defendant had a significant impairment of his ability to know and understand in a reasonable manner the nature and character of his acts or conduct at the time of the offense by a fair preponderance of the evidence, *then you have found* the first proposed mitigating factor set out in the statute and by the defendant. Likewise, if you find that the defendant's ability to conform his conduct to the requirements of the law was significantly impaired at the time of the offense by a fair preponderance of the evidence, *then you have found* the second proposed mitigating factor set out in the list of the defendant or set out in the statute." (Emphasis added.)

[15] The defendant presented the following nonstatutory mitigants relating to his mental capacity: (1) his "psychiatric/ psychological profile presents significant evidence that he is currently suffering from the insidious onset of a major mental disorder"; and (2) he "has suffered from a variety of forms of serious mental illness throughout his life, including: a) attention deficit hyperactivity disorder; b) conduct disorder; c) antisocial personality disorder; d) alcohol or substance abuse."

## I

### Proof of Mitigating Nature of Nonstatutory Factors

The defendant argues that the trial court improperly required him not only to prove the factual basis of the claimed nonstatutory mitigating factors, but also to prove that they were mitigating in nature, where the latter is a matter of judgment, not of fact, and thus not susceptible of proof. We recently rejected a similar argument in *State* v. *Cobb*, supra, 251 Conn. 458. I would accordingly reject this argument.

## J

### Irrelevant and Prejudicial Evidence

The defendant argues that the trial court erroneously admitted irrelevant and prejudicial evidence during the penalty hearing. The defendant asserts that the issues in the penalty phase were limited to the consideration of aggravating and mitigating factors, and the admission of evidence to prove his involvement in the crimes, to which he had pleaded guilty, was improper.[16] The defendant also argues that the admission of his post-crime statements was improper.[17]

" 'Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an

[16] This evidence included: photographs of the interior and exterior of the Land and Sea; lists of stolen weapons and admission of the stolen weapons themselves; weapons and other items found on the ground outside the gun shop; wire cutters and strippers; bloodstained items; fingerprint evidence; a videotape of the crime scene; testimony from a drive-by witness; Duane Johnson's sneakers; sneaker imprints on the boat; items seized from the defendant's residence; the vehicle identification number of the Volkswagen; weapons stolen during the 1990 burglary; fingerprints from the 1990 burglary; the strobe light box switch from the trooper's cruiser; evidence of whether fear can cause pain; and evidence of the defendant's marksmanship with an M-16 rifle.

[17] This evidence consisted of the testimony of Scott Ilewicz, Donald Williams, Steven McMechen, Robert Hanson, Melanie Bratavich, Sergeant Steven Fields, Robert Wolstencroft, Brian Parisella and Kevin Shea.

issue.' " *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995). "Determinations of relevancy are within the broad discretion of the trial court and will not be overturned in the absence of clear abuse of that discretion." *State* v. *Thomas*, 205 Conn. 279, 283, 533 A.2d 553 (1987). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . The aggrieved party, therefore, assumes a heavy burden when seeking to reverse the exercise of judicial discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Tirado*, 194 Conn. 89, 95, 478 A.2d 606 (1984).

The defendant's bragging after the murder was relevant because it illustrated his intent during the murder of Trooper Bagshaw. "Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. *State* v. *Greenfield*, [228 Conn. 62, 77, 634 A.2d 879 (1993)]." (Internal quotation marks omitted.) *State* v. *Raguseo*, 238 Conn. 253, 257, 681 A.2d 922 (1996). The defendant's statements revealed his lack of remorse, and even his pleasure in murdering Trooper Bagshaw. See footnotes 1 through 5 of this dissent. This evidence was relevant to the aggravating factor, because it demonstrated that the defendant intended to inflict extreme pain and torture above and beyond that necessarily accompanying the underlying murder. It was not an abuse of discretion for the trial court to admit this evidence.

The evidence concerning the defendant's involvement in the burglary of the gun shop was relevant to his intent to inflict extreme pain and torture on anyone frustrating the crime. The fact that the defendant had burglarized the shop in 1990 also showed his familiarity with the gun shop and its merchandise to be stolen. I

would conclude that the trial court did not abuse its discretion in admitting this evidence.

Moreover, when the imposition of the death penalty is the issue, all the facts and circumstances surrounding the case should be presented to the jury. We have observed that "[a] jury that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum." *State* v. *Ross*, supra, 230 Conn. 284. Similarly, the United States Supreme Court has held that "the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime." *Barclay* v. *Florida*, 463 U.S. 939, 967, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983). I would conclude that the trial court did not abuse its discretion in admitting this evidence.

K

Restriction of Cross-Examination

The defendant also claims that the trial court improperly restricted his ability to cross-examine the state's rebuttal witnesses.

General Statutes (Rev. to 1991) § 53a-46a (c) provides in relevant part: "Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials in criminal matters . . . ." In *State* v. *Ross*, 251 Conn. 579, 583, 742 A.2d 312 (1999), we recently held that this statutory language must be strictly construed to allow the admission of any evidence relevant to the mitigating factors. The improper exclusion of relevant evidence, however, may be harmless if the evidence would have been cumu-

lative of other evidence presented at the hearing. See *State* v. *Shabazz*, 246 Conn. 746, 760, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). Examining the excluded evidence, I would conclude that any error was harmless because the excluded testimony either was not relevant to a mitigating factor or it was cumulative.

L

Admission of Statements to Correction Officer

The defendant argues that the trial court improperly allowed Robert Wolstencroft, a correction officer at the Hartford Correctional Center, to testify regarding statements that the defendant had made to him when Wolstencroft was observing the defendant as an inmate of the correctional center during a one-on-one suicide watch. The defendant maintains that the trial court's admission of these statements violated his privilege against self-incrimination and his rights to due process and to counsel. See U.S. Const., amend. V, VI, XIV; Conn. Const., art. I, §§ 8, 9. I would reject the defendant's claims.

When the state called Wolstencroft as a witness, the defendant moved to suppress his testimony. At the suppression hearing, the following evidence was produced. While at the correctional center, the defendant attempted suicide by an overdose of sleeping pills and was taken to the hospital. Upon his return to the correctional center, the defendant was placed in a hospital isolation area under a one-on-one suicide watch. A correction officer was posted in front of his cell to watch the defendant constantly. The officer also was required to record the defendant's conduct in the logbook at fifteen minute intervals. On August 18, 1991, Wolstencroft was assigned to watch the defendant during the midnight to 8 a.m. shift. Wolstencroft initially asked the

defendant how he was feeling.[18] Wolstencroft described the defendant as "very talkative" between midnight and 12:35 a.m., when Wolstencroft took a meal break. Wolstencroft testified that, during those thirty-five minutes, the defendant volunteered information about his knowledge of weapons and ammunition, his involvement in the crimes at the Land and Sea gun shop and his reasons for the attempted suicide. Wolstencroft testified that he participated in a general· conversation with the defendant.

During his break, Wolstencroft discussed that conversation with his supervisor, who instructed him to write down "pertinent information about the suicide." Wolstencroft testified that, after his break, he and the defendant discussed the same subjects over and over all night. Wolstencroft testified that he asked the defendant three questions during this conversation.[19] As instructed, Wolstencroft made log entries regarding the defendant's actions throughout the night to assist the correctional center doctor. Wolstencroft also made personal notes for a future book about prison life. Wolstencroft testified that he made no report of his conversation with the defendant to any criminal investigators. Wolstencroft first mentioned the conversation to a state police officer at a highway construction site approximately one year later. The conversation with the officer led to Wolstencroft's first contact with a criminal investigator regarding this case.

---

[18] Wolstencroft testified: "I asked him how he was feeling—you know. Ah—was he—did he hurt himself? Is he physically all right after bein'— after attemptin' suicide?"

[19] At the beginning of the shift, Wolstencroft asked how the defendant was feeling. After his break Wolstencroft inquired several times "why [the defendant tried] to kill himself?" He also asked "how [the defendant] could . . . be so stupid to kill a state trooper?" and, after the defendant mentioned the burglary of the gun shop, Wolstencroft asked "if he would do the same crime again?"

The defendant testified at the suppression hearing that he was trying to sleep when Wolstencroft engaged in general conversation and asked specific questions about his criminal involvement. He denied giving Wolstencroft any information concerning the burglary and the killing of Trooper Bagshaw.

At the conclusion of the suppression hearing, the trial court denied the defendant's motion to suppress Wolstencroft's testimony. The trial court found that the defendant had failed to demonstrate custodial interrogation, and that the defendant had made the statements to Wolstencroft voluntarily.

On appeal, the defendant claims that Wolstencroft conducted a custodial interrogation, in violation of his *Miranda* rights. See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). I would reject this claim.

We have held that, once a defendant has invoked his right to counsel, he is not to be subject to "custodial interrogation" unless counsel is present. *State* v. *Evans*, 203 Conn. 212, 223–24, 523 A.2d 1306 (1987), citing *Miranda* v. *Arizona*, supra, 384 U.S. 436. Interrogation "may be either express questioning or its functional equivalent . . . [that] include[s] any statements or actions that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Evans*, supra, 225, citing *Rhode Island* v. *Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). While the determination of whether the defendant has been subjected to interrogation is an objective test, the police officer's subjective intent is relevant to the analysis. *State* v. *Evans*, supra, 226.

The United States Supreme Court has explained that *Miranda* v. *Arizona*, supra, 384 U.S. 436, applies where "the inquiring government is acutely aware of the poten-

tially incriminatory nature of the disclosures sought." *Garner* v. *United States*, 424 U.S. 648, 657, 96 S. Ct. 1178, 47 L. Ed. 2d 370 (1976). In *United States* v. *Morales*, 834 F.2d 35, 38 (2d Cir. 1987), the Court of Appeals for the Second Circuit stated: "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, *Miranda*[ v. *Arizona*, supra, 384 U.S. 467] (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought, *Garner* v. *United States*, [supra, 424 U.S. 657] (the investigative intent requirement)." See also *United States* v. *Thomas*, 961 F. Sup. 43, 45 (W.D.N.Y. 1997).

Although *Miranda* requires that, once an accused exercises his *Miranda* rights, he may not be subject to further interrogation by the police seeking incriminating statements, this does not mean that correctional officers having the custody and charged with the well-being of the accused may not speak to him or ask him any questions which may, although not designed to do so, result in incriminating statements. We held in *State* v. *Vitale*, 197 Conn. 396, 409–13, 497 A.2d 956 (1985), that a correction officer's conversation with an inmate whom the officer knew from high school was not an interrogation in violation of *Miranda*, even though the correction officer started a conversation that eventually "turned over" to the reasons the defendant had been arrested. Id., 410. We also held in *Vitale* that, because the state did not deliberately elicit incriminating information, the defendant's sixth amendment right to counsel was not violated. Id., 412, citing *United States* v. *Henry*, 447 U.S. 264, 270, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980) and *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

The trial court's essentially factual determination of whether the police officer's conduct constituted interrogation is reversed only if it is "clearly erroneous." *State v. Evans*, supra, 203 Conn. 227. "[W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Hartford Electric Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 346, 736 A.2d 824 (1999).

I would conclude that the trial court's finding that "the conversation [with Wolstencroft] would [not] elicit incriminating statements" was not clearly erroneous. The trial court found that Wolstencroft "obviously was not a sophisticated police officer looking for information." Wolstencroft was not acting as a police officer seeking that the defendant implicate himself in Trooper Bagshaw's death, but as a correction officer concerned and curious about the defendant's present feelings and his mental state during an intensive suicide watch. There was no evidence that Wolstencroft was working with or on behalf of any criminal investigators or had a duty to report to them. The trial court also concluded that Wolstencroft "was unaware that the statements had any evidentiary value." Wolstencroft did not immediately bring the defendant's statements to the attention of the state police. While the conversation with the defendant occurred in August, 1991, Wolstencroft did not give a statement to the police until October, 1992.

The trial court's conclusion that the defendant voluntarily conversed with Wolstencroft is supported by substantial evidence. The trial court found that Wolstencroft's testimony that the defendant "was very talkative before his break and that there was repetition of that conversation all through the night" was credible. The trial court found that the defendant's denial that he had made these admissions was not credible. From

this evidence, the trial court properly concluded that the defendant voluntarily had admitted his involvement in Trooper Bagshaw's murder.

M

Motion for Change of Venue

The defendant also claims that the trial court improperly denied his motion for a change of venue without providing a full-scale evidentiary hearing, thus depriving him of his rights to due process of law and a fair and impartial trial. U.S. Const., amend. V, VI, XIV; Conn. Const., art. I, §§ 8, 9. I would disagree with the defendant's claim.

On January 7, 1993, the defendant filed a motion for change of venue alleging that pretrial publicity had created a substantial likelihood that he would not receive a fair and impartial penalty hearing in the judicial district of Windham.[20] The defendant requested an evidentiary hearing on this motion, in order to present evidence that the pretrial publicity prejudiced his right to a fair trial. On January 12, 1993, the trial court determined that the motion was untimely but allowed the

[20] In his motion, the defendant claimed:

"5. Since June 5, 1991, the date of the alleged offense, this matter has been the subject of intense and pervasive media coverage.

"6. This media coverage has included, inter alia, items concerning the police investigation and subsequent arrest of the defendant, the personal characteristics of the victim and the effect of his death on family and friends, and the arrest, prosecution, and conviction of the defendant for these crimes, as well as coverage of other criminal convictions of the defendant for larceny, criminal trespass, failure to appear in court and criminal impersonation as well as various allegations of other criminal behavior for burglary and larceny, and the personal family, educational and social history of the defendant.

"7. Said news coverage will continue in nature and intensity until and during jury selection and during the penalty phase of the trial.

"8. The result of the foregoing is the creation of a substantial likelihood that the defendant will be denied his constitutionally guaranteed right to a fair trial within the Judicial District of Windham. . . ."

defendant to make an offer of proof. The defendant produced newspaper articles in support of his motion.[21] The trial court denied the motion, finding that the defendant did not meet his burden of demonstrating that the pretrial publicity would interfere with his right to a fair and impartial trial.[22]

On appeal, the defendant argues that the motion for change of venue was timely, that the trial court improperly required him to make an offer of proof in order to conduct an evidentiary hearing, and that the offer of proof he presented was sufficient to warrant a hearing on this motion. I would conclude that, even if the trial court improperly denied the motion for a change of venue, the error was harmless because the defendant has failed to demonstrate that he suffered any actual prejudice.

To reverse a conviction on appeal on the basis of the improper denial of a motion for change of venue, a defendant must demonstrate that the jury actually was prejudiced by the pretrial publicity. See *State* v. *Piskorski*, 177 Conn. 677, 685, 419 A.2d 866, cert. denied, 444

[21] The defendant argues that the trial court gave him insufficient notice that he would need to make an offer of proof, and that he was unable to present witnesses and evidence to establish the extensive radio and television coverage of the case.

[22] The trial court found: "As to the motion for a change of venue the court has reviewed the offer of proof presented to it as Defendant's Exhibit One and finds that the news events portrayed therein appear to be factual communications of such events, neither inflammatory no[r] discriminatory— and free of sensationalism, so as not to be inherently prejudicial to prevent the impaneling of a fair and impartial jury, to provide the defendant with a fair and impartial trial.

"When requesting a change of venue the defendant has the burden of showing that he could not receive a fair and impartial trial, as cited in *State* v. *Piskorski*, 177 Conn. 677, [419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)] with particular reference to 683–85. From the offer of proof the defendant has made to the court I must conclude that he has been [un]able to do so and for that reason I deny his motion for a change of venue."

U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); see also *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). The defendant has not met this burden because the trial court adequately addressed any potential prejudice during jury selection. The trial court dismissed for cause all venirepersons who were prejudiced because of their familiarity with the case. In addition, the defendant was given the opportunity to excuse for cause any remaining venirepersons who had prejudged the case on the basis of publicity. Among the twelve jurors who were chosen, three said they had had no exposure to the case, three said they had been exposed to some publicity but had not followed the story and six said they had obtained the same information from the media that had been provided by the court. In these circumstances, the defendant has not demonstrated prejudice. See *Beck* v. *Washington*, 369 U.S. 541, 555–58, 82 S. Ct. 955, 8 L. Ed. 2d 98 (1962) (denial of motion for change of venue not improper when process during jury selection ensured that each juror chosen was impartial).

Furthermore, any potential prejudice was lessened by the time delay between the pretrial publicity and the penalty phase trial. See *State* v. *Townsend*, 211 Conn. 215, 227, 558 A.2d 669 (1989) (likelihood of jury bias is lessened by " 'a significant delay between the majority of the publicity and the time of trial' "). The majority of the articles cited by the defendant were published well before the penalty phase began on March 22, 1993. Thus, because the defendant has not established any actual prejudice, I would reject his claims regarding the motion for a change of venue.

## N

### Juror Misconduct

The defendant claims that the court improperly denied his motion for a new penalty phase hearing based on allegations of jury misconduct. He argues that

he was thereby deprived of his right to due process of law, his right to an impartial jury trial, and his right to equal protection of the law under the federal and state constitutions. I would conclude that this claim is without merit.

The defendant filed a petition for a new penalty phase hearing pursuant to what was then Practice Book § 904, now § 42-55,[23] asserting that the jury had misunderstood or misapplied the trial court's instructions on determining the existence of aggravating and mitigating factors and improperly had considered the defendant's demeanor in the courtroom as evidence relating to those factors. The motion was based on postverdict radio interviews with two of the jurors, during which the jurors stated that they had found that the defendant had proved psychiatric disorders, but that those psychiatric disorders did not justify the killings. Also, during argument on the motion, counsel for the defendant stated that "upon good faith and honest belief," one of the jurors had publicly stated that the defendant's demeanor in the courtroom had affected her findings as to the existence of aggravating and mitigating factors. According to counsel for the defendant, the juror "was particularly taken by the fact that to her the defendant showed no obvious remorse throughout the trial . . . ." Relying on these facts, the defendant requested the court's permission to subpoena the juror and to conduct an evidentiary hearing on the claim of juror misconduct.

---

[23] At the time in question Practice Book § 904, now § 42-55, provided: "A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought in accordance with Gen. Stat., § 52-270. The judicial authority may grant the petition even though an appeal is pending."

General Statutes § 52-270 provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant . . . ."

The trial court treated the defendant's motion as a motion pursuant to then Practice Book § 902, now § 42-53,[24] and denied it on the ground that the defendant had not alleged trial court errors. We held in *State* v. *Brown*, 235 Conn. 502, 522, 668 A.2d 1288 (1995), that a motion pursuant to Practice Book § 902 is the proper vehicle for requesting a hearing on the issue of juror misconduct. Thus, I would conclude that the trial court's denial of the defendant's motion on these grounds was incorrect, but that any error was harmless.

To prevail on the merits of such a claim, a defendant must show that his allegations of juror misconduct were so compelling and unusual that it was an abuse of discretion for the trial court not to hold a preliminary hearing on the matter. *State* v. *Brown*, supra, 235 Conn. 524. We have held that the role of this court in reviewing a claim that a trial court abused its discretion in responding to a claim of juror misconduct is "highly circumscribed," and that abuse will be found only in a "highly unusual case." Id.

The defendant claims that the statements of two jurors that they found that the defendant had proved that he suffered from psychiatric disorders, but that the psychiatric disorders did not "justify" the killing, was evidence of juror misconduct because the statements showed that the jurors mistakenly or disobediently engaged in a weighing process in determining whether a mitigating factor existed. The only way for the trial court to determine whether the jurors were

---

[24] At the time in question Practice Book § 902, now § 42-53, provided in relevant part: "Upon motion of the defendant, the judicial authority may grant him a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his asserting the error, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him. . . ."

mistaken or disobedient in applying its instruction would be to take testimony from the jurors. This would have violated the well established common-law rule against receiving testimony "to show any matter . . . which does essentially inhere in the verdict itself . . . ." *Josephson* v. *Meyers*, 180 Conn. 302, 310, 429 A.2d 877 (1980). As we said in *Aillon* v. *State*, 168 Conn. 541, 550 n.3, 363 A.2d 49 (1975), " 'it is today universally agreed that on a motion to set aside a verdict and grant a new trial the verdict cannot be affected, either favorably or unfavorably, by the [circumstance]: that one or more jurors misunderstood the judge's instruction . . . .' " I would conclude that the trial court did not abuse its discretion by denying the defendant's request for an evidentiary hearing to present such testimony.

The defendant also claims that the alleged public statement of one juror that she considered the defendant's demeanor in the courtroom showed that that juror violated the trial court's instructions. The defendant, however, placed his character and mental state in issue by requesting the jury to consider them as mitigating factors during the penalty phase. See part II D of this dissent. Courts have held that, when the defendant has placed his mental state or character in issue, the jury properly may be asked to consider the defendant's courtroom demeanor. See, e.g., *People* v. *Heishman*, 45 Cal. 3d 147, 197, 753 P.2d 629, 246 Cal. Rptr. 673 (1988) (prosecutor properly may bring defendant's demeanor to attention of jury when defendant has placed character in issue as mitigating factor); *Commonwealth* v. *Smiledge*, 419 Mass. 156, 160, 643 N.E.2d 41 (1994) (prosecutor may properly bring defendant's demeanor to attention of jury when defendant's ability to control behavior in issue). A fortiori, the jury may, on its own, consider the defendant's courtroom demeanor when the defendant has placed his mental state or char-

acter in issue. The bare allegation that a juror, acting on her own, took the defendant's courtroom demeanor into account in determining whether a mitigating factor existed does not constitute an allegation of juror misconduct. Thus, the trial court's denial of the defendant's request for an evidentiary hearing on juror misconduct was harmless.

## O
### Death Sentence Resulted from Passion, Prejudice or Arbitrariness

The defendant's next claim is that the death sentence imposed on him should be vacated pursuant to General Statutes (Rev. to 1991) § 53a-46b (b)[25] because it was the product of passion, prejudice or some other arbitrary factor. Specifically, the defendant argues that the death sentence was a product of the passion and prejudice that accompany the killing of a police officer, noting that the state itself stated to the trial court, outside the presence of the jury, that "the murder of a police officer in the performance of his duties is so senseless, and so hateful, and so shockingly evil as to conclusively demonstrate that the conduct of the defendant was heinous . . . ."[26] I would reject this claim.

[25] General Statutes (Rev. to 1991) § 53a-46b (b) provides in relevant part: "The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor . . . ."

[26] The defendant also argues that the trial court's improper instructions regarding aggravation and mitigation, the trial court's failure to order a competency examination of him, the trial court's failure to provide him with a hearing on his motions for a change of venue, his motion for a new penalty hearing and his pro se motion to withdraw his plea, the trial court's denial of his motion for a change of venue, the trial court's improper acceptance of his guilty plea, the jury's rejection of his claims of mitigation, and all other issues raised by him illustrate that arbitrary factors led to an invalid death sentence. I am not persuaded. I have addressed each of these claims individually elsewhere in this opinion, and have concluded that the trial court acted properly in each instance.

It is true that the murder of a police officer in the performance of his duties is a shocking and repugnant crime. The defendant cannot claim that he is entitled to a jury that will have no strong negative moral response to the especially heinous and cruel murder of a police officer in the performance of his duties. That moral response, however, does not render the jury's finding that the crime was especially cruel and heinous a result of passion or prejudice. Accepting the defendant's argument would make the prosecution of horrendous crimes impossible. Accordingly, I would reject this claim.[27]

## P

### Constitutionality of Death Penalty Statute

The defendant also argues that Connecticut's death penalty statute is unconstitutional.[28] We repeatedly have held that our death penalty scheme is constitutional under both the United States and Connecticut constitutions. See *State* v. *Cobb*, supra, 251 Conn. 496–97; *State* v. *Ross*, supra, 230 Conn. 183. The defendant raises no new arguments and points to no recent developments

[27] The defendant also argues that he should not be procedurally barred in habeas proceedings from raising a claim under General Statutes (Rev. to 1991) § 53a-46b (b) (1) that, as a statistical matter, in Connecticut the race of the victim and the race of the defendant impermissibly influence the sentencing determination in death penalty cases. Because this issue was not raised at trial, there would be no point in my addressing this issue here.

[28] Specifically, the defendant claims that the statute is unconstitutional because: (1) the defendant must prove the existence of a mitigating factor by the preponderance of the evidence; (2) it incorporates a presumption that death is the appropriate sentence; (3) it requires the jury to reach a unanimous determination that some mitigating factor exists before a life sentence will be imposed; (4) it does not require the sentencer to make an individualized determination as to whether the death penalty is appropriate on the basis of the aggravating factors in the case; (5) the determination of whether a mitigating factor exists is "standardless and unreviewable"; (6) the death sentence is imposed by a formula rather than by the jury's sense of the appropriateness of the sentence; and (7) the death penalty is per se unconstitutional under the Connecticut constitution.

in either federal or state case law that would require us to reconsider those decisions. Accordingly, I would decline to do so.

## Q

### Proportionality Review

The defendant also argues that the death sentence in this case is not proportionate to the crime for which he has been convicted.[29] I would disagree.

The defendant first argues that, under traditional proportionality review,[30] the death penalty in this case is disproportionate because an "ordinary" murder by gunshot is not as a matter of law "heinous, cruel or depraved." This murder, however, was especially heinous and cruel, and was hardly an "ordinary" gunshot murder. See part I of this dissent. Accordingly, I would find that the sentence of death in this case was not disproportionate under traditional proportionality review.

The defendant also urges this court to abandon its holding in *State* v. *Webb*, supra, 238 Conn. 513, that "our statute contemplates the precedent seeking method of comparative proportionality review." The defendant argues that "precedent seeking" proportionality review cannot be applied meaningfully to Connecticut's man-

[29] General Statutes (Rev. to 1991) § 53a-46b (b) provides in relevant part: "The supreme court shall affirm the sentence of death unless it determines that . . . (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant."

[30] "Traditional proportionality review . . . is simply another term for analysis under either the eighth amendment's prohibition against cruel and unusual punishment or under our state constitutional counterpart . . . to determine whether the death sentence for certain categories of crime is inherently disproportionate." (Citations omitted.) *State* v. *Webb*, supra, 238 Conn. 510.

datory nonweighing death penalty statutory scheme[31] because, of necessity, all capital cases in which the death penalty was imposed will have an aggravating factor and no mitigating factor, and all cases in which a life sentence was imposed will have a mitigating factor. This claim was analyzed thoroughly and rejected in *Webb*. We concluded in that case that the purpose of proportionality review "is to minimize the risk that the death sentence before the court on such review was imposed by an aberrant sentencer—was wantonly or freakishly imposed by the sentencing authority—and that determination is to be made by comparing it with sentences imposed in similar cases by juries or judges in the particular jurisdiction." Id., 519–20; see also *State v. Cobb*, supra, 251 Conn. 502–508. I see no reason to abandon our previous holdings that this court is capable of making a meaningful determination of whether the sentence of death was "wantonly or freakishly imposed" under General Statutes (Rev. to 1991) § 53a-46a by comparing the case under review to similar capital felony cases in which a death penalty hearing has been held, including those that are on appeal or that have been reversed on appeal. See *State v. Cobb*, supra, 251 Conn. 518–19.

Likewise, I see no reason to abandon the definition of "similar cases" adopted by this court in *State v. Webb*, supra, 238 Conn. 528, as the defendant urges us to do. In *State v. Webb*, supra, 528, after a lengthy and in-depth analysis, we held that "the universe of cases from which we cull the ultimate pool of cases deemed 'similar cases' consists only of capital felony convictions in which

[31] General Statutes (Rev. to 1991) § 53a-46a (f) provides that when a defendant is convicted of a capital felony, and when an aggravating factor is found and no mitigating factor is found by the jury, or the court if there is no jury, the court shall sentence the defendant to death. If any mitigating factor is found, the court shall sentence the defendant to life imprisonment without possibility of release. The jury does not weigh the aggravating and mitigating factors.

there was a penalty phase hearing. . . . [T]he universe of cases includes cases currently on appeal and, absent exceptional circumstances wholly undermining the fundamental reliability of the fact-finding process, cases that have been reversed on appeal. . . . [T]he pool of 'similar cases,' for purposes of comparison to the case on review, consists of those cases in which the underlying capital felony convictions involved conduct that is substantially similar, in its criminal characteristics, to that of the defendant in the case under review." Id. We held that "[t]here is no hard and fast rule or definition of 'similar cases' that will be satisfactory—in the sense of conforming to legislative intent in establishing proportionality review—in all cases. What the ultimate pool of 'similar cases' will consist of in any particular case will have to be developed on a case-by-case basis. . . . In our view, 'similar cases' means, in general, cases in which the underlying capital felonies were based on conduct of other defendants that is substantially similar in its criminal characteristics, to that of the defendant in the case under review." Id., 525.

The defendant argues that the *Webb* definition of "similar cases" is too limiting in this case to satisfy the requirements of due process. Specifically, he contends that, as applied to his case, the definition unconstitutionally limits the universe of similar cases to a single case, *State* v. *Reynolds*, Supreme Court, Docket No. SC 15258, because that is the only other case in which a defendant was convicted of a capital felony for killing an on-duty police officer and underwent a penalty phase hearing. I would disagree. In *Webb*, we addressed this claim and concluded that, while the cases of other defendants convicted under the same subsection of the statute would generally be considered "similar cases" for purposes of proportionality review, the cases of defendants convicted under other subsections of the statutes involving comparable behavior might also be

considered "similar cases." *State* v. *Webb*, supra, 238 Conn. 525–26. We further concluded that "[t]he language of § 53a-46b (b) (3) is relatively open-textured, suggestive of a broad but not unlimited inquiry." Id., 526. "[T]he notion of similarity contain[s] some element of what such sentencing authorities would normally consider to be 'similar cases.' . . . [I]n general, sentencers' commonsense notion of similarity would include, not only the particular subsections under which the defendants were convicted, but also a consideration of the substance of the defendants' criminal behavior." Id., 527. Accordingly, I would reject the defendant's claim that, in this case, our holding in *Webb* would limit the pool of similar cases to capital felony convictions for the killing of an on-duty police officer. Thus, the statute is not unconstitutional as applied in this case.[32]

Finally, assuming, without necessarily holding, that the cases cited by the defendant constitute the appropriate pool of similar cases, I would reject the defendant's argument that the sentence of death imposed on him was comparatively disproportionate. Contrary to the defendant's claims, his conduct in accomplishing

---

[32] Furthermore, even if there was, as the defendant argues, only one "similar case" available for comparison to the case under review, I do not believe that Connecticut's death penalty statute would be unconstitutional as applied in this case, or that the death sentence would be disproportionate as a matter of law. Proportionality review is not constitutionally required in every case in which the death penalty is imposed. *State* v. *Webb*, supra, 238 Conn. 503, citing *Pulley* v. *Harris*, 465 U.S. 37, 50–51, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). Rather, proportionality review is one constitutionally sound statutory method for ensuring that the death penalty is not imposed in a "wanton, freakish, aberrant, or wholly arbitrary and capricious manner." *State* v. *Webb*, supra, 500–504. I would conclude that, even if the pool of "similar cases" was limited to one case, this court would still be able to make a meaningful determination of whether the death penalty had been imposed in a "wanton, freakish, aberrant, or wholly arbitrary and capricious manner," and the statute therefore would comply with constitutional requirements.

the murder of a police officer was no less morally culpable or reprehensible than the conduct involved in *State v. Reynolds*, supra, Docket No. SC 15528, where Reynolds was sentenced to death for the shooting death of a police officer. Moreover, the defendant's claim that his sentence is disproportionate when compared to cases in which a mitigating factor was found[33] is unavailing because the jury found no mitigating factor here. Finally, there is no merit to the defendant's argument that his death sentence is disproportionate when compared to those cases in which an aggravating factor was found,[34] as the jury found an aggravating factor existed in this case. See part I of this dissent.

For all of the above reasons, I would hold that the sentence of death for the defendant in this case was not disproportionate, but was, rather, appropriate.

---

[33] *State v. Hafford*, 252 Conn. 274, 746 A.2d 150 (2000) (conviction for rape-murder; aggravating factor—cruel; mitigating factors—inability to conform conduct to law, remorse, cooperation and regret; sentenced to life in prison); *State v. Usry*, 205 Conn. 298, 533 A.2d 212 (1987) (conviction for rape-murder; aggravating factor—heinous, cruel and depraved; hung jury on mitigating factor; sentenced to life in prison); *State v. Daniels*, 207 Conn. 374, 542 A.2d 306 (1988) (conviction for multiple murders; aggravating factor—heinous, cruel and depraved; hung jury on mitigating factor; sentenced to life in prison); *State v. King*, 249 Conn. 645, 735 A.2d 267 (1999) (conviction for rape-murder and kidnap-murder; aggravating factor—heinous, cruel and depraved; mitigating factor—found but unspecified; sentenced to life in prison); *State v. Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996) (conviction for rape-murder; aggravating factor—grave risk to others; mitigating factor—found but unspecified; sentenced to life in prison).

[34] *State v. Webb*, supra, 238 Conn. 389 (conviction for kidnap-murder; aggravating factors—heinous and cruel and prior felony conviction; no mitigating factor; sentenced to death); *State v. Cobb*, supra, 251 Conn. 285 (conviction for rape-murder and kidnap-murder; aggravating factor—heinous and cruel; mitigating factor—none; sentenced to death); *State v. Ross*, supra, 230 Conn. 183, on appeal after remand, 251 Conn. 579, 742 A.2d 312 (1999) (conviction for rape-murder and kidnap-murder, four victims; aggravating factor—heinous, cruel and depraved; no mitigating factor found; sentenced to death, remanded for new penalty hearing).

## III

There are many who believe that no decent and truly human society should execute anyone for any crime. See *State* v. *Webb*, 252 Conn. 128, 148, 750 A.2d 448 (2000) (*Katz, J.*, dissenting). We must recognize, however, that society, given its imperfect nature, ultimately depends upon a criminal code and its enforcement by some police agency. Society is itself endangered when effective law enforcement, as in this case, is mortally threatened.

Because of human frailty, the death penalty, it is also argued, may result in an injustice incapable of righting. The guilt of this defendant, however, is beyond the possibility of any human error. No one argues that the "wrong man" is to be punished.

It is also argued that imprisonment for the remainder of one's life without the possibility of release is an effective and humane substitute for the death penalty. Such a life sentence itself may some day come under attack as a cruel and unusual punishment and one that leaves the jailor without a means to curtail violent prison behavior. It may be that in the future, the force of those arguments may prevail. A change in the law may result in the defendant's release from prison in twenty or thirty years.[35] At that time, the victim may be forgotten by everyone except his family. They alone may feel the sting of the injustice, although the defendant's release would weaken our entire society. If the penalty so severe and to be dreaded is needed to save the next police officer's life and maintain our society, it must be enforced.

Accordingly, I would affirm the defendant's death sentence.

---

[35] Other circumstances also may affect the defendant's release before his death. See footnote 13 of this dissent.

SCHALLER, J., with whom MCDONALD, C. J., joins, dissenting. I agree with parts I, II, III and V of the majority opinion. I respectfully disagree, however, with the reversal of the death sentence. I would affirm that sentence. Although I agree with Chief Justice McDonald's dissent, I write separately to expand on several points. While the majority alludes to the appropriate standard of review to be applied in this case, it does not apply that standard. In reality, the majority applies a higher standard than that prescribed in *State* v. *Webb*, 252 Conn. 128, 138, 750 A.2d 448 (2000) (*Webb II*), and *State* v. *Ross*, 230 Conn. 183, 259, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995).[1] In so doing, the majority rejects the jury's legitimate determination of facts, thereby invading the province of the jury. In addition, the majority does not consider the jury's verdict on the basis of the whole record, taking into account the cumulative effect of all the facts and reasonable inferences.

I

## STANDARD OF REVIEW

This court, in *Webb II*, supra, 252 Conn. 138,[2] stated that "[a]lthough a trial court's factual findings are customarily subject to a clearly erroneous standard of review, the constitutional implications involved and the nature of the determination in any death penalty case require us to undertake an independent and scrupulous

---

[1] The defendant in *Ross* urged this court to employ a heightened standard of review in the determination of whether the state presented sufficient evidence to prove the existence of an aggravating factor. This court disagreed and, instead, applied the traditional constitutional fact-finding standard of review. *State* v. *Ross*, supra, 230 Conn. 258–59.

[2] Although the issue in *Webb II* involved the review of the trial court's conclusions with respect to the constitutionality of lethal injection as the method of execution, there is no reason, grounded in fact or law, why the prescribed standard of review would not apply to review of the jury's fact-finding, with which we are concerned in the present case.

examination of the entire record to ascertain whether the trial court's conclusions with respect to the constitutionality of the method of execution *are supported by substantial evidence.*"[3] (Emphasis added.) The majority in the present case, however, does not state this standard of review in its entirety. Page 64–65 of the majority opinion. The majority omits the vital language indicating that the fact finder's determination should be upheld as long as it is supported by "substantial evidence." The full standard, including the substantial evidence test, guides the reviewing court in its inquiry; without that crucial language, the "scrupulous examination" takes on a different meaning and proceeds on a different course. The majority recites in part the traditional standard employed in review of constitutional

[3] The correct standard of review even for cases not involving the death penalty is the following: "This determination . . . in the first instance, is a question of fact for the trial court to resolve in the exercise of a legal discretion in accordance with constitutional standards of due process. *State* v. *Derrico*, [181 Conn. 151, 162–63, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]. This, of course, includes decisions on questions of credibility presented to the trial court. *State* v. *McCarthy*, 197 Conn. 247, 258, 496 A.2d 513 (1985). Though the question is ultimately factual, our usual deference to fact-finding by the trial court is qualified on the question . . . by the necessity for an independent and scrupulous examination of the entire record to ascertain *whether the trial court's finding is supported by substantial evidence. State* v. *Smith*, 200 Conn. 465, 478, 512 A.2d 189 (1986); *State* v. *Chung*, [202 Conn. 39, 54, 519 A.2d 1175 (1987)]. *State* v. *Schroff*, [206 Conn. 182, 195–96, 536 A.2d 952 (1988)]; see *State* v. *Barrett*, 205 Conn. 437, 451–52, 534 A.2d 219 (1987); *State* v. *DeAngelis*, [200 Conn. 224, 232–33, 511 A.2d 310 (1986)]." (Emphasis added; internal quotation marks omitted.) *State* v. *Rosado*, 218 Conn. 239, 255, 588 A.2d 1066 (1991).

This standard, which consists of review of "legal discretion in accordance with . . . due process"; *State* v. *Rosado*, supra, 218 Conn. 255; is deferential to the jury as fact finder. It is worth emphasizing that we are bound, accordingly, to review the entire record for the "cumulative effect of the evidence"; *State* v. *Ross*, supra, 230 Conn. 265; while viewing that evidence, both facts and inferences, "in the light most favorable to sustaining the facts impliedly found by the jury." Id., 264. It is evident from the majority's conclusion that it applied a heightened standard that accorded the jury's fact-finding less than appropriate deference.

fact-finding on issues such as the voluntariness of a confession, citing for that proposition *State* v. *Ross*, supra, 230 Conn. 259, *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994), *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993), and *State* v. *Smith*, 200 Conn. 465, 478, 512 A.2d 189 (1986). Each of those cases expressly stated or incorporated the substantial evidence test as part of the review standard. The majority also recites, in its discussion of the standard of review, several rules embodying deference to the jury's fact-finding authority. In the course of its analysis of the question of sufficiency of the evidence, however, the majority appears to engage in a plenary review of the record and to make an independent determination, without regard to the substantial evidence test or according other deference to the jury's determination.

A review of our case law reveals that the traditional constitutional fact-finding standard of review, incorporating the substantial evidence test, first appeared in Connecticut jurisprudence in *State* v. *Frazier*, 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982), citing *Culombe* v. *Connecticut*, 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). After the standard appeared, it was adopted as the proper standard for review of constitutional fact-finding in at least two lines of cases, including death penalty cases and voluntariness of confession cases.

The complete language contained in the traditional standard of review as stated in *Webb II* did not appear expressly in three recent decisions concerning the death penalty. See *State* v. *Webb*, 238 Conn. 389, 485, 680 A.2d 147 (1996) (*Webb I*); *State* v. *Breton*, 235 Conn. 206, 221, 663 A.2d 1026 (1995); *State* v. *Ross*, supra, 230 Conn. 259. Each of those cases, however, cited to *State* v. *Medina*, supra, 228 Conn. 294, and *State* v. *Smith*, supra, 200 Conn. 478, which specifically included the

substantial evidence test. Although the substantial evidence test was not expressly stated in those recent death penalty cases, the court's continued reference to both *Medina* and *Smith* implicitly indicates that the "substantial evidence" test remained part of the constitutional fact-finding standard as applied to death penalty cases.

In view of the fact that the court in those death penalty cases upheld the juries' verdicts, the omission of reference to the substantial evidence test had less significance than it might otherwise have had. Because in the present case the majority is reversing the jury's verdict, addressing the omission of reference to the test and its effect is vital to a proper analysis. Moreover, because this court in *Webb II*, supra, 252 Conn. 138, restored the "substantial evidence" language, it is now beyond question that the substantial evidence test is a vital part of the review standard.

In *State* v. *Ross*, supra, 230 Conn. 259, this court first analogized the constitutional fact-finding standard of review for a death penalty case to that used for a case involving the voluntariness of a confession, stating that "because of the seriousness of any death penalty determination, we will subject a finding of an aggravating factor to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina*, [supra, 228 Conn. 294]; *State* v. *Smith*, [supra, 200 Conn. 478] . . . ." As stated previously, both *Medina* and *Smith* endorsed the substantial evidence test as the appropriate standard of review for fact-finding in voluntariness of confession cases. Some ambiguity existed, however, regarding whether the "substantial evidence" standard was the appropriate standard of review for voluntariness cases. This uncertainty was resolved in *State* v. *Pinder*, 250 Conn. 385, 736 A.2d 857 (1999).

In *Pinder*, this court held that "[a]s was true concerning appellate review of determinations of custodial interrogation, although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. The ambiguity apparent in our prior cases is that, while correctly citing to the relevant federal case law for the proposition that we will conduct an independent determination of voluntariness . . . we also have continued to state in these same cases that [o]n the ultimate issue of voluntariness . . . we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence. . . .

"Our continued use of the substantial evidence language, when it is inconsistent with the plenary review that we in fact conduct, perpetuates a misstatement of the law. We today clarify, therefore, that applying the proper scope of review to the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citations omitted; internal quotation marks omitted.) Id., 420–21.

This court narrowly confined the *Pinder* clarification, applying plenary review to situations dealing with "ultimate legal determination[s]." Id., 420. "Subsidiary factual determinations"; id.; such as the present, and "mixed question[s] of law and fact"; *Webb II*, supra, 252 Conn. 137; however, are still reviewed under the substantial evidence test. In any event, *Webb II* resolved

any uncertainty by expressly stating that the substantial evidence test is the appropriate standard of review to apply in death penalty cases.

## II

## APPLICATION OF THE STANDARD

The ambush slaying of Trooper Russell Bagshaw was not, as the majority concludes, an " 'ordinary' gunshot death . . . ." Page 72 of the majority opinion. The jury in this case properly found from the evidence produced, together with the reasonable and logical inferences that could be drawn consistent with the existence of an aggravating factor, that the murder was especially heinous and cruel.

Although the majority gives a reasonable account of the facts, it omits the inferences that were a vital component of the verdict. I offer the following statement of facts that I contend demonstrates that the jury had ample justification to find that there was sufficient evidence of an aggravating factor. First, there was evidence that the defendant, Terry D. Johnson, had strong animosity toward police officers prior to the murder of Bagshaw. This hostility was evidenced by a verbal encounter on June 5, 1991, that the defendant had with Steven Fields, a state trooper, and by another conversation in which the defendant stated that he hated police officers and would kill one if given the chance.

The jury also heard the following evidence detailing the murder of Bagshaw, which the defendant admitted. On June 5, 1991, the defendant and his brother, Duane Johnson, were attempting to burglarize the Land and Sea Sports Center (Land and Sea). After removing several weapons and boxes of ammunition, the defendant loaded a semi-automatic nine millimeter pistol. While the burglary was in progress, Bagshaw was making a routine patrol of the Land and Sea parking lot. After the

defendant's brother warned him of Bagshaw's presence, the defendant proceeded to wait near the building instead of fleeing. When Bagshaw's cruiser approached the Land and Sea, the defendant began firing a series of seventeen bullets, one of which fatally wounded Bagshaw.[4] Thereafter, the defendant and his brother fled the scene, leaving Bagshaw to die. The majority fails to give deference to the reasonable and logical inferences that the jury could have drawn to the effect that the defendant's senseless actions were cruel and heinous. From this evidence, moreover, the jury could have inferred that the defendant had ample opportunity to leave the crime scene without resorting to the violence that he chose. The jury, in fact, reasonably could have inferred that Bagshaw's murder was more the product of the defendant's animosity toward police officers than Bagshaw's misfortune in being in the wrong place at the wrong time.

From the testimony of Wayne Carver, the chief state medical examiner, the jury reasonably could have concluded that Bagshaw died in an excruciating manner. According to Carver, after the bullet entered through the left arm hole of Bagshaw's bulletproof vest, it passed through his left lung and heart, lodging in his right shoulder. It was also Carver's opinion that the official cause of death was this single gunshot wound to the chest. Carver explained that, although Bagshaw essentially bled to death, he could have remained conscious for as long as one and one-half minutes and could have survived for nearly twenty minutes.

---

[4] Hollow points are bullets that are designed to expand upon contact and cause greater damage to their target than ordinary bullets. This court has indicated that the jury's consideration of hollow point bullets in deciding whether an aggravating factor existed is proper. *Webb I*, supra, 238 Conn. 487 (use of hollow point bullets "further supports a finding by the jury that the defendant intentionally inflicted extreme pain and torture on the victim beyond that necessary to accomplish the murder").

The jury had every justification for concluding that Bagshaw was killed in a cruel and heinous manner. The jury could have inferred that Bagshaw unexpectedly and defenselessly drove slowly into the defendant's ambush. The jury heard that, as the first round of bullets ripped through Bagshaw's cruiser, Bagshaw cried out "Oh, my God" and, in a futile attempt to save his life, turned on his strobe lights. The jury also heard evidence from Henry Lee, chief criminalist and director of the state forensic laboratory, as to the order and trajectory of the seventeen shots fired. From this evidence, the jury reasonably could have inferred that the defendant, a sharpshooter, fired the first round of bullets in a manner either to wound Bagshaw or to place him in a situation where he feared for his life. From the facts and inferences, the jury could well have concluded that "the defendant intentionally inflicted extreme pain and torture on the victim beyond that necessary to accomplish the murder." *Webb I*, supra, 238 Conn. 487.

In addition to being bombarded with bullet fragments and flying pieces of glass, Bagshaw endured another round of bullets. The jury could have inferred that, as the defendant fired the second round of bullets, Bagshaw realized that he was in a situation that he would not survive. Although all the events occurred within a short period of time, it is reasonable to infer that Bagshaw realized that he was defenseless and helpless, as evidenced by the fact that he had no chance to remove his gun from his holster. In any event, the bullet that took Bagshaw's life was fired toward the end of the second round. In all, approximately 6.6 seconds elapsed between the firing of the first bullet and the firing of the last.

Upon being wounded, Bagshaw's lungs filled with blood. The jury reasonably could have inferred the significance to Bagshaw of the gruesome situation he had to endure. For as long as one and one-half minutes,

Bagshaw consciously suffered an agonizing death, eventually suffocating in his own blood. The applicable statutes establish no minimum time standard for a death to qualify as one that falls within the scope of the aggravating factor. Although, ninety seconds may seem a short time under normal circumstances, to Bagshaw, it may have seemed an eternity.

The jury reasonably could have considered in finding the murder heinous and cruel, the defendant's total lack of remorse or regret for his actions. The defendant on several occasions demonstrated both a lack of compassion for Bagshaw's plight and a bizarre pride in what he had accomplished. The defendant on one occasion commented that he had shot Bagshaw, and that the trooper had gotten what he deserved. On that same occasion the defendant admitted that the reason he murdered the officer was because he did not want to get caught and if he did get caught it was going to be for something big. The defendant also was observed, and described, as acting proud, stating he had no regret and would do it over again if he could.

A review of the entire record, including "the cumulative effect of the evidence"; *State* v. *Ross*, supra, 230 Conn. 265; the manner in which Bagshaw was killed and the way he died, supports the jury's verdict that the state proved beyond a reasonable doubt that the defendant engaged in "intentional conduct that inflicted extreme physical or psychological pain or torture on the victim above and beyond that necessarily accompanying the underlying killing . . . ." Page 66 of the majority opinion, citing *State* v. *Cobb*, 251 Conn. 285, 445, 743 A.2d 1 (1999). When the verdict is measured by the standard appropriate for a death penalty case; *Webb II*, supra, 252 Conn. 138; *State* v. *Ross*, supra, 259; the evidence supports that verdict. In that regard, the jury properly considered the evidence of the defendant's expressed hatred of police officers, his deliberate

decision to wait in ambush rather than leave the scene of his crime and return later to remove the arms cache that constituted the fruits of his burglary, the act of the defendant, an expert marksman, in subjecting Bagshaw to two barrages of hollow point bullets at close range, despite Bagshaw's anguished crying out and agonizing death, and the defendant's expressed "satisfaction" at his cruel punishment. This evidence amounts to a "principled way to distinguish this case from the 'ordinary' gunshot death or to differentiate it from the norm of capital felonies." Page 72 of the majority opinion.

The majority carefully recapitulates the evidence before the jury that is capable of supporting the verdict but does not consider the inferences that reasonably and logically follow from that evidence. In that regard, the majority fails to give proper consideration to the cumulative effect of the evidence, contrary to well established principles. These omissions in the majority's analysis undermine the conclusion rejecting the jury's well considered verdict. It is especially important to note that the jury was entitled to give weight to the defendant's statements before and after the murder that revealed unmistakably his hatred of police officers, his contemptuous satisfaction at having transformed Bagshaw's cruiser into "Swiss cheese," and at having given the officer "what he deserved." The defendant added that "[h]e would do it all over again."

The jury was entitled to consider the evidence of the physical events of the murder, itself, *in the context of the defendant's statements*, before and after, as they revealed the defendant's intention, thus supporting the jury's reasonable and logical inferences that the defendant acted intentionally, callously and cruelly when he killed the officer whom he had trapped in ambush. By declining to evaluate all the evidence according to the appropriate standard, including inferences properly drawn from the evidence, the majority, in essence, sub-

stitutes its own interpretation of the evidence rather than deferring to the authority of the jury's interpretation. The effect of applying this higher standard of review, which deprives the jury's fact-finding of its authority, is to raise the factual threshold that will apply to future death penalty cases, contrary to the intent of the legislature. When the proper standard is duly applied to the facts impliedly found by the jury in this case, it is beyond question that the verdict was supported by substantial evidence.

Our General Assembly, exercising its judgment on behalf of the people, has enacted a death penalty law to be applied in cases of murder so "especially heinous, cruel, or depraved"; General Statutes (Rev. to 1991) § 53a-46a (h); as to deserve this severe and dreadful penalty. A jury of twelve, lawfully constituted and lawfully instructed, has determined beyond a reasonable doubt that this case is one that warrants the imposition of the death penalty. This court is constrained to apply the review standards prescribed by law. The jury, following the law, exercised its collective judgment to reach a verdict that is supported by the evidence. However formidable the task, however grim the prospect, under these circumstances, I must conclude that the jury's verdict should be upheld.

Accordingly, I respectfully dissent.